UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

RONI GILADI,                              :

                    Plaintiff,            :    94 Civ. 3976 (RMB)(HBP)

      -against-                           :    OPINION
                                               AND ORDER
BERISH STRAUCH, HARRIS STERMAN,           :
DEBRA IRIZARRY, MONTEFIORE MEDICAL
CENTER, "JOHN DOE" and                    :
"RICHARD ROE", last two names
being fictitious, true names              :
being unknown,
                                          :
                    Defendants.
                                          :
----------------------------------X


            PITMAN, United States Magistrate Judge:


I.   Introduction


            By notice of motion dated March 6, 2006, plaintiff

moves for an Order in limine:  (1) precluding defendants' liabil-

ity expert, Joel Grad, M.D., from testifying at trial because (a)

he has failed to comply adequately with the disclosure require-

ments of Rule 26(a)(2) of the Federal Rules of Civil Procedure;

(b) his expert report is predicated upon conjecture and specula-

tion in violation of Daubert v. Merrell Dow Pharmaceuticals,

Inc., 509 U.S. 579 (1993), and (c) testimony from Dr. Grad

concerning causation of plaintiff's injuries or damages "intrudes

upon the function" of defendants' damages expert, Martin Posner,

M.D. (Plaintiff's Memorandum in Support of Motion in Limine at

11); (2) precluding Dr. Grad, as well as defendants' damages
expert Dr. Posner, from testifying as expert witnesses on ground
that they failed to timely provide an updated list of cases where
they have testified as experts in the previous four years pursu-
ant to Fed.R.Civ.P. 26; (3) precluding defendants from offering
expert or opinion testimony of non-treating physicians who
performed medical examinations on plaintiff in connection with
plaintiff's prior Workers' Compensation Claims, including Joseph
Fulco, M.D., Arthur Helft, M.D., and Jay Rosenblum, M.D. on
ground that they were not disclosed as experts under Fed.R.Civ.P.
Rule 26(a)(2)(B) and they do not qualify as treating physicians
under that rule, and (4) precluding defendants from offering
evidence or mentioning at trial (a) all collateral sources of
payments to plaintiff, (b) plaintiff's workers compensation
claims or the injuries giving rise to those claims, (c) plain-
tiff's lumbar spine injury, his eye surgery or treatment to any
other body part unrelated to his injured left arm, (d) lost
earnings beyond the initial post-operative convalescence period,
(e) employment disability, (f) testimony of plaintiff's ex-wife,
Beth Giladi and all matters related to plaintiff's matrimonial
actions, (g) plaintiff's Americans with Disabilities Act action
against his former employer, (h) records of plaintiff's air
travel, and (i) specific documents described in further detail

below.  For the reasons set forth below, plaintiff's motion is
granted in part and denied in part.

II.  Facts

⎯⎯⎯⎯⎯This is a medical malpractice action in which plaintiff
alleges that defendants committed certain acts of malpractice
during a December 1991 operation on plaintiff's left arm.

Defendants' liability expert, Dr. Grad, issued a report
on April 20, 2001, detailing his opinions on the medical treat-
ment provided by defendants in connection with the surgery at
issue in this case (Report of Dr. Joel Grad ("Report of Dr.
Grad"), annexed as Exhibit I to Affidavit of Kenneth Burford,
Esq., sworn to May 1, 2006 ("Burford Aff.")).  In his report, Dr.
Grad identified twenty five records on which he relied in forming
his opinions (Report of Dr. Grad at 1-2, annexed as Exhibit I to
Burford Aff.).  Dr. Grad expressed the opinion that there were no
deviations from good and accepted medical and surgical practice
in the care and treatment of plaintiff and no breaches in the
standard of care by any of the defendants (Report of Dr. Grad at
2, annexed as Exhibit I to Burford Aff.).

Dr. Grad also noted that the records in this case
reflect that defendant Berish Strauch, M.D. formulated an appro-
priate surgical plan prior to surgery to perform a decompression
procedure and a transposition of the ulnar nerve (Report of Dr.

3

Grad at 2, annexed as Exhibit I to Burford Aff.).  Dr. Grad noted
that depending on the specific anatomy encountered after the
surgery was commenced, these plans may or may not have been
executed, but that it is good surgical practice to defer the
final decision on exactly what surgical procedure should be
performed until the surgery has been commenced and the affected
area and structures can actually be seen (Report of Dr. Grad at
2, annexed as Exhibit I to Burford Aff.).  Dr. Grad also wrote
that Dr. Strauch's notes and testimony reflect that the risks,
benefits and alternatives of the procedure were discussed with
plaintiff in accordance with good surgical practice (Report of
Dr. Grad at 2, annexed as Exhibit I to Burford Aff.).  Dr. Grad
indicated that there is a discrepancy in the surgical records as
to whether a transposition was performed, but that this does not
suggest any deviation from good and accepted surgical technique
(Report of Dr. Grad at 2, annexed as Exhibit I to Burford Aff.).
Dr. Grad asserted that it is both accepted and reasonable surgi-
cal practice to perform a neurolysis[1] and a decompression proce-
dure[2] at both the median and ulnar nerves, at two different

---

[1]A neurolysis is:  (1) release of a nerve sheath by cutting
it longitudinally; (2) the operative breaking up of perineural
adhesions; (3) the relief of tension upon a nerve obtained by
stretching; (4) exhaustion of nervous energy, or (5) destruction
or dissolution of nerve tissue.  Dorland's Medical Dictionary
1129 (27th ed. 1988).

[2]The parties' motion papers do not define what this
                                                    (continued...)

levels, in a single procedure, and that this was not an excessive or an inappropriate surgical plan and was performed within a reasonable period of time (Report of Dr. Grad at 2, annexed as Exhibit I to Burford Aff.).

Dr. Grad noted that both plaintiff's pre- and post-operative records document that plaintiff had bilateral disease on both of his arms, and that this finding was supported by a pre-operative electromyogram of March 8, 1991 and subsequent pre- and post-operative studies (Report of Dr. Grad at 2, annexed as Exhibit I to Burford Aff.).  Dr. Grad stated that a transposition may very well have been performed on plaintiff but that the nerve may have slipped back into its normal anatomic groove after the surgery (Report of Dr. Grad at 2, annexed as Exhibit I to Burford Aff.).  Dr. Grad added that whether or not an ulnar nerve trans-position was performed does not impact plaintiff's surgical result or prognosis (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).

