127

1                    GILADI

2    Q.   And where?

3    A.   If I had any, it's in Israel.

4    Q.   That would have been by Dr. Russo?

5    A.   Dr. Russo doesn't do EMGs.

6    Q.   Who over there does EMG for you?

7    A.   For me?

8    Q.   Yes.

9    A.   I don't recall. Dr. Sadeh did for me.

10   Q.   S-A-D-E-H?

11   A.   Yes. He did for me EMG.

12   Q.   Do you have copies of any EMGs in your
13   possession?

14   A.   Whatever I had, I gave to my attorney.

15   Q.   Did you keep copies of them?

16   A.   I said whatever I have, I gave to my
17   attorney.

18        MR. DINHOFER: Who in turn gave them
19   to you already, many years ago.

20        MR. BURFORD: There is an EMG that's
21   referred to in the Workers' Compensation material
22   that apparently he produced.

23        MR. DINHOFER: By the Israeli doctor,
24   Dr. Sadeh.

25        MR. DINHOFER: Off the record.

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

1                       GILADI

2              (Whereupon, a discussion was held off

3      the record).

4         Q.     In Israel, the only one who has

5      performed an EMG on you at any time, would have

6      been Dr. Sadeh?

7         A.     To the best of my recollection, yes.

8         Q.     Did you have an EMG in October when you

9      were in Israel?

10        A.     The dates --

11               MR. DINHOFER:   This year.

12        Q.     This year, eight weeks ago?

13        A.     You need to be specific with me.

14        Q.     You told me earlier, if I recall

15     correctly, that you were in Israel in October of

16     this year?

17        A.     That's correct.

18        Q.     Six to eight weeks ago, something like

19     that.

20        A.     Yes.

21        Q.     Did you have an EMG while you were

22     there?

23        A.     No.

24        Q.     It was more than a year before you saw

25     any doctors in Israel for your left arm or wrist

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

129

                    GILADI
2   before that?
3       A.   I believe so.
4       Q.   Any recollections of having EMGs there
5   in the last five years?
6       A.   As I said, if ever I did an EMG, it
7   would be Dr. Sadeh.
8       Q.   In this country, has anyone performed
9   an EMG on you?
10      A.   Yes.
11      Q.   Who?
12      A.   Dr. Strauch's friends at Montefiore,
13  but this is a long time ago. It's prior to my
14  surgery. I do not know his name.
15      Q.   Otherwise, no?
16      A.   What?
17      Q.   The only EMGs you have had would either
18  be by Dr. Strauch's friend, prior to Dr. Strauch's
19  surgery, or by Dr. Sadeh in Israel?
20      A.   No, I had Dr. Kaplan from Einstein.
21      Q.   Anyone else?
22      A.   Not that I can recall.
23      Q.   Just so I am clear, it's my
24  understanding that you told the Court that the lost
25  earnings claim in this case is only for one or two

130

1                    GILADI

2   months?

3           MR. DINHOFER: It's the period of time
4   here that's indicated by the asterisk in Exhibit
5   A.

6           MR. BURFORD: So that's --

7           MR. DINHOFER: That was the primary
8   lost wage claim.

9           THE WITNESS: Whatever you do.

10          MR. DINHOFER: You got reimbursed by
11  other sources.

12          THE WITNESS: It's my vacation time, my
13  personal time I did not use because of this
14  problem. The problem he caused me.

15          MR. DINHOFER: Then he is amending the
16  claim.

17      Q.  So just so I am clear, the limits of my
18  lost earnings claim is for the period of time
19  December 28th through March 7th of 1992?

20          THE WITNESS: You know what, I don't
21  care. I really -- do whatever you think is right.
22  I really --

23          MR. DINHOFER: What I understand him
24  to be saying, distinct from what I understood this
25  chart to represent, I thought this chart

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

```
 1                    GILADI
 2   represented all time he lost and what was
 3   highlighted by the asterisk is what we were
 4   claiming; what he is explaining to me now, is the
 5   sick hours, the vacation hours, the leave with pay
 6   hours that he utilized.  That too is money he could
 7   have otherwise recouped from his employer.  I guess
 8   at some point, either at the end of the year or the
 9   termination of his employment, depending upon what
10   the contract provided, and had he not used these
11   times for this injury, then he would have been able
12   to recoup them otherwise.  So then in effect, all
13   of this is being claimed in this column, I guess
14   the unclaimed column is the only thing that is not
15   being claimed.
16        Q.    Sir, as you look at Exhibit A, I am
17   going to make, just so I am now clear once again.
18   The entirety of the lost earnings claim in this
19   case, sir, is $13,000 and change?
20        A.    To the best of my recollection, yes.
21        Q.    As you look at Exhibit A, does any
22   portion of the lost hours that you have on this
23   sheet, refer to or include any problem with your
24   back?
25        A.    No.  Because if you look at the chart,
```