With respect to a contention by plaintiff's treating physician, Maurice Rousso, M.D., that no transposition was performed because a ligament known as Ligament Testutt was in its normal location when Dr. Rousso performed a subsequent surgery on plaintiff, Dr. Grad asserted that there was no reference to this

---

[2](...continued)
procedure entails.

5

ligament in Dr. Rousso's operative or pathology reports, and that the appearance of this ligament provides no indication of whether the ulnar nerve was transposed (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).

Dr. Grad found that there was no evidence in any of the records he reviewed to suggest that there was an injury to the ulnar nerve during the December 1991 surgery (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.). Dr. Grad noted that plaintiff had good sensation after the operation, full passive range of motion, and did not complain of any elbow pain until months after the surgery in April 1992 (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.). Dr. Grad opined that plaintiff improperly returned to work within days of surgery, against medical advice, and injured his left arm at that time (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.). Dr. Grad further asserted that plaintiff lifted heavy equipment from immediately after the operation through 1993 and suffered a second injury to his left arm, an injury which could have damaged the nerve and caused a neuroma[3] (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).

Dr. Grad opined that the records provided by Dr. Rousso are deficient because they fail to document any specific injury

---

[3]A neuroma is "a tumor or new growth largely made up of nerve cells and nerve fibers; a tumor growing from a nerve." Dorland's Medical Dictionary 1129 (27th ed. 1988).

to the nerve or the Ligament Testutt and fail to document that
the Ligament Testutt was excised and sent to pathology (Report of
Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).  Dr. Grad
believed that plaintiff delayed returning for further surgery
until 1994, even though it was urgently recommended to him that
he undergo the surgery as early as 1992, and that plaintiff's
result might have been better had he returned for surgery sooner
(Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).
Dr. Grad also asserted that an injury to a nerve or the formation
of a neuroma can result from a number of things, including
compression, formation of post-operative adhesions, or the
actions of the patient (Report of Dr. Grad at 3, annexed as
Exhibit I to Burford Aff.).

Dr. Grad also noted in his report that "it was impossi-
ble for Dr. Rousso to intra-operatively isolate and definitely
identify the functioning of isolated nerve fascicles of the level
of his surgery"[4] (Report of Dr. Grad at 3, annexed as Exhibit I
to Burford Aff.).  Accepting that Dr. Rousso did find severed
nerve fascicles and a neuroma, Dr. Grad opined that the likely
causes would be plaintiff's healing process, adhesions, improper
and premature use of and stress to his left arm following the
December 1991 surgery, and post-surgical trauma to the arm after

---

[4]A fascicle is "a small bundle or cluster, especially of
nerve or muscle fibers."  Dorland's Medical Dictionary 613 (27th
ed. 1988).

surgery (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.). In closing, Dr. Grad noted that plaintiff's prognosis is guarded due to the initial diagnoses and persistent subjective complaints notwithstanding Dr. Grad's belief that the defendants provided appropriate care (Report of Dr. Grad at 3, annexed as Exhibit I to Burford Aff.).

Defendants' damages expert, Dr. Posner, issued a report on March 15, 2001, detailing his opinions on plaintiff's medical condition based on a February 8, 2001 examination he conducted (Report of Dr. Martin Posner ("Report of Dr. Posner"), annexed as Exhibit J to Burford Aff.). Specifically, Dr. Posner noted in his report that plaintiff was accompanied to his examination by his attorney, Mr. Philip Dinhofer, who told Dr. Posner that plaintiff was "a victim of medical malpractice in an attempted ulnar nerve transposition," that "there was a partial severence of the ulnar nerve above the groove and he was closed up, and he was never told that" (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.). Dr. Posner's report went on to summarize Dr. Strauch's operative report from plaintiff's December 12, 1991 surgery, and noted that a second operation on plaintiff's left ulnar nerve was performed by Dr. Rousso on April 11, 1994 (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).

8

Dr. Posner noted that in response to being asked to list his current complaints in order of severity, plaintiff answered "'pain in my elbow,'" and specifically pointed to the "epicondylar groove,"[5] stating that this was "'where I had my surgery'" (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner wrote that plaintiff's other complaints were weakness, dulled sensation, but not a total loss of sensation, and sensitivity to light touch at the elbow (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner also noted that plaintiff reported having been diagnosed with bilateral carpal tunnel syndrome and bilateral ulnar nerve compressions at the elbow in March 1991 (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner's report indicated that plaintiff never underwent surgery for the nerve compression in his right arm (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner also noted that plaintiff reported having sustained a stab wound to the "volar aspect"[6] of his left forearm in September 1987, and underwent surgery two to three weeks later, which plaintiff describes as an

---

[5]An epicondyle is "an eminence upon a bone, above its condyle." <u>Dorland's Medical Dictionary</u> 565 (27th ed. 1988).

[6]Volar is defined as "pertaining to the palm or sole; plantar; indicating the flexor surface of the forearm, wrist, or hand." <u>Dorland's Medical Dictionary</u> 1847 (27th ed. 1988).

"exploration of median [sic] nerve" (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).

Dr. Posner's report stated that active range of motion of both of plaintiff's shoulders "were pain free and symmetrical as were flexion and extension of both elbows, and pronation and supination of both forearms"[7] (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner indicated that while flexing and extending his left elbow, plaintiff commented that he would experience pain if he "'did it more than once'" (Report of Dr. Posner at 1, annexed as Exhibit J to Burford Aff.).  Dr. Posner noted that upon lightly touching the olecranon[8] area of plaintiff's arm, with the elbow fully extended, plaintiff immediately recoiled his arm, winced with pain, and cradled the arm with his right hand for about one minute reporting severe pain (Report of Dr. Posner at 1-2, annexed as Exhibit J to Burford Aff.).  Dr. Posner wrote that "[a]ctive flexion and active extension of the left wrist were each to 40 [degrees] as compared

_____

[7]Flexion is "[t]he act of bending or condition of being bent." Dorland's Medical Dictionary 640 (27th ed. 1988). Pronation is "the act of turning the palm backward (posteriorly) or downward, performed by medial rotation of the forearm." Dorland's Medical Dictionary 1364 (27th ed. 1988).  Supination is "the act of turning the palm forward (anteriorly) or upward, performed by lateral rotation of the forearm."  Dorland's Medical Dictionary 1614 (27th ed. 1988).

[8]Olecranon is "the proximal bony projection of the ulna at the elbow, its anterior surface forming part of the trochlear notch." Dorland's Medical Dictionary 1172 (27th ed. 1988).

to 60 [degrees] of active flexion and 70 [degrees] of active
extension in the right wrist" (Report of Dr. Posner at 2, annexed
as Exhibit J to Burford Aff.).  Dr. Posner opined that plaintiff
was not making a maximum effort to actively flex or extend his
left wrist, despite plaintiff's claims to the contrary (Report of
Dr. Posner at 2, annexed as Exhibit J to Burford Aff.).  Dr.
Posner then noted that plaintiff's left wrist actively flexed and
extended to sixty degrees later in the examination when Dr.
Posner was measuring the girth of plaintiff's forearms (Report of
Dr. Posner at 2, annexed as Exhibit J to Burford Aff.).  Dr.
Posner also noted that plaintiff winced and appeared to be in
pain when actively flexing his right wrist;  Dr. Posner's report
indicates that when he inquired about this, plaintiff claimed to
have tingling in his thumb, index, and middle finger (Report of
Dr. Posner at 2, annexed as Exhibit J to Burford Aff.).  Dr.
Posner wrote that "[a]ctive extension was complete" for the
fingers in plaintiff's left hand, and that when plaintiff ini-
tially flexed them, they came to within two centimeters of the
"midpalmar crease" (Report of Dr. Posner at 2, annexed as Exhibit
J to Burford Aff.).  Dr. Posner indicated that "[p]assively, [he]
was able to easily press the fingertips into the palm and [plain-
tiff] was able to actively maintain them in their fully flexed
positions" (Report of Dr. Posner at 2, annexed as Exhibit J to
Burford Aff.).  Dr. Posner also wrote that there was "no rota-

tional or angulatory deformity" of the little finger, active
range of motions of the left thumb were complete, and there were
no "intrinsic contractures" in the hand (Report of Dr. Posner at
2, annexed as Exhibit J to Burford Aff.).

Dr. Posner noted that there were several surgical scars
on plaintiff's left arm, including: (1) a faint scar from plain-
tiff's 1987 surgery, measuring less than "3.0 cm," situated on
the "volar-radial aspect of the distal forearm, 3.5 cm proximal
to the wrist flexion crease";[9] (2) a faint scar in the palm area,
measuring "10.0 cm," situated in the thenar[10] crease and continu-
ing proximally into the distal forearm and ending "2.5 [centime-
ters] proximal to the wrist flexion", and (3) a scar on the
"medial aspect" of the left elbow and upper arm that measured
"13.0 cm" and ended "2.0 [centimeters] distal to the medial
epicondyle" (Report of Dr. Posner at 2, annexed as Exhibit J to
Burford Aff.).  When Dr. Posner examined the scar on the medial
aspect of plaintiff's left elbow, plaintiff told Dr. Posner that
"the scar following the 1991 operation ended in the epicondylar
groove and that the operation in 1994 required a much longer

---

[9]Radial is defined as "pertaining to the radius of the
forearm or to the radial (lateral) aspect of the arm as opposed
to the ulnar (medial) aspect."  Dorland's Medical Dictionary 1404
(27th ed. 1988).  Distal is defined as "remote; farther from any
point of reference; opposed to proximal."  Dorland's Medical
Dictionary 499 (27th ed. 1988).

[10]Thenar indicates "the mound on the palm at the base of the
thumb."  Dorland's Medical Dictionary 1705 (27th ed. 1988).

incision that ended on the volar-ulnar side of the forearm"
(Report of Dr. Posner at 2, annexed as Exhibit J to Burford
Aff.).  Dr. Posner noted that in so stating, plaintiff "pointed
to a spot 5.0 to 6.0 centimeters distal to where the scar actu-
ally ended" (Report of Dr. Posner at 2, annexed as Exhibit J to
Burford Aff.).  Dr. Posner wrote that when he pointed this out
plaintiff, plaintiff responded that he could not see the entire
scar (Report of Dr. Posner at 2, annexed as Exhibit J to Burford
Aff.).  Dr. Posner indicated that there was no "tenderness" over
the two scars in the distal forearm or palm, but that plaintiff
reported "marked tenderness" over the distal portion of the scar
at the elbow (Report of Dr. Posner at 2, annexed as Exhibit J to
Burford Aff.).  Dr. Posner noted that plaintiff remarked that
there was "'one small spot'" in the area of the elbow scar that
was causing him great pain (Report of Dr. Posner at 2, annexed as
Exhibit J to Burford Aff.).  Dr. Posner also indicated that he as
unable to "palpate the ulnar nerve" (Report of Dr. Posner at 2,
annexed as Exhibit J to Burford Aff.).

        Dr. Posner's report stated that it was impossible to
objectively evaluate plaintiff's muscle strength because "it was
obvious" that plaintiff "was not making a maximum effort to
contract the extrinsic muscles in his left forearm or the intrin-
sic muscles in his left hand" (Report of Dr. Posner at 2, annexed
as Exhibit J to Burford Aff.).  Dr. Posner noted that there was

no evidence of any muscle wasting or atrophy, and that there was
no "clawing" of the fingers (Report of Dr. Posner at 2, annexed
as Exhibit J to Burford Aff.).  Dr. Posner reported that the
girth of plaintiff's right forearm measured "just 0.5 cm" greater
than his left, and that the circumferential measurements of both
palms were equal (Report of Dr. Posner at 2, annexed as Exhibit J
to Burford Aff.).  Dr. Posner wrote that plaintiff claimed to be
ambidextrous when questioned as to which of his arms was domi-
nant, and that plaintiff further claimed to have been able to
write with equal facility using either hand prior to the 1991
surgery, but has used only his right hand for writing since that
surgery (Report of Dr. Posner at 2, annexed as Exhibit J to
Burford Aff.).

Dr. Posner next indicated that plaintiff reported a
wide zone of numbness that "extended from the medial aspect of
his left elbow, into his hand and included the ulnar one half of
the ring finger and the entire little finger" (Report of Dr.
Posner at 3, annexed as Exhibit J to Burford Aff.).  Dr. Posner
noted that the "zone of numbness in the forearm measured 10.0 cm
in width" (Report of Dr. Posner at 3, annexed as Exhibit J to
Burford Aff.).  Dr. Posner's report stated that plaintiff claimed
that the numbness in his hand and ring and little fingers was so
severe that he was unable to discriminate between sharpness and
dullness (Report of Dr. Posner at 3, annexed as Exhibit J to

14

Burford Aff.).  Dr. Posner observed that there was no difference in color, temperature or tissue turgor[11] between the "almost anesthetic ring and little fingers and the other three digits which [plaintiff] reported had normal sensibility" (Report of Dr. Posner at 3, annexed as Exhibit J to Burford Aff.).  Dr. Posner further noted that all five of plaintiff's digits were uniformly dry, and that radiographs of plaintiff's left elbow were negative (Report of Dr. Posner at 3, annexed as Exhibit J to Burford Aff.).

Dr. Posner concluded by summarizing his observations, in particular opining that "although [plaintiff] claimed a total absence of any protective sensibility in the ulnar nerve distribution in his hand, there were no trophic skin changes and no alteration in color or temperature" and that "such changes would be expected if the deficit in sensibility was as severe as he claimed" (Report of Dr. Posner at 3, annexed as Exhibit J to Burford Aff.).  Dr. Posner additionally noted that the forearm numbness was not in the "anatomical distribution" of the ulnar nerve (Report of Dr. Posner at 3, annexed as Exhibit J to Burford Aff.).  Dr. Posner further opined that there would be "muscle atrophy, and clawing of the ring and little fingers" if plaintiff's muscle weakness was as severe as he claimed, but that no

---

[11]Turgor is the "the normal consistency of living tissue." Dorland's Medical Dictionary 1777 (27th ed. 1988).

such changes were present (Report of Dr. Posner at 3, annexed as
Exhibit J to Burford Aff.).  In closing, Dr. Posner concluded
that plaintiff's complaints of "profound numbness and weakness
can not be supported by the objective physical findings" (Report
of Dr. Posner at 3, annexed as Exhibit J to Burford Aff.).

On April 16, 2001, I issued an Opinion and Order
precluding plaintiff's experts, Dr. Rousso and Dr. Fulton, from
testifying as experts in this matter due to plaintiff's failure
to comply with the disclosure requirements of Fed.R.Civ.P.
26(a)(2).  Giladi v. Strauch, 94 Civ. 3976 (RMB)(HBP), 2001 WL
388052 (S.D.N.Y. Apr. 16, 2001).  In my April 16, 2001 Order, I
declined to preclude defendants' experts, Dr. Grad and Dr.
Posner, from testifying based on their alleged failure to satisfy
the disclosure requirements of Fed.R.Civ.P. 26(a)(2), finding
that any failure by defendants to comply with the Rule was the
result of plaintiff's default.  See Giladi v. Strauch, supra,
2001 WL 388052 at *7-*8.  On May 25, 2001, I issued an Order in
which I declined to preclude the testimony of Dr. Posner for,
inter alia, failing to provide a list of cases in which he
testified as an expert in the previous four years, noting on the
record in open Court that defense counsel had provided such a
list of cases for Dr. Posner and that there was no indication
that this list was deficient.  See Giladi v. Strauch, 94 Civ.
3976 (RMB)(HBP) (S.D.N.Y. May 25, 2001).  In that same May 25,

16

2001 Order, I also declined to preclude Dr. Grad for, inter alia, failing to provide a list of cases in which he testified expert in the prior four years, however I did so without prejudice, and expressly directed defendants to provide, within ten days, supplemental information which meaningfully identified the cases in which Dr. Grad had testified between April 30, 1997 and May 25, 2001.  See Giladi v. Strauch, 94 Civ. 3976 (RMB)(HBP) (S.D.N.Y. May 25, 2001).  No renewed motion to preclude Dr. Grad's testimony followed.

On December 28, 2005, the Honorable Richard M. Berman, United States District Judge, issued a Joint Consolidated Pre-Trial Order (Joint Consolidated Pre-Trial Order ("Pre-Trial Order"), annexed as Exhibit 2 to Affidavit of Philip Dinhofer, Esq., sworn to March 6, 2006 ("Dinhofer Aff.")).  In the section of this Order entitled "Defendants' Proposed Additional Exhibits," defendants noted that they intended to call as witnesses Joseph Fulco, M.D., Arthur Helft, M.D., and Jay Rosenblum, M.D., physicians who performed medical examinations on plaintiff in connection with plaintiff's prior Workers' Compensation Claims, and to introduce their related records into evidence (Pre-Trial Order at 37, 39, 42, annexed as Exhibit 2 to Dinhofer Aff.).

III.  <u>Analysis</u>

     A.  Dr. Grad's Compliance
        With Fed.R.Civ.P. 26(a)(2)

        Plaintiff first claims that defendants' liability expert, Dr. Grad, should be precluded from testifying at trial because the opinions set forth in his report fail to comply with the specificity requirements of Fed.R.Civ.P. 26(a)(2).  In support of this claim, plaintiff argues that Dr. Grad's report is no more detailed than the report of plaintiff's expert, Dr. Fulton, whom I precluded from testifying as an expert in my April 16, 2001 Order for failing to comply with Fed.R.Civ.P. 26(a)(2). <u>See</u> <u>Giladi v. Strauch</u>, <u>supra</u>, 2001 WL 388052.

        The standards applicable to an expert witness's disclosure were set forth in <u>St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.</u>, 91 Civ. 0748 (MJL), 1996 WL 19028 at *11-*12 (S.D.N.Y. Jan. 17, 1996):

> Rule 26(a)(2)(B), as amended in 1993, provides that a party shall provide the other parties to the case with "a written report prepared by and signed by" each of its expert witnesses.  Rule 26(a)(2)(B).  The report must include "a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions . . . ." <u>Id</u>. According to the Advisory Committee notes on the 1993 amendment to Rule 26(a), paragraph (2)(B) "requires that persons retained or specially employed to provide expert testimony . . . must prepare a <u>detailed</u> <u>and</u> <u>complete</u> written report, stating the testimony the witness is expected to present during direct examination together with the reasons therefor." Rule

26(a)(2)(B) advisory committee's note on 1993 amend.
(emphasis added) . . . .

\*       \*       \*

[A report is deficient if it] fails to include any of
the <u>underlying</u> <u>conclusions</u> on which the expert's ulti-
mate opinions are based.  Bald conclusions on the
ultimate issues do not alone amount to a "detailed and
complete written report" of the expert's expected
testimony.  Rule 26(a)(2)(B) advisory committee's note
on 1993 amend.

[A report is also deficient if it] fail[s] to set
forth "a complete statement" of the "basis and reasons"
for [the] expert['s] opinions.  Rule 26(a)(2)(B).

<u>See also</u> <u>Sierra Club v. Cedar Point Oil Co.</u>, 73 F.3d 546, 571

(5th Cir. 1996) (The Advisory Committee Notes to Rule 26(a)(2)(B)

"explain that the purpose of the reports is to avoid the disclo-

sure of 'sketchy and vague' expert information, as was the

practice under the former rule."); <u>Ferriso v. Conway Org.</u>, 93

Civ. 7962 (KMW), 1995 WL 580197 at \*2 (S.D.N.Y. Oct. 3, 1995)

("Amended Rule 26 requires, not just that expert testimony be on

notice, but that notice be given in the form of a <u>written</u> report

which '<u>shall</u> contain a <u>complete</u> statement of <u>all</u> opinions to be

expressed and the <u>basis</u> and <u>reasons</u> therefor.'" (emphasis added

by the Court)).

"The 'automatic sanction' for a violation of Rule 26(a)

is preclusion." <u>Giladi v. Strauch</u>, <u>supra</u>, 2001 WL 388052 at \*3,

<u>quoting</u> <u>LaMarca v. United States</u>, 31 F. Supp.2d 110, 122-23

(E.D.N.Y. 1998); <u>see also</u> <u>Fund Comm'n Serv., II, Inc. v. Westpac</u>

<u>Banking Co.</u>, 93 Civ. 8298 (KTD)(RLE), 1996 WL 469660 at \*3

19

(S.D.N.Y. Aug. 16., 1996); 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure, § 2031.1 at 441 (2d ed. 1994). Preclusion is appropriate where an expert's report is "so inadequate that it is impossible for [the other party] to ascertain . . . the specifics to which [the expert] will testify or any of the bases from which [he or she] derived their conclusions." 251 CPW Hous. Ltd. v. Paragon Cable Manhattan, 93 Civ. 0944 (JSM), 1995 WL 70675 at *4 (S.D.N.Y. Feb 21, 1995).

Dr. Grad's report complies with the requirements of Fed.R.Civ.P. 26(a)(2). His report identifies the twenty-five records and data sources he reviewed and relied upon in forming his opinions. He specifically explained, inter alia, that his opinion that there were no deviations from accepted medical practice in the care of plaintiff was based upon his review of the medical records and that it is good surgical practice to determine whether to proceed with an ulnar nerve transposition after the surgery has commenced and the area in issue can actually be observed. He explained that plaintiff suffered from bilateral disease of both arms, as is evident from a pre-operative electromyogram from March 8, 1991 and other pre-operative and post-operative records. He specifically supported his opinion that plaintiff was not injured during the operation with reference to data from plaintiff's medical records, and noted

20

that plaintiff's injury and neuroma were likely caused by docu-
mented, improper, post-operative conduct by plaintiff -- conduct
in which plaintiff engaged against medical advice -- and a
documented post-operative injury to the same arm in a subsequent
unrelated accident.

Plaintiff's comparison of Dr. Grad's report with the
four sentence report of his precluded expert, Dr. Fulton, is
unjustifiable.  As I noted in my April 16, 2001 Opinion and
Order, Dr. Fulton's report contained only "a brief statement of
his ultimate conclusions with no explanation of the bases and
reasons therefore, no statement of how the medical records
support[ed] the conclusion and no explanation of the methodology
he utilized to draw his conclusions from the data available to
him."  Giladi v. Strauch, supra, 2001 WL 388052 at *5.  In
contrast, Dr. Grad's report is four, single-spaced, pages long
and specifically identifies the data on which he relied.  Dr.
Grad's report includes the underlying conclusions on which his
opinions are based, and sets forth a complete statement of the
bases and reasons for his opinions.  Accordingly, I find that Dr.
Grad's report satisfies the disclosure requirements of
Fed.R.Civ.P. 26(a)(2).[12]

---

[12]Defendants argue that plaintiff's motion to preclude is
barred by Local Rule 37.2 of the U.S. District Court for the
Southern District of New York, which requires a party to request
an informal conference with the court and attempt to confer with
(continued...)

B.  Admissibility of Dr. Grad's
    <u>Testimony Under Daubert</u>

Plaintiff next argues that the testimony of Dr. Grad
should be precluded because it is based upon impermissible
conjecture and speculation in violation of the principles set
forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., 509 U.S.
579 (1993).  More particularly, plaintiff contends that "there is
simply no indication of any methodology or reliable application
of that methodology to explain just how [Dr. Grad] arrived at the
opinions stated, beyond sheer ipsi [<u>sic</u>] dixit speculation"
(Plaintiff's Memorandum in Support of Motion <u>In</u> <u>Limine</u> at 10).

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., <u>supra</u>, 509 U.S. at
589, established that the trial court has a gatekeeping duty

---

[12](...continued)
opposing counsel before moving under Fed.R.Civ.P. 26.  I decline
to address this argument because it is highly probable that any
such attempt would have been futile, and the parties' failure to
engage in this conference has not resulted in any prejudice to
defendants.

under Rule 702 to ensure that any and all expert testimony admitted under Fed.R.Evid. 702 is "both relevant and reliable." "[T]he Supreme Court clarified [in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)] that, whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,'" the district court was required to "fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005), quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Performance of the gatekeeping function requires the trial court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." See Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 589. Factors that trial courts may consider in evaluating the reliability of expert testimony include: "whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation."

Nimely v. City of New York, supra, 414 F.3d at 396, quoting

Daubert v. Merrell Dow Pharm., Inc., supra, 509 U.S. at 593-94.

"[N]othing in either Daubert or the Federal Rules of Evidence

requires a district court to admit opinion evidence which is

connected to existing data only by the ipse dixit of the expert."

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  Indeed,

"when an expert opinion is based on data, a methodology, or

studies that are simply inadequate to support the conclusions

reached, Daubert and Rule 702 mandate the exclusion of that

unreliable opinion testimony."  Amorgianos v. Nat'l R.R. Passen-

ger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

As an initial matter, I find that Dr. Grad is qualified

to testify as an expert here in light of his thirty years of

experience as a practicing physician and his certification as an

orthopaedic and hand surgeon by the American Board of Orthopaedic

Surgery (Curriculum Vitae of Dr. Grad, annexed as Exhibit M to

Burford Aff.).  Plaintiff does not challenge the adequacy of Dr.

Grad's credentials to testify as an expert in this matter.

I find that Dr. Grad's opinions are reliable, based on

adequate data, and are not mere ipse dixit pronouncements.  As

discussed above, Dr. Grad's opinions are based upon his review of

twenty-five records and data sources and his extensive experience

as an orthopaedic and hand surgeon.  His opinion that determining

whether to proceed with an ulnar nerve transposition should be

deferred until after the surgery has commenced and the structures in issue can be observed is sound surgical practice, as well as his opinion concerning the appropriateness of performing a neurolysis and decompression procedure at two different levels in the same procedure, can be tested with other expert testimony or medical reference materials and would be governed by scientific standards employed in the medical profession.  His opinion that there is no evidence in plaintiff's medical records to suggest an injury to the ulnar nerve during the operation is fairly supported by plaintiff's medical records, which show good post-operative sensation and passive range of motion, and by the fact that it was not until months after the December 1991 surgery that plaintiff began complaining of pain at his elbow.  Similarly, Dr. Grad's belief that plaintiff's maladies stemmed from improper post-operative conduct, to wit, ignoring medical advice and returning to work which involved heavy lifting days after the surgery, and subsequent injury to plaintiff's left arm, is clearly grounded in plaintiff's medical and employment documentation and amenable to testing by other expert testimony or medical reference materials.  Additionally, Dr. Grad's opinions on the findings and report of Dr. Rousso are supported by data in the record and Dr. Grad's extensive experience as a hand surgeon.

Plaintiff's arguments that Dr. Grad's opinions on the appropriate standard of care are based on impermissible speculation and conjecture are also unfounded.  Plaintiff contends that because Dr. Grad's testimony does not specify whether an ulnar nerve transposition was actually performed, any opinions offered by Dr. Grad on deviations from the appropriate standard of care during the surgery are simply speculative.  However, given that Dr. Grad maintains that whether or not the transposition was ultimately performed is immaterial to plaintiff's recovery and prognosis and immaterial to determining whether there was a deviation from the appropriate standard of care during surgery, I fail to see how Dr. Grad's opinions on the standard of care are impermissibly speculative.  To the contrary, I find that Dr. Grad's report adequately articulates both how, and why, he arrived at his opinions in this matter and his opinions appear to be sufficiently reliable to assist to the trier of fact in understanding the complex medical evidence in this case.  Based on these findings, I conclude that preclusion of Dr. Grad's testimony is not warranted.  See e.g. Carroll v. Morgan, 17 F.3d 787, 789-90 (5th Cir. 1994) (finding that expert's testimony was not impermissibly speculative and was grounded in the methods and procedures of science because it was based on thirty years of experience as a practicing, board-certified cardiologist and his review of the medical records); Hopkins v. Dow Corning Corp., 33

F.3d 1116, 1125 (9th Cir. 1994) (holding that the district court
properly admitted expert testimony under Daubert as based on
valid scientific reasoning and methodology because it was based
on, inter alia, the doctors' clinical experience and review of
the medical records).  Accordingly, plaintiff's motion to pre-
clude Dr. Grad's testimony under Daubert and its progeny is
denied.

      C.  Admissibility of Dr. Grad's
          Testimony on Causation and Damages

Plaintiff next argues that Dr. Grad should be precluded
from offering testimony on plaintiff's surgical results and
prognosis, on the ground that such testimony would "intrude" upon
the function, and be cumulative of the testimony, of defendants'
damages expert Dr. Posner (Plaintiff's Memorandum in Support of
Motion in Limine at 11).  Alternatively, plaintiff argues that
Dr. Posner should be precluded from duplicating Dr. Grad's
testimony.

This issue is not ripe for adjudication.  It would
ordinarily be inappropriate for any party to call two witnesses
to offer the same testimony because such testimony would be
cumulative.  However, at this time it is impossible to know
whether Dr. Grad's testimony will be cumulative of Dr. Posner's
because neither has testified.  Accordingly, this issue would be
better determined at trial by the Honorable Richard M. Berman,

United Stated District Judge, at trial, if and when duplicative or cumulative testimony is offered.  I therefore deny without prejudice plaintiff's motion to preclude Dr. Grad's testimony on surgical results or prognosis, as well as to preclude any similar testimony by Dr. Posner.

      D.  Update of Information Contained
          in Defendants' Fed.R.Civ.P. 26(a) Disclosure

      Plaintiff next moves to preclude both experts, Dr. Grad and Dr. Posner, from testifying in this matter on the ground that defendants have failed to fulfill their obligations under Fed.R.Civ.P. 26(e) to update their expert witness disclosures.  This argument stems from a demand, faxed to defendants on November 5, 2002, for updated lists of cases in which defendants' experts testified in the prior four years, to which defendants have not responded.

      Fed.R.Civ.P. 26(a)(2)(B) requires parties to disclose for their expert witnesses, inter alia, a "listing of any other cases in which the witness has testified as an expert . . . within the preceding four years."  Fed.R.Civ.P. 26(a)(2)(C) requires parties to supplement their expert disclosures with updated information when required under Fed.R.Civ.P. 26(e)(1).  Fed.R.Civ.P. 26(e)(1), in turn, provides:

          A party is under a duty to supplement at appropri-
        ate intervals its disclosures under subdivision (a) if

> the party learns that in some material respect the
> information disclosed is incomplete or incorrect and if
> the additional or corrective information has not other-
> wise been made known to the other parties during the
> discovery process or in writing. With respect to
> testimony of an expert from whom a report is required
> under subdivision (a)(2)(B) the duty extends both to
> information contained in the report and to information
> provided through a deposition of the expert, and any
> additions or other changes to this information shall be
> disclosed by the time the party's disclosures under
> Rule 26(a)(3) are due.

Rule 26(a)(3) disclosures must be made "at least 30 days before

trial," unless otherwise directed by the court. Fed.R.Civ.P.

26(a)(3). As noted in section III.A. above, "[t]he 'automatic

sanction' for a violation of Rule 26(a) is preclusion."

Plaintiff here does not challenge defendants' initial

Rule 26(a) expert witness disclosures, but rather, defendants'

failure to supplement their initial disclosures. Plaintiff's

argument with respect to preclusion is unpersuasive, however,

because defendants have not violated Rule 26(a). By the combined

operation of Fed.R.Civ.P. 26(a)(2)(C) and 26(e)(1), a duty to

supplement information provided under Fed.R.Civ.P. 26(a) arises

where a party learns that the information initially provided was

in some material respect incomplete. The deadline for providing

supplementation in such a circumstance is the time the party's

disclosures are due under Fed.R.Civ.P. 26(a)(3), which is thirty

days before trial unless otherwise directed by the court. I find

that the amount of time that has elapsed between defendants'

initial Rule 26(a)(2) disclosures of the cases in which their

experts had testified -- April 4, 2001 for Dr. Posner,[13] and June
8, 2001 for Dr. Grad[14] -- and plaintiff's November 5, 2002 demand
is sufficient to give rise to a duty to supplement.  However,
because I have not otherwise modified the schedule set forth in
Fed.R.Civ.P. 26(a)(3), defendants had until thirty days before
trial to provide this supplementation.  As there is no trial date
set at this time, defendants are not delinquent in supplementing
their disclosures and have therefore not violated Fed.R.Civ.P.
26(a).  Accordingly, preclusion is not appropriate in this
instance and plaintiff's motion is denied in this respect.

        Plaintiff also requests, in the alternative, that
defendants be compelled to provide an updated list of cases in
which Dr. Grad and Dr. Posner have testified, current through the
date of this decision.  Given plaintiff's need to analyze the
testimony of defendants' experts and the fact that plaintiff will
ultimately be entitled to the updated information he is request-
ing, there is no reason not to grant plaintiff's request in this

---

        [13]See Dr. Posner's Rule 26 Disclosure, dated April 4, 2001,
annexed as exhibit 1 to Letter of Philip Dinhofer, Esq., dated
May 14, 2001 (Docket Item 62).

        [14]In my May 25, 2001 Order, I denied without prejudice
plaintiff's motion to preclude the testimony of Dr. Grad for
failing to provide a list of cases in which he testified in the
prior four years, and directed Dr. Grad to complete his
disclosure of this information within ten days.  See Giladi v.
Strauch, 94 Civ. 3976 (RMB)(HBP) (S.D.N.Y. May 25, 2001).  As no
renewed motion to preclude followed, I assume that Dr. Grad
adequately disclosed this information by June 8, 2001.

respect and to accelerate the deadline by which defendants must supplement their disclosures.  Accordingly, plaintiff's motion in this respect is granted and defendants are hereby ordered to provide updated lists of cases in which Dr. Grad and Dr. Posner have testified between November 5, 2002 and the present within ten (10) business days from the date of this Order.[15]

        E.  Preclusion of Dr. Fulco,
            Dr. Helft, and Dr. Rosenblum

            Plaintiff also moves to preclude defendants from offering expert or opinion testimony from physicians who per-formed medical examinations on plaintiff in connection with plaintiff's Workers' Compensation Claims, including Dr. Joseph Fulco,[16] Dr. Arthur Helft,[17] and Dr. Jay Rosenblum,[18] on grounds that they were not disclosed as experts under Fed.R.Civ.P. Rule

---

[15]As defendants have already submitted an updated list of cases in which Dr. Grad has testified as an expert between the years of 2002 and 2005, inclusive (Annexed as Exhibit G to Burford Aff.), it is not necessary to resubmit this information to the extent they have already provided it.

[16]Dr. Fulco examined plaintiff on or about the following dates:  June 21, 1996, January 29, 1997, October 24, 1997, September 4, 1998, and May 1, 1998 (Pre-Trial Order, at 39, annexed as Exhibit 2 to Dinhoffer Aff.).

[17]Dr. Helft examined plaintiff on or about January 26, 1995 and January 30, 1995 (Pre-Trial Order, at 37, annexed as Exhibit 2 to Dinhoffer Aff.).

[18]Dr. Rosenblum examined plaintiff on or about June 10, 1997 (Pre-Trial Order, at 42, annexed as Exhibit 2 to Dinhoffer Aff.)

31

26(a)(2)(b) and do not qualify as treating physicians under Fed.R.Evid. 702.

Plaintiff's argument is without merit, and provides no valid basis for precluding these witnesses. First, none of these physicians have been retained or employed by the defense in this matter, and as such, are not subject to the detailed disclosure requirements of Fed.R.Civ.P. 26(a)(2)(B). See Fed.R.Civ.P. 26(a)(2)(B) (disclosure requirements apply to a "witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony"). Accordingly, plaintiff's argument that these witnesses were not disclosed as experts under Fed.R.Civ.P. 26(a)(2)(B) fails.

Second, plaintiff has not made any showing that these physicians are unqualified to provide expert testimony under Fed.R.Evid. 702 with respect to their examinations of plaintiff for the Workers' Compensation Board. Plaintiff's contention that they are unqualified to testify as treating physicians under Fed.R.Evid. 702 because they lack the requisite doctor-patient relationship is not supported by any authority. Fed.R.Evid. 702 does not require any particular doctor-patient relationship.

Third, with respect to an expert witness not subject to the disclosure requirements of Fed.R.Civ.P. 26(a)(2)(B), Fed.R.Civ.P. 26(a)(2)(A) requires the disclosure of only the

identity of the expert.  See Fed.R.Civ.P. 26(a)(2)(A) ("[A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.").  Defendants satisfied this requirement by disclosing to plaintiff the identities of Dr. Fulco, Dr. Helft, and Dr. Rosenblum in the Pretrial Order (Pre-Trial Order, at 37, 39, 42, annexed as Exhibit 2 to Dinhoffer Aff.).  Indeed, plaintiff's position in his motion necessarily concedes that he was on notice that these individuals may be called as witnesses in this matter.

Dr. Fulco, Dr. Helft and Dr. Rosenblum are expert witnesses whose testimony may be relevant to establishing plaintiff's condition after the surgery in issue.  Since plaintiff has demonstrated no basis for precluding them from testifying about their examinations and related records his motion to preclude their testimony is denied.

F.  Motion to Preclude Defendants
    From Offering Other Miscellaneous Evidence

Since defendants do not respond to plaintiff's motion to preclude the offering of evidence concerning the following matters, plaintiff's motion to preclude is granted as unopposed with respect to:  (1) references to collateral sources of payment to plaintiff; (2) plaintiff's Workers' Compensation Claims to the

extent that they relate to injuries to body parts other than
plaintiff's left arm; (3) plaintiff's lumbar spine injury, eye
injury or injuries to body parts other than plaintiff's left arm;
(4) plaintiff's lost earnings, beyond the initial period of post-
operative convalescence and plaintiff's general physical inabil-
ity to work; (5) the testimony of plaintiff's ex-wife, Beth
Giladi, and all matters related to Plaintiff's New Jersey matri-
monial claims, litigation and orders; (6) plaintiff's lawsuit
against his former employer alleging a violation of the Americans
With Disabilities Act ("ADA"); (7) plaintiff's airline travel;
(8) documents itemized in defendants' exhibit list in the Pre-
Trial Order, annexed as Exhibit 2 to Dinhofer Aff., as Bates
stamped pages numbered 006001 through 006103, 006017 through
006026, 006042, 006049, 006054 through 006055, 006064, 006107
through 0061169,[19] 006183 through 006208, 006244 through 006261,
006271 through 006287, 006297 through 006304, 006306 through
006317, 006319; (9) defendants' Exhibit Z in the Pre-Trial Order,
annexed as Exhibit 2 to Dinhofer Aff. (transcript of plaintiff's
testimony in the ADA action); (10) defendants' Exhibit AA in the
Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (plain-
tiff's testimony before the Workers' Compensation Board); (11)

---

[19]Plaintiff in his motion requests the preclusion of
document Bates stamp numbered 0061169.  I assume that this is a
typographical error and that plaintiff seeks preclusion of
document Bates stamp numbered 006169.

defendants' Exhibit AB in the Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (Dr. Martin Posner's records, report and Curriculum Vitae); (12) defendants' Exhibit AC in the Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (records of Dr. Glukashow); (12) defendants' Exhibit AE in the Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (records of Dr. Dan Herness); (13) defendants' exhibit AF in the Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (interrogatories by plaintiff), and (14) defendants' Exhibit AH in the Pre-Trial Order, annexed as Exhibit 2 to Dinhofer Aff. (records of Dr. Ronald Kanner).

VI.  Conclusion

Accordingly, for all the foregoing reasons, plaintiff's motion in limine is hereby granted in part and denied in part. Specifically, plaintiff's motion to:  (1) preclude Dr. Grad from testifying at trial for failure to comply with Fed.R.Civ.P. 26(a)(2) is denied with prejudice; (2) preclude Dr. Grad from testifying at trial on the ground that his opinions are predicated upon conjecture and speculation in violation of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), is denied with prejudice; (3) preclude Dr. Grad or Dr. Posner from testifying at trial with respect to plaintiff's surgical results and prognosis on the ground that such testimony will be cumulative is

prognosis on the ground that such testimony will be cumulative is denied without prejudice; (4) preclude Dr. Grad and Dr. Posner from testifying at trial on ground that they failed to provide updated lists of cases where they have testified as experts in the previous four years pursuant to Fed.R.Civ.P. 26 is denied with prejudice; (5) compel the production of updated lists of cases where Dr. Grad and Dr. Posner have testified as experts in the previous four years pursuant to Fed.R.Civ.P. 26 is granted, (6) preclude defendants from offering expert or opinion testimony of non-treating physicians who performed medical examinations on plaintiff in connection with plaintiff's Workers' Compensation Claims, including Joseph Fulco, M.D., Arthur Helft, M.D., and Jay Rosenblum, M.D. on ground that they were not disclosed as experts under Fed.R.Civ.P. Rule 26(a)(2)(b) and do not qualify as treating physicians is denied with prejudice, and (7) preclude defendants from offering other miscellaneous evidence described in section III.F. above is granted.

Dated:    New York, New York
          February 6, 2007

                                        SO ORDERED

                                        _____
                                        HENRY PITMAN
                                        United States Magistrate Judge

Copies mailed to:

Kenneth J. Burford, Esq.
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, New York 10271

Philip J. Dinhofer, Esq.
Philip J. Dinhofer, LLC
77 N. Centre Ave. - Suite 311
Rockville Centre, New York 11570