132

```
 1                      GILADI
 2   you see that the last day was June 11, 1993.  My
 3   injury of, my back injury was June 30, 1993.
 4        Q.     The sick hours totaling 132 hours on
 5   Exhibit A?
 6        A.     That's correct.
 7        Q.     Is it your position that you could have
 8   used those sick hours for some other purpose?
 9        A.     If I was having, I had to go back, I
10   had to go to work with fever because I didn't have
11   sufficient sick time, and the reason I didn't have
12   sick time because I used it for the problem with my
13   hand.  Many times I had to take vacation time or
14   compensation time that I had in my bank because I
15   couldn't take the sick time, compensation time is
16   money for my sick time, is something that I
17   deserve, but I couldn't take because I use it for
18   my elbows condition.
19        Q.     Do you have any recollection of when,
20   as you described it, you had a fever and you ended
21   up going to work anywhere?
22        A.     I will give you a better example.  Sick
23   time is an accumulated by union contract.  In
24   October and August of 1993, I had to go on medical,
25   a medical leave with no pay.
```

```
 1                     GILADI
 2    Q.      In October of '93?
 3    A.      I said -- August.  Because I did not
 4  have enough sick time in my account.  If I was
 5  having enough sick time in my account, I could
 6  take -- sick time, partially sick time, partially,
 7  some -- I could be not on medical leave without
 8  pay, I will be able to receive some income at the
 9  time and not to fall on Workmen's Comp.
10          MR. DINHOFER:   When he is saying when
11  he injured his back in this July, when he went out
12  in August he could have then used his sick time.
13  For his back.  That he didn't use.  He didn't have
14  it?
15    A.      I couldn't use it because I used it
16  here (indicating) and I lost all my hours.
17    Q.      When you injured your back, I
18  understand you are saying you didn't use your sick
19  time because it had been used for your wrist or
20  your elbow?
21    A.      Correct.
22    Q.      But you were compensated by Worker's
23  Comp. for the time you were off for your back,
24  correct?
25    A.      As I said, this is an example, how I
```

                                                              134

1                       GILADI
2    ~~can use one thing against the other, you want~~
3    ~~something specific that I can use? I you told me~~
4    ~~when I have cold when I have~~ --
5              MR. DINHOFER:  Roni.  Let the record
6    reflect Workmen's Compensation is not a complete
7    remedy in terms of wages, I think everybody knows
8    that it's a matter of public record.  Workers'
9    Compensation pays you a portion of your wage, not
10   the whole thing, this would have guaranteed him his
11   full wage.
12        Q.   You mentioned earlier, sir, that you
13   had a recollection, or you gave us an example of
14   going to work when you were sick.  Other than what
15   you just told me about your back, do you have any
16   other recollections of going to work while you were
17   sick because you were out of sick time?
18        A.   If you have a stomach virus you have a
19   lot of things, I cannot tell you we are talking
20   about years back.
21        Q.   I am just following up on something you
22   said.  That's the only reason I bring it up.
23        A.   And I am trying to give you an answer,
24   but I cannot.  You can have a headache in the
25   morning and you cannot go to work.

```
 1                      GILADI
 2       Q.      When your sheet here, sir, says
 3  "average payment per hour," what was the range?
 4       A.      It goes from 19, '93 to -- this is, all
 5  of them are in neighborhood of $19 per hour.
 6       Q.      What was it on November 30th, and what
 7  was it on June 11th?
 8       A.      As I said, it's -- the average, the
 9  differences may be a few cents difference like
10  50-cent difference, or something like that per hour
11  difference.  I cannot tell you exactly at the
12  moment.  Because the maximum can be different.
13       Q.      Are any of your expenses paid for by
14  any of the Jacobs?
15       A.      No.
16       Q.      Do you currently pay the Jacobs rent?
17       A.      No.
18       Q.      Do you pay child support?
19       A.      I am following the Court Order.
20       Q.      My question however was, do you send
21  off a payment for child support, with whatever
22  regularity the Court requires?
23       A.      I said what the Court Order told me, I
24  am doing.
25       Q.      Have you had any offers of employment
```

```
                                                        136
 1                       GILADI
 2   since you graduated from college?
 3        A.   No.
 4        Q.   From the process of applying for a job,
 5   how far have you gotten in any particular job?
 6        A.   Most of the time on the first
 7   conversation was no.
 8        Q.   What sort of topics are typically
 9   discussed during those conversations?
10        A.   Their need.  What I can do for them.
11   What is my knowledge.
12        Q.   When you are discussing employment with
13   a prospective employer, how do you describe your
14   disability?
15        A.   I do not recall, maybe some of the
16   cases I did, some of the cases I didn't, I do not
17   know.
18        Q.   Not necessarily asking about any
19   specific case, but generally speaking, when you are
20   talking to a perspective employer, what do you say
21   about your disability?
22        A.   If anybody asks me if I can do A, B and
23   A, B and C, I am not going to lie.  If I cannot do
24   it, I say with some accommodation I can do it.
25        Q.   What sort of accommodation?
```

137

```
 1                    GILADI
 2      A.   ~~I never went through this kind of
 3   conversation.  Except with my employer, Albert
 4   Einstein College of Medicine.~~
 5           MR. BURFORD:   Thank you very much.
 6           (Whereupon, at 2:40 p.m., the
 7   Examination of this Witness was concluded.)
 8
 9
10                            _____
11                                 RONI GILADI
12
13   Subscribed and sworn to before me
14   this _____ day of _____, 2000.
15
16   _____
17        NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

```
                                                              138
 1                         GILADI
 2
 3
 4                       E X H I B I T S
 5
 6    DEFENDANT'S EXHIBITS:
 7
 8    EXHIBIT         EXHIBIT                         PAGE
 9    NUMBER          DESCRIPTION
10
11       A            Chart                            48
12       B            '95 tax return                   88
13       C            '92 State tax return             90
14
15
16
17
18
19
20
21
22
23
24
25

         DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY
```

1                           GILADI

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK     )
                           : SS.:
5    COUNTY OF KINGS       )

6

7

8            I, EVELYN KIPERMAN, a Notary Public for

9    and within the State of New York, do hereby

10   certify:

11           That the witness whose examination is

12   hereinbefore set forth was duly sworn and that such

13   examination is a true record of the testimony given

14   by that witness.

15           I further certify that I am not related

16   to any of the parties to this action by blood or by

17   marriage and that I am in no way interested in the

18   outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto set

20   my hand this 12th day of December, 2000.

21

22

23                          _____Evelyn____Kiperman_____

24                                 EVELYN KIPERMAN

25

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY