# EXHIBIT E

# In The Matter Of:

*RONI GILADI   v.*
*ALBERT EINSTEIN COLLEGE OF MEDICINE*

---

*RONI GILADI*
*June 23, 1998*

---

*ESQUIRE DEPOSITION SERVICES*
*216 EAST 45TH STREET*
*8TH FLOOR*
*NEW YORK, NY  10017-3304*
*(212) 687-8010*

*Original File rg062398.v1, 165 Pages*
*Min-U-Script® File ID: 4130745116*

**Word Index included with this Min-U-Script®**

Page 415

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1] UNITED STATES DISTRICT COURT
[2] SOUTHERN DISTRICT OF NEW YORK

[4] RONI GILADI,                     )
[5]          Plaintiff,              )
[6]     vs.                          )
[7] ALBERT EINSTEIN COLLEGE          )
[8] OF MEDICINE,                     )
[9]          Defendant               )

[14] CONTINUED DEPOSITION OF RONI GILADI
[15]        New York, New York
[16]        Tuesday, June 23, 1998

[24] Reported by:
     ROBERT X. SHAW, CSR
[25] CSR NO. 817
     JOB NO. 74347

---

Page 416

[5] June 23, 1998
[6] 10:23 a.m.

[9]    Continued Deposition of RONI GILADI,
[10] held at the offices of Sive Paget & Riesel,
[11] P.C., 460 Park Avenue, New York, New York,
[12] pursuant to Adjournment, before Robert X.
[13] Shaw, CSR, a Notary Public of the State of
[14] New York.

---

Page 417

[2] APPEARANCES:

[4] LAW OFFICES OF PHILIP J. DINHOFER
[5] Attorneys for Plaintiff
[6]     450 Seventh Avenue
[7]     New York, New York 10123
[8] BY:  PHILIP J. DINHOFER, ESQ.
[9]      JOHN L. LEIFERT, ESQ.

[12] SIVE PAGET & RIESEL, P.C.
[13] Attorneys for Defendant
[14]     460 Park Avenue
[15]     New York, New York 10022
[16] BY:  DANA SADE, ESQ.
[17]      -and-
[18]      WENDY SMITH, Law Assistant

---

Page 418

[1]                    *Giladi*
[2] RONI GILADI, called as a
[3] witness, having been previously duly sworn
[4] by the Notary Public, was examined and
[5] testified as follows:

[6]           **EXAMINATION BY**
[7]             **MS. SADE:**

[8]     **Q:** Mr. Giladi, you understand that you
[9] are still under oath?
[10]    **A:** Yes, I do.
[11]    **Q:** The instructions I gave you at the
[12] last two days of deposition still stand.
[13]        If you have any clarification that
[14] you need on a question, please let me know. If
[15] you need to take a break, please let me know.
[16]    **A:** Yes.
[17]    **Q:** What's the current status of your
[18] current medical malpractice against Montefiore?
[19]    **A:** I don't know.
[20]    **Q:** Are you currently engaged in
[21] depositions?
[22]    **A:** I said, the status of my lawsuit I
[23] don't know. You have to talk with my attorney
[24] about this issue.
[25]    **Q:** You have not discussed this matter

---

RONI GILADI
June 23, 1998

RONI GILADI  v.
ALBERT EINSTEIN COLLEGE OF MEDICINE

---

Page 419

[1]                    *Giladi*

[2] with your attorney?

[3]   **A:** Not for the last year.

[4]   **Q:** Has the case been active during the

[5] last year?

[6]   **A:** I said, I don't know.

[7]   **Q:** The question is, has the case been

[8] active during the last year?

[9]   **A:** I said that I have not talked with my

[10] attorney for the last year. You as an attorney,

[11] I think you know what that means.

[12]   **MS. SADE:** We are on Exhibit 11.

[13]   I would like to mark as Exhibit 11, a

[14] notice of discrimination, which appears to

[15] have been filed by Mr. Giladi, that was sent

[16] to the Albert Einstein College of Medicine,

[17] dated 5/8/95.

[18]   (Defendant's Exhibit 11, EEOC

[19] documents, Bates D-00864 to 867, marked for

[20] identification as of this date.)

[21]   **Q:** Can you please let me know when you

[22] have had a chance to review all of the pages of

[23] that document.

[24]   **MR. DINHOFER:** The notice of charge of

[25] discrimination is generated by the EEOC and

---

Page 420

[1]                    *Giladi*

[2] not by the plaintiff. There are four pages

[3] comprising this document, previously Bates

[4] stamped 000864, 865, 866 and 867. 866 and

[5] 867 are again EEOC generated documents, only

[6] 865 is a document that appears to be

[7] generated by Mr. Giladi.

[8]   **MS. SADE:** Have you finished reviewing

[9] it?

[10]   **A:** I have not reviewed it yet.

[11]   **MR. DINHOFER:** Read it. Take your

[12] time.

[13]   **A:** I read the documents that I

[14] submitted.

[15]   **MR. DINHOFER:** Did you read the last

[16] two pages, too?

[17]   **THE WITNESS:** I read it, but I did not

[18] understand it. It is on your request.

[19]   **MR. DINHOFER:** Did you reidentify –

[20]   Did you read it, yes or no? I am

[21] asking you a simple question, not a story of

[22] your life.

[23]   **THE WITNESS:** Not fully.

[24]   **Q:** You have plenty of time, Mr. Giladi.

[25] Why don't you go ahead and read it and

---

Page 421

[1]                    *Giladi*

[2] let me know when you are done.

[3]   **A:** Yes.

[4]   **Q:** Do you recognize the second page of

[5] that document, Bates D 865?

[6]   **A:** Yes.

[7]   **Q:** Can you tell me what that is?

[8]   **A:** It is an initial complaint to the

[9] EEOC.

[10]   **Q:** Did you draft that document,

[11] Mr. Giladi?

[12]   **A:** Yes.

[13]   **Q:** Did anyone assist you in drafting that

[14] document?

[15]   **A:** My attorney drafted, typed it for me.

[16]   **Q:** Are those your four signatures at the

[17] bottom of this document?

[18]   **A:** Yes.

[19]   **Q:** Are all of them your signatures?

[20]   **A:** Yes.

[21]   **Q:** Can you tell me why you signed the

[22] document four times?

[23]   **A:** Because first, I signed the signature

[24] where I thought it should be signed and then my

[25] attorney told me I had to do it over.

---

Page 422

[1]                    *Giladi*

[2]   **Q:** Have you authorized your attorney to

[3] sign your name to documents on your behalf?

[4]   **A:** I authorized my attorney to do

[5] whatever was necessary to have the case done.

[6]   **Q:** The question is –

[7]   **A:** I authorized my attorney to do

[8] whatever is necessary to have the case run

[9] smooth.

[10]   **Q:** But that is not the question that I

[11] asked you. I asked you if you ever specifically

[12] authorized your attorney to sign your name to

[13] documents on your behalf?

[14]   **A:** It is my signature.

[15]   **Q:** That was not the question either, and

[16] I am not asking you just with respect to this

[17] document. I am asking have you ever authorized

[18] your attorney to sign your name to documents on

[19] your behalf?

[20]   **A:** I think I responded.

[21]   **Q:** No, you did not?

[22]   **A:** I did respond.

[23]   **Q:** It is a yes or no answer.

[24]   **A:** Okay. It is your opinion and not my

[25] opinion, and I think I gave you the right answer.

---

Page 423

### Giladi

[1]
[2]    Q: Mr. Giladi, it is a very simple
[3] question.
[4]    MR. DINHOFER: It is very
[5] argumentative.
[6]    A: I am not going to change my answer.
[7]    Q: Are you aware of the fact that if you
[8] don't answer questions, the court can order you
[9] to come back and answer questions at your
[10] expense?
[11]    A: The answer is, I think I answered the
[12] question to the full extent that I should answer
[13] and I gave you the right answer.
[14]    Q: Was the answer to that yes or no?
[15]    A: The answer is, I gave my attorney the
[16] authorization to do whatever was necessary to run
[17] the case smoothly.
[18]    Q: Did that authorization include
[19] authority –
[20]    Let me finish the question.
[21]    A: Whatever is necessary.
[22]    Q: You have to let me finish the
[23] question.
[24]    The question is, did that
[25] authorization to your attorney include the

Page 424

### Giladi

[1]
[2] authority to sign your name to documents on your
[3] behalf?
[4]    A: I think I responded to you, and I am
[5] not going to change what I said.
[6]    Q: It is a yes or no answer, Mr. Giladi.
[7]    A: Not everything is a yes or no answer.
[8]    Q: This is a yes or no question.
[9] Did you authorize your attorney to
[10] sign your name on documents on your behalf?
[11]    A: When I have given authorization to
[12] do, to my attorney to do what is, whatever is
[13] necessary for the case, this is privilege to
[14] whatever is necessary. Whatever necessary is, he
[15] is an attorney and he is a good one and he will
[16] do the case properly.
[17]    Q: Does that includes signing documents,
[18] your name to documents on your behalf?
[19]    A: I don't understand why you are pushing
[20] for this kind of situation.
[21]    Q: It is a very simple question,
[22] Mr. Giladi. I am just looking for a yes or no
[23] answer. Have you authorized your attorney to
[24] sign your name to documents on your behalf?
[25]    A: As I said, I responded and you can do

Page 425

### Giladi

[1]
[2] whatever is necessary to do, if you are not happy
[3] with the answer.
[4]    Q: You have not given me an answer yet,
[5] Mr. Giladi.
[6]    A: I gave you an answer for the last five
[7] minutes.
[8]    Q: You have not?
[9]    A: In my opinion, it is not yes or no and
[10] I gave you the answer the way I feel should be
[11] answered.
[12]    Q: You are aware of the fact that you
[13] have not given me a yes or no answer to this
[14] question.
[15]    A: I think you understand that you are
[16] refusing to accept my answer.
[17]    Q: I am just going to say once again,?
[18] Mr. Giladi, you should probably talk
[19] to your attorney about this, but I will request
[20] that the court have you come back and order you
[21] to talk, to answer the question.
[22]    A: I would like the privilege to talk
[23] with my attorney outside.
[24]    Q: You are welcome to.
[25]    (Witness and counsel leave room.)

Page 426

### Giladi

[1]
[2]    MS. SADE: Let the record reflect
[3] that the witness and his attorney convened
[4] outside.
[5]    We are back on the record.
[6]    MR. DINHOFER: Let the record reflect
[7] that the constitution of the United States
[8] of America gives my client the absolute
[9] right to consult with his attorney at any
[10] stage and at any time during this
[11] proceeding.
[12]    MS. SADE: Citing the Constitution is
[13] very interesting.
[14]    MR. DINHOFER: There is no reason to
[15] cite anything on the record, but if you are
[16] going to make a cite, I am going to make a
[17] cite.
[18]    Q: As far as you know, has your
[19] attorney ever signed your name to a document
[20] on your behalf?
[21]    A: My attorney never signed my signature
[22] on documents.
[23]    Q: As far as you know.
[24]    A: Yes.
[25]    Q: As far as you know, has your attorney

Page 427

Giladi

[1]
[2] ever photocopied your signature to a document on
[3] your behalf?
[4] **A:** You are asking me about if my attorney
[5] did that. You are going into too many things.
[6] **Q:** Mr. Giladi, you are here to answer
[7] questions.
[8] **MR. DINHOFER:** One second.
[9] **Q:** You are not here to argue.
[10] **MR. DINHOFER:** I will stipulate that I
[11] have. I don't know it was photocopied or if
[12] it was a scan of his signature with his
[13] consent for the authorization of forms that
[14] I have given you; yes. That is done with
[15] the consent of the client.
[16] **MS. SADE:** That's all we were trying
[17] to establish.
[18] **MR. DINHOFER:** You can't ask him what
[19] I did.
[20] **MS. SADE:** I can ask if he authorized
[21] you to do that.
[22] **MR. DINHOFER:** Did you authorize me
[23] to scan your signature on two forms, into
[24] forms?
[25] **THE WITNESS:** Yes.

Page 428

Giladi

[1]
[2] **MR. DINHOFER:** Thank you.
[3] **MS. SADE:** Mr. Dinhofer, I will ask
[4] you to refrain from asking questions until
[5] it is your time to answer questions.
[6] **MR. DINHOFER:** What does it have to do
[7] with what happened at the hospital? You are
[8] wasting time with this nonsense.
[9] **MS. SADE:** Your client is wasting time
[10] here by not answering the question. We will
[11] stay here as long as is necessary.
[12] **MR. DINHOFER:** If he doesn't
[13] understand and he wants to consult with
[14] his attorney afterwards, that is his
[15] Constitutional God given right.
[16] **Q:** Mr. Giladi, can you please look at
[17] Exhibit 11, page D 865.
[18] **A:** Yes.
[19] **Q:** That exhibit states in the third
[20] paragraph, despite my repeated requests for
[21] reasonable accommodation, my employer has denied
[22] me the opportunity to work with my physical
[23] limitations; is that correct?
[24] **A:** Yes.
[25] **Q:** Can you please identify what

Page 429

Giladi

[1]
[2] request you made to your employer for reasonable
[3] accommodations?
[4] **A:** You want it again?
[5] **Q:** I will ask you what you meant in this
[6] document, when you stated despite my repeated
[7] requests for reasonable accommodations?
[8] **A:** I requested to have a chair in a
[9] darkroom, in the darkroom.
[10]     I requested that a table will be built
[11] that will be in a height that the chair that they
[12] were going to give me will be, will fit with a
[13] height that I can do the work that they require
[14] me to do.
[15]     And I requested that the jobs that
[16] are, that the department at that time should be
[17] divided fairly between the workers so that I can
[18] do not only darkroom but also photography work.
[19]     And I requested part-time employment
[20] if they are refusing to provide me with all these
[21] accommodations.
[22]     And I provided, I asked for, I asked
[23] for other from Ms. Zuckman to look for a job that
[24] would fit my medical disability, my physical
[25] disability.

Page 430

Giladi

[1]
[2]     And I think this is what I remember at
[3] that moment, and I think that is enough.
[4] **Q:** When did you make these requests?
[5] **A:** For the period of August 12th, 1994 to
[6] the last day of the hearing, I think it was
[7] November 20th or something like that.
[8] **Q:** When you say the hearing, what are you
[9] referring to?
[10] **A:** The grievance hearing.
[11] **Q:** To whom did you make these requests?
[12] **A:** I made the requests initially with my
[13] direct supervisor, Mr. Rick DeWitt.
[14] **Q:** Which of the accommodations that you
[15] previously identified did you request that he
[16] provide you with?
[17] **A:** He did not provide me with anything.
[18] **Q:** Which did you request is the question?
[19] **A:** I requested everything except for to
[20] look for another job in the institution.
[21] **Q:** Did you request that he provide you
[22] with part-time work?
[23] **A:** Yes.
[24] **Q:** You requested that he provide you with
[25] a table?

**Min-U-Script®**

*Giladi*

[1]
[2] A: I requested that the engineering
[3] department, which we have in the institution, was
[4] not going to cost anything to the institution to
[5] really to build a table that will be comfortable
[6] for me to do my work and to have a chair.
[7]    We had enough chairs in the department
[8] that they could assign me one of the chairs, but
[9] he refused. He said you have one chair there and
[10] that's it.
[11] Q: What chair? I am sorry.
[12] A: And do the job the way it is.
[13] If you don't want to do the job the
[14] way I am telling you to do it, you know what we
[15] will do.
[16] Q: What chair was he referring to?
[17] A: The high chair, the stool which is not
[18] comfortable for me to work with.
[19] Q: This high chair that was located in
[20] the darkroom?
[21] A: Yes. It was there for God knows how
[22] many years.
[23] Q: Did you request an accommodation from
[24] anyone besides Mr. DeWitt?
[25] A: As I recall I asked only from him, but

*Giladi*

[1]
[2] I asked for Ms. Altman.
[3] Q: Mr. Altman?
[4] A: Mr. Altman. But I can't testify to
[5] that, I don't recall exactly what I did.
[6]    I think I was following one of the
[7] letters that I received from Dr. Levine that told
[8] me whatever problem I have in the department I
[9] should do it only with my direct supervisor.
[10]    I was limited by his letter, and I
[11] followed Dr. Levine's instructions, and I tried
[12] to solve the problem with Mr. DeWitt.
[13] Q: What letter are you referring to,
[14] Mr. Giladi?
[15] A: One of the many harassment letters
[16] that I received, trying to control me and
[17] intimidate me into just to cause a lot of
[18] harassment on me.
[19]    And I received too many letters, and
[20] I don't remember which one of them, one of the
[21] letters he wrote me.
[22]    He said that anything in the
[23] department that I have to discuss with my direct
[24] supervisor and not the other people. I did what
[25] he told what he told me to do.

*Giladi*

[1]
[2] Q: Is Dr. Levine an employee of AECOM at
[3] this point? You are talking about August of
[4] 1994?
[5] A: I came to the department.
[6] Mr. Altman was new to me.
[7] I did not have with him any direct
[8] contact fairly for five or ten minutes.
[9]    He told me, as I recall, he said go
[10] talk with Rick.
[11]    And my opinion, in my opinion Rick is
[12] my direct supervisor and he is the only one that
[13] is assigning jobs for me and whatever, so I spoke
[14] with him.
[15] Q: The question was, was Dr. Levine an
[16] employee of AECOM in August of 1994, during this
[17] period?
[18] A: I said no, Altman was just –
[19] Q: The answer is no, Dr. Levine was not
[20] even an employee at this point?
[21] A: No.
[22] Q: When did you receive the letter from
[23] Dr. Levine that instructed you to bring problems
[24] to your supervisors?
[25] A: I don't remember. I said I received a

*Giladi*

[1]
[2] lot of harassment letters and this was one of
[3] them.
[4] Q: Did you request accommodations from
[5] anyone besides Mr. DeWitt?
[6] A: During the grievance yes, from
[7] Ms. Zuckman.
[8] Q: By the grievance are you referring to
[9] the November of 1994 meeting?
[10] A: The November and by September, but in
[11] September I said the same thing.
[12] Q: During the September 1994 meeting?
[13] A: Yes.
[14] Q: What exactly did you ask for during
[15] the September 1994 meeting?
[16] A: I asked for accommodations that will
[17] fit my medical limitations.
[18] Q: Did you identify what those
[19] accommodations would be?
[20] A: Everything that the doctor said that I
[21] am not allowed to do or I should not do.
[22]    If you can find a job for me that I
[23] can fit or I can do, with these limitations.
[24] Q: Did you recommend to her any specific
[25] jobs that you would do consistent with your

Page 435

*Giladi*

[2] limitations during the September of 1994 meeting?

[3]   A: In the institution, almost 2,000 jobs

[4] and she knows better than me what's in the

[5] institution and I can't, I wanted her to make a

[6] decision based on my –

[7]   And also, I don't remember

[8] specifically if I said exactly what job to do,

[9] but I think I said something, but I don't recall.

[10]   Q: Is the answer that you don't recall

[11] whether you specifically identified jobs that you

[12] could perform?

[13]   A: No. I don't recall if I specified

[14] the job, but I asked for an accommodation that

[15] she feels will fit what my disability is.

[16]   And her response was that I will give

[17] you custodian work, which is really fit with the

[18] doctor's note.

[19]   I am sarcastic.

[20]   Q: Did you have any specific jobs in mind

[21] in September of 1994 that –

[22]   MR. DINHOFER: Don't be sarcastic.

[23]   Q: – that you could perform consistent

[24] with your limitations?

[25]   A: I could do, I could do my, our

Page 436

*Giladi*

[2] department clerk job. I did before all of the

[3] entry into the computer, and I could do telephone

[4] work.

[5]   Q: Have you made any attempt to get a job

[6] doing telephone work since August of 1994?

[7]   A: No. As I said to you, before, when

[8] I realized that my medical limitation made me

[9] lose my job because my boss refusing to accept

[10] me with my limitation and refused to give me

[11] accommodations.

[12]   And especially when my boss is telling

[13] me that nobody would hire you for any jobs, I

[14] decided to go back to school to educate myself in

[15] a new field and this is what I did.

[16]   Q: Does that mean that you did not make

[17] any attempt to get a job doing input into

[18] computers since August of 1994?

[19]   A: I was, I said to you the last time and

[20] I will say it again, I will repeat it again.

[21]   I did not want to lose a year or two

[22] looking for a job, and then to go to school.

[23]   I made the decision that it is

[24] necessary to, it is necessary to do, is to go

[25] immediately to school to build myself with the

Page 437

*Giladi*

[2] new field, with a new profession, that my

[3] limitations would not affect my profession.

[4]   And this is what I did. I would hope

[5] that I would find a job and move into a new

[6] field.

[7]   MS. SADE: Would you read back the

[8] previous question and answer.

[9]   (Record read.)

[10]   Q: You testified that your boss was

[11] telling you that nobody would hire you for any

[12] jobs?

[13]   A: He said you are no good for anybody.

[14]   Q: Who were you referring to, who made

[15] that statement?

[16]   A: Rick DeWitt, I believe.

[17]   Q: When did he make that statement?

[18]   A: On one of the days that I was there.

[19]   Q: During August of 1994?

[20]   A: Yes.

[21]   Q: Who was present when he made that

[22] statement?

[23]   A: Aaah –

[24]   Q: Who was present?

[25]   A: I don't know.

Page 438

*Giladi*

[2]   Q: Was anybody besides you there when he

[3] made that statement?

[4]   A: I don't know.

[5]   Q: Where were you?

[6]   A: In the department.

[7]   Q: Where in the department?

[8]   A: We had many conversations. It is one

[9] of the things that I have in my mind.

[10]   Q: Do you remember anything else about

[11] that conversation?

[12]   A: Specifically, just what I remember at

[13] the moment.

[14]   Q: Do you remember what was discussed

[15] before he made that comment?

[16]   A: If I remember, I will tell you later

[17] on.

[18]   Q: Do you remember what happened

[19] subsequent to that comment?

[20]   A: I said, I don't remember. I told you

[21] what I remember.

[22]   Q: It is the only thing that you remember

[23] about the conversation?

[24]   A: At this moment.

[25]   Q: Okay. Other than Mr. DeWitt,

*Giladi*

[1]
[2] Ms. Zuckman and possibly Mr. Altman, who else
[3] did you make requests to, for reasonable
[4] accommodation for you at AECOM?
[5]    **A:** It is the only people that I have
[6] contact with.
[7]    **Q:** During the period August 12th, 1994
[8] through August 24, 1994.
[9]    **A:** Okay.
[10]    **Q:** August 12th, 1994, that is the date
[11] that you returned, and August 24, 1994, which is
[12] I believe the last day that you worked, or the
[13] last date or that period after you returned, did
[14] you make any attempt to discuss your situation
[15] with your union?
[16]    **A:** To the best of my knowledge, I don't
[17] recall.
[18]    **Q:** Prior to August 12th, 1994, which is
[19] the day that you returned, did you make any
[20] request for reasonable accommodations of your
[21] physical limitations to AICOM?
[22]    **A:** Prior to August 12th?
[23]    **Q:** Yes.
[24]    **A:** I cannot, I cannot recall. At the
[25] moment I may have, I have to think about it for a

*Giladi*

[2] while.
[3]    If I recall anything, I recall that I
[4] told them that I cannot sit in the darkroom for a
[5] long time.
[6]    **Q:** Prior to August 12th of 1994?
[7]    **A:** Yes. I think, there were times in
[8] 1993 that I was given too many other jobs to do,
[9] I was doing clerker work, I was doing darkroom, I
[10] was doing photography, I was doing copying.
[11]    And I believe one of the days he gave
[12] me, I think I only had two days that he gave me
[13] some work in the photography work. And I told
[14] the supervisor at the time that I cannot do
[15] darkroom for this period of time.
[16]    He said to me, this is what I have for
[17] you today. And I recall that I said that this is
[18] too much for me.
[19]    **Q:** What do you mean by copying in that
[20] answer?
[21]    **A:** Copying.
[22]    **Q:** Copying.
[23]    **A:** You take pictures or whatever a doctor
[24] requested, provided you with, you put it under a
[25] camera, you put the lights and make focus. You

*Giladi*

[2] take a picture, and you have a picture of it.
[3]    **Q:** It is duplicating, duplication, it is
[4] not the same thing?
[5]    **A:** It is a cheap way to reproduce
[6] something.
[7]    **Q:** How is that?
[8]    **A:** How is that?
[9] When you do copying you copy the –
[10] the quality is not as, is not always as good
[11] quality. Here for example you have a book and
[12] you have a picture and a book that the doctor
[13] wanted publication of what is exhibits of
[14] whatever.
[15]    So, you take the book, you take the
[16] right page and put it under the camera and you
[17] take only the picture that you are looking for,
[18] and then you do with that what the doctor asks
[19] you to do. If it is to combine it, photo –
[20] pictures or to do whatever that is necessary to
[21] do, it is a lot of work.
[22]    It is not really straight photocopying
[23] that you could do to any photo center.
[24]    **MS. SADE:** I would like to mark the
[25] complaint in this matter as Defendant's

*Giladi*

[2] Exhibit 12, for identification.
[3]    (Defendant's Exhibit 12, complaint,
[4] marked for identification as of this date.)
[5]    **Q:** Mr. Giladi, can you please take a look
[6] at Exhibit 12, and let me know when you have
[7] finished reviewing it.
[8]    **A:** All right.
[9] (Pause.) Yes.
[10]    **Q:** Have you finished examining the
[11] complaint, Mr. Giladi?
[12]    **A:** Yes.
[13]    **Q:** Mr. Giladi, do you recognize that
[14] document?
[15]    **A:** Yes.
[16]    **Q:** What is it?
[17]    **A:** The complaint.
[18]    **Q:** All right. Do you know who drafted
[19] that document?
[20]    **A:** Together with my attorney I did it.
[21]    **Q:** Did you provide the facts that were
[22] alleged in that complaint?
[23]    **A:** That is correct.
[24]    **Q:** Did you read the final complaint?
[25]    **A:** I read the complaint a few times, but

Page 443

*Giladi*

[2] before the final, but I read it a few times.

[3] **Q:** Did you understand the conduct of the

[4] complaint?

[5] **A:** I believe so.

[6] **Q:** I will ask you to turn to paragraph 5

[7] of the complaint, which reads while plaintiff was

[8] employed with the defendant he sustained injuries

[9] to his back and both upper extremeties, which

[10] substantially limit plaintiff in major life

[11] activities including but not limited to prolonged

[12] standing, sitting, kneeling, climbing, bending,

[13] lifting and repetitive motions.

[14] **A:** Yes.

[15] **Q:** What major lifting activities do you

[16] have, does it affect?

[17] **A:** Prolonged sitting, prolonged standing.

[18] **Q:** Do the injuries identified in

[19] paragraph 5 affect your ability to work?

[20] **A:** I was never given that opportunity to

[21] try to work, so how can I give you this answer?

[22] **Q:** Do you know what the term major life

[23] activities means?

[24] **A:** Major life activity, what everybody

[25] normally does in life, what you used to do before

Page 444

*Giladi*

[2] and if I can do it again.

[3] **Q:** The question is, what major life do

[4] the injuries that you sustained to your back and

[5] upper extremeties affect?

[6] **A:** I said long standing and long

[7] sitting.

[8] **Q:** What activities that you performed

[9] previously besides prolonged standing, prolonged

[10] sitting, kneeling, climbing, bending, lifting and

[11] repetitive motion are you no longer able to

[12] engage in?

[13] **A:** I am really not monitoring myself. I

[14] give you the basic thing that I am aware of.

[15] **Q:** How do the limitations affect your

[16] day-to-day activities?

[17] **A:** I cannot run like I used to run.

[18] **Q:** You cannot run. Is there anything

[19] else that you can't do because of these

[20] limitations besides that, those things identified

[21] in paragraph five?

[22] **A:** What can I do? I cannot sit for a

[23] long time.

[24] **Q:** Did the limitations identified in

[25] paragraph 5 affect your ability to care for

Page 445

*Giladi*

[2] yourself?

[3] **A:** Care for myself?

[4] **Q:** Yes.

[5] **A:** I do not care for myself the way I

[6] used to.

[7] **Q:** What can't you do now that you used to

[8] be able to do prior to suffering these injuries?

[9] **A:** First is to be more fit.

[10] Do I exercise?

[11] I used to exercise, and I don't do it

[12] any more.

[13] **Q:** Besides exercising, is there anything

[14] that you could do before that you can't do now,

[15] with respect to these injuries?

[16] **A:** I can't play guitar. I cannot do

[17] crafting, I am not doing this any more. So I

[18] assume that that is one of the reasons. This is

[19] one of the things.

[20] **Q:** Paragraph seven of the

[21] complaint reads, plaintiff with

[22] reasonable accommodations of work, and

[23] restrictions of prolonged standing, sitting,

[24] kneeling, climbing, bending, lifting, and

[25] repetitive motions, can perform many jobs which

Page 446

*Giladi*

[2] are available with the defendant including but

[3] not limited to light clerical reception and

[4] telephone work.

[5] What jobs as far as you know are

[6] available at Albert Einstein College of Medicine

[7] that you are physically able to perform?

[8] **A:** I don't know what is available. I

[9] know what I can do.

[10] **Q:** What jobs can you perform?

[11] **A:** I said, before I went on medical leave

[12] I did all this work besides telephone work, but I

[13] did answer the phones in the department when it

[14] was necessary, and I did all this work after my

[15] back injury without a problem.

[16] **Q:** Can you tell me whether the audio

[17] visual department at Albert Einstein had a

[18] clerical worker in August of 1994 when you

[19] attempted to return to work?

[20] **A:** Yes. They had a clerical worker.

[21] **Q:** Can you tell me whether the

[22] audiovisual department in August of 1994 had a

[23] receptionist?

[24] **A:** I believe they did.

[25] **Q:** Do you know what his or her name was?

**Giladi**

[1]
[2]   A: Camille, I believe.

[3]   Q: Paragraph 17 of the complaint,
[4] Mr. Giladi states that prior to August 12th,
[5] 1994, plaintiff's treating physician authorized
[6] him to return to work on a restricted basis given
[7] the physical limitations resultant from his
[8] injuries, from his injuries and disabilities?

[9]   A: Yes.

[10]   Q: Who authorized you to return to work
[11] prior to August 12th, 1994?

[12]   A: As I said before, Dr. Morris Russo
[13] from Israel told me that I can do light work with
[14] my hands. With this letter I had in my hands, I
[15] brought it to Mr. Rick DeWitt on August 12th.

[16]   Also in August of 1994, prior to my
[17] return to work I spoke with Dr. Cohen, which he
[18] stated to me that I can, that now after my
[19] injection if I feel I can go back to work I can
[20] go back to work, but with restrictions. And I
[21] should get some accommodation. So this issue, I
[22] am talking about paragraph 17.

[23]   Q: Is it your testimony that prior to
[24] August 12th, 1994 that Dr. Cohen released you to
[25] go back to work?

**Giladi**

[1]
[2]   A: Like I said, at the last deposition,
[3] we discussed the issue verbally. And he told me
[4] verbally that if I feel that I have relief that
[5] can let me do my work with some accommodation, I
[6] should go and try it.

[7]   Q: Is it your testimony that you asked
[8] Dr. Cohen prior to August 12th, 1994, if you
[9] could go back to work?

[10]   A: We discussed it.

[11]   Q: You and Dr. Cohen discussed it?

[12]   A: Yes. But everything that we talked
[13] about and discussed was the fact, and he said to
[14] me if I feel so, but we never found what I am
[15] going to do.

[16]   He said to me that if you feel that
[17] you can, and he said, too, he said that he would
[18] never restrict me on anything. He will let me
[19] make my own judgment as to what I think I can do
[20] and not do. That's what we discussed at the
[21] time.

[22]   Q: Did you obtain any medical
[23] documentation prior to August 12th, 1994
[24] from Dr. Cohen releasing you to go back to work,
[25] Mr. Giladi?

**Giladi**

[1]
[2]   A: From him I did not.

[3]   Q: Why didn't you obtain medical
[4] authorization from him in connection with that
[5] conversation?

[6]   A: I spoke with him. I did not know
[7] whether I had to have a medical recommendation
[8] from my boss, because I did not know the
[9] regulations of the company. On August 12th I had
[10] the letter from Dr. Russo in my hand, and I had
[11] the other paper that I had with me, and I gave it
[12] to them.

[13]   Q: You testified that the letter from
[14] Dr. Russo had to do with your hand injury; is
[15] that correct?

[16]   A: You are talking about if I had to have
[17] surgery, and I was talking about my hand.

[18]   Q: What was the purpose of your August
[19] 12th, 1993 to August 12th, 1994 leave, didn't you
[20] previously testify that it was in connection with
[21] your back?

[22]   A: That is why on August, on August 8, I
[23] believe I was talking with Dr. Cohen about if I
[24] can do my work, after receiving the epidural
[25] block.

**Giladi**

[1]
[2]   Q: Question was, Mr. Giladi, what was the
[3] purpose of your August 1993 to August of 1994
[4] leave, is it in connection with your back?

[5]   A: I said, yes.

[6]   Q: And yet you brought a note back to
[7] work that related to your hands?

[8]   A: And I said minutes ago, that the
[9] letter was in my hand. When he asked for a
[10] letter from a doctor saying what I could do at
[11] work, I said I have only that letter from
[12] Israel.

[13]   And I was not, I did not come with the
[14] letter to give him the letter, I had it with the
[15] other paper that I had in my hand. He asked me
[16] for a letter and I have this letter with me.

[17]   Q: You just happened to have Dr. Russo's
[18] letter when you went back to work?

[19]   A: I had some documentations with me, and
[20] as part of it, I had some papers with me and one
[21] of them was Dr. Russo's letter.

[22]   Q: Paragraph 19 of the complaint,
[23] Mr. Giladi, states that Mr. DeWitt further
[24] advised the plaintiff that a job would only be
[25] made available to him without regard to his

Page 451

*Giladi*

[1]
[2] disabilities; is that correct?

[3] **A:** That is correct.

[4] **Q:** When did Mr. DeWitt advise you that a
[5] job would only be made available to you without
[6] regard of your —

[7] **A:** A few days.

[8] **Q:** When was the first case that he did
[9] so?

[10] **A:** On August 12th.

[11] **Q:** When during August 12th did he tell
[12] you this?

[13] **A:** I believe during the meeting.

[14] **Q:** What meeting would that be?

[15] **A:** August 12th.

[16] **MR. DINHOFER:** Of what year?

[17] **THE WITNESS:** 1994.

[18] **Q:** Is this a meeting that you taped?

[19] **A:** That is correct.

[20] **Q:** Mr. DeWitt was advising you that your
[21] job would only be made available to you, without
[22] regard of your disabilities, and it was on the
[23] tape?

[24] **A:** He said, I believe he said you are
[25] only going to do darkroom work, and that was one

Page 452

*Giladi*

[1]
[2] of the things that he said, if I am not
[3] mistaken.

[4] And only darkroom work, is work
[5] without accommodation, to my verbal request for
[6] not to have to do work that requires only
[7] standing. To have work that requires only
[8] standing.

[9] **Q:** So Mr. DeWitt told you this August 12
[10] of 1994?

[11] **A:** I believe so.

[12] **Q:** And those were the words he used, you
[13] are only going to do darkroom work?

[14] **A:** You have the tape.

[15] **Q:** That was not my question. The
[16] question was it is, were those words the words he
[17] used?

[18] **A:** I said I believe that is what he
[19] said. I don't remember. I did not listen to the
[20] tape for a long time.

[21] **Q:** Did he say anything else with regard
[22] to —

[23] Strike that.

[24] Did he say anything else that relates
[25] to paragraph 19 on August 12th, 1994?

Page 453

*Giladi*

[1]
[2] **A:** I don't remember the full
[3] conversation. If you give me the tape, let me
[4] listen, and I will tell you. I don't remember.

[5] **Q:** I may do that a little later. For now
[6] we are talking about this.

[7] **A:** I don't remember.

[8] **Q:** Did Mr. DeWitt make any other
[9] statements to you that suggested that a job
[10] would only be made available to you without
[11] regard to your disabilities, besides the
[12] statement that he made at the August 12th, 1994
[13] meeting?

[14] **A:** I believe he said a statement on
[15] August 16th, when he was screaming and yelling at
[16] me when I asked him to provide me with other
[17] works besides darkroom.

[18] **Q:** Other —

[19] **A:** Other work beside the darkroom.
[20] He began to raise his voice to be
[21] hostile towards me. And he told me that I have
[22] to understand that he is doing me a favor by even
[23] letting me do darkroom.

[24] I shouldn't push him further.
[25] This is what I am going to do, and

Page 454

*Giladi*

[1]
[2] this is what I have to do.

[3] I don't have any other work for
[4] you and this is the only work that I can give
[5] you. And you have to do only work without any
[6] limitations. He also requested that all of the
[7] work will be done at the same day.

[8] **Q:** He specifically said to you, you have
[9] to do all of your work without limitations?

[10] **A:** He said, you have to do all of the
[11] work without any limitations.

[12] **Q:** Are those are the words he used,
[13] Mr. Giladi?

[14] **A:** I believe so.

[15] **Q:** Paragraph 20 of the complaint states
[16] that since the time of the afore described
[17] incidents, plaintiff has been denied employment
[18] any reasonable accommodations for his physical
[19] limitations and violations of the ADA. What did
[20] you mean by that?

[21] **A:** Since December 12th until the date
[22] that I was at the last hearing that I had until I
[23] got the letter in December, I was denied, I was
[24] denied any work that will accommodate, to provide
[25] me with work that will be reasonable

*Giladi*

[1] accommodation that it will fit my accommodate
[3] physical accommodations.
[4]   Q: Until you got a letter in December?
[5]   A: Yes.
[6]   Q: What letter –
[7]   A: A letter from Ms. Zuckman, who said
[8] that they are not going to do anything for me and
[9] they are not going to look for a job for me, and
[10] I am on my own.
[11]   Q: Did the letter say anything else
[12] besides that?
[13]   A: Just what I remember. Those are the
[14] words that Ms. Zuckman used in the letter?
[15]   A: That is my understanding.
[16]   Q: Paragraph 21 of the complaint states
[17] AICOM acted with malice and reckless indifference
[18] towards plaintiff's federally protected rights as
[19] a qualified individual with disability when it
[20] refused to make reasonable accommodations for
[21] plaintiff's known disabilities.
[22]   A: Yes.
[23]   Q: Mr. Giladi, how has AICOM acted with
[24] malice –
[25]   A: How?

*Giladi*

[2]   Q: – in your view?
[3]   A: First, usually when somebody
[4] comes back from medical leave some special
[5] administrative forms have to be filled, and my
[6] department refused to fill these kind of forms.
[7]     When I spoke with my supervisor about
[8] the forms he told me it is not your business. It
[9] is not your business. And we are doing what we
[10] have to do, and we know what we are doing.
[11]     When I asked him about accommodations
[12] for work he said that he was not willing to spend
[13] any money on me, and my supervisor said that he
[14] is going to challenge my doctor's letter, and to
[15] prove that the doctor is wrong, and to prove that
[16] the doctor is wrong.
[17]     And he was hostile towards me with
[18] screaming, yelling. He refused even to listen to
[19] me, and he told me that I should go and do my
[20] work.
[21]     And I was, I was constantly feeling
[22] like a kid that was being screamed at by his
[23] parents for not listening; where I just wanted
[24] something very simple, alternate work that I
[25] could do between standing and sitting, to do work

*Giladi*

[2] that I can avoid any aggravation of a condition
[3] that I just improved by epidural block, by
[4] epidural block.
[5]     And instead of that they are – they
[6] tried to push me to the point that I will be
[7] unable to do anything, and to say that I failed
[8] to do my work. I did all my jobs that were
[9] provided to me with the medical problem that I
[10] was suffering, and I pushed myself to comply with
[11] my boss' request.
[12]     And for all the days that I was there,
[13] whenever I came to ask for accommodation, I was
[14] being denied to get it.
[15]     And the approach was there, even when
[16] I was asked to go to see the doctor, he kept me
[17] for an hour to make sure that when I will arrive
[18] at the doctor's office, the doctor was not going
[19] to accept me, to tell me that the working hours
[20] are only up to 3:00 o'clock, and therefore I am
[21] not going to see the doctor.
[22]     And as a result I wanted to come
[23] back to the department and continue doing my work
[24] without seeing my doctor, and I did not know how
[25] to call this kind of maneuver by my boss.

*Giladi*

[2]     If this is not a malice approach that
[3] they are trying to nail you –
[4]   Q: What do you mean by trying to nail
[5] you?
[6]   A: They are trying to nail you, they are
[7] trying to cause you not to get what you deserve.
[8]     And if I have a right to see the
[9] doctor, I should have the right, and if I am
[10] asking for 2 o'clock, he cannot keep me until
[11] 3:00 o'clock.
[12]     I usually sit and write the
[13] authorization to get me to see the Doctor.
[14]     You know that the doctor finishes at
[15] 3:00 o'clock, why give me the letter at three,
[16] why are you waiting?
[17]   Q: Do you think that they were trying to
[18] nail you? Do you think that your supervisor –
[19]   A: They were trying to nail me for seven
[20] years.
[21]   Q: Why were they trying to nail you?
[22]   A: Because I refused to accommodate my
[23] boss for sexual harassment.
[24]   Q: Which boss would that be?
[25]   A: Dr. Levine.

Page 459

*Giladi*

**Q:** You believe that Dr. Levine sexually harassed you?

**A:** I know he sexually harassed me.

**Q:** Mr. Giladi, you stated that –

**MS. SADE:** Off the record.

(Discussion off the record.)

**Q:** You stated that one of the reasons that you believed that AICOM was acting with malice towards you, had to do with special administrative forms relating to medical leave; what forms are they?

**A:** There is a special form when an employee leaves for medical leave that has everything with respect to the employee's life with regard to work.

It means that the supervisor has to fill out these forms to say if for example if the address was being changed or the person had the spouse died or whatever situation.

When I went on medical leave my boss filed a form that said that I am on medical leave, meaning that the payroll department would understand not to produce anything for me because I am on medical leave.

Page 460

*Giladi*

When he returned to work, the practice of the institution, any institution, is to inform all of the right people that this person is back to work.

Now, my boss refused to file this form and by refusing to file this form this indication for me– this indication for me that there never was an attempt to bring me back to the work force of Einstein, they are just buying time to see when they are going to tell me that you are being fired.

**Q:** What's the basis of your knowledge that it is the practice of the institution to file special forms?

**A:** I learned this through the agreement that we had, when I spoke with Ms. Zuckman. She told me, this is what we do, but it is our business and it is not your business.

And I am not going to show you anything and I am not going to give you anything, only if you sue us.

I said, okay.

**Q:** What is the basis of your knowledge that your supervisors are the people that are

Page 461

*Giladi*

supposed to file this supposed form?

**A:** How –

**Q:** Yes.

**A:** I think I spoke –

This came to my attention.

How it came to my attention at this moment, I don't recall. But it came to my attention.

**Q:** You are sure that your supervisors are the ones that have to initiate the filings of this form?

**A:** I believe so. Again, I am not administrative, but I believe so that my direct supervisor had to fill out this paper to give it to somebody else. And this is a process that is going on there. I just, I don't know how this goes, but I do know the procedure that is followed.

**Q:** Are you familiar with any guidelines that require your supervisor to file this form within a certain amount of time?

**A:** I believe it had to be done the first week that the person returned to work, from the first few days that the person returned to work.

Page 462

*Giladi*

I don't know. I can't tell you.

My understanding logically, if you don't have this form filled, you are not covered by insurance. So everybody tried to cover themselves. In order to cover yourself, you filed the paper as soon as possible, to cover yourself on medical insurance or whatever, if something happened to the employee with respect to the work.

**Q:** Is it your understanding that this special form had to do with insurance?

**A:** It had to do with everything with regard to the employee. I don't know.

If you don't report it back on the job, so whatever happened to the employee during this time – so who is reliable to that?

So that is why they have to fill this paper out to show that the person is back. I believe, I am telling you from what my understanding is of that.

**Q:** We are going to get to that.

What's the basis of your understanding that this special form was not filled out and submitted on your behalf when you returned to

Page 463

*Giladi*

[1]
[2] AECOM?
[3]  **A:** I told you –
[4]  **Q:** Who?
[5]  **A:** Mr. Altman.
[6]  **Q:** When did he tell you that?
[7]  **A:** I believe he told me that in September
[8] or November grievance hearing.
[9]  **Q:** In connection with what kind of issue?
[10]  **A:** When I was talking about, I believe in
[11] November because they held my payment for almost
[12] three months for the time that I was working
[13] there.
[14]    When I received my paycheck, my
[15] paycheck reflected that it did not reflect the
[16] same time that usually my paycheck shows.
[17]  The physical paycheck is a special,
[18] they have this paycheck and they have another
[19] part to it that reflects my analysis work, how
[20] much time you have left, how much sick time or
[21] whatever.
[22]    And when I looked at this form I
[23] saw that it was saying that it was a special
[24] arrangement for payment.
[25]    And during the grievance we asked a

Page 464

*Giladi*

[1]
[2] question, what do you mean special arrangement,
[3] for what is the payment for?
[4]    And Ms. Zuckman said that it is
[5] for our work in August.
[6]    I said to her, my understanding is
[7] that when you returned to work that the paychecks
[8] have to be looked, should look differently and I
[9] don't have any indications here that really I was
[10] being returned to work.
[11]    No.
[12] You never returned to work.
[13] We never filed a paper that you
[14] returned to work.
[15]    And I said why, this is our business
[16] this is not your business.
[17]  **MR. DINHOFER:** Could we take a break
[18] for a minute?
[19]  **MS. SADE:** Yes.
[20]    (Recess).
[21]  **Q:** You testified when you were explaining
[22] why you felt that AICOM – and they acted with
[23] malice to you, that your boss said that AICOM was
[24] not going to spend any money on accommodating
[25] you?

Page 465

*Giladi*

[1]
[2]  **A:** That is correct.
[3]  **Q:** When you made that statement you were
[4] referring to Mr. DeWitt?
[5]  **A:** That is correct.
[6]  **Q:** When did he tell you that he was not
[7] going to spend any money on you?
[8]  **A:** I believe the first day or the second
[9] day that I was working there.
[10]  **Q:** He only told you that once?
[11]  **A:** Are you repeating the same question
[12] twice?
[13]  **Q:** He just told you once?
[14]  **A:** I believe so.
[15]  **Q:** You have a habit of answering a
[16] question with a question.
[17]  **MR. DINHOFER:** Okay.
[18]  **Q:** The question is, did he.
[19] Did he just make that statement
[20] relating to not spending any money on you once?
[21]  **A:** I believe once or maybe more, but I
[22] don't recall it that way.
[23]  **Q:** Did anyone else make that statement on
[24] behalf of AICOM –
[25]  **A:** I don't know.

Page 466

*Giladi*

[1]
[2]  **Q:** – to you?
[3]  **A:** What. Sorry.
[4]  **Q:** Did anyone else make that statement to
[5] you on behalf of AICOM?
[6]  **A:** I don't think so.
[7]  **Q:** You also stated that parts of your
[8] belief that AICOM acted with malice was based on
[9] your supervisor being hostile and screaming and
[10] yelling at you?
[11]  **A:** Yes.
[12]  **Q:** When you made that statement were you
[13] referring to Mr. DeWitt?
[14]  **A:** That is correct.
[15]  **Q:** When did Mr. DeWitt scream and yell at
[16] you?
[17]  **A:** Beginning August 12th and ending the
[18] last day that I was working.
[19]  **Q:** During the period August 12th until
[20] the last day that you were working, which was
[21] August 24.
[22]    During the period August 12, 1994 to
[23] August 24, 1994, how many days were you actually
[24] working at AICOM?
[25]  **A:** I believe four and something.

Page 467

*Giladi*

[1]
[2]    Q: On the four days that you worked at
[3] AICOM, how many days did you actually spend a
[4] full day working?
[5]    A: I believe two or three days was full
[6] days' work and only one day I left in the middle
[7] of the day, or maybe two hours before the end of
[8] the day.
[9]    Q: You spent two or three days, full
[10] days, out of the period August 12th to August
[11] 24th working?
[12]    A: No. I returned to work on August
[13] 16th. On August 12th, I came to work.
[14]    My supervisor refused to let me
[15] work and refused to let me do any work and she,
[16] until I provide a, provide him with a letter from
[17] Dr. Cohen.
[18]    I saw Dr. Cohen on August 15th,
[19] and I provided the letter on August 15th to my
[20] supervisor, and they told me to come back on
[21] August 16th, and this is my first day of work,
[22] August 16th, so I worked from August 16th to the
[23] 24th.
[24]    Q: And during the period then, August
[25] 16th to August 24th, you said you worked for

Page 468

*Giladi*

[1]
[2] parts of four days?
[3]    A: No. I worked for one day partially
[4] and the other, three days fully, if I am not
[5] mistaken.
[6]    Q: All right. So, when I asked you to
[7] identify when Mr. DeWitt was hostile and yelled
[8] and screamed at you, was it on the days that you
[9] were there and working?
[10]    A: It was also the day that I was there
[11] without work waiting for an answer, August 12th.
[12]    Q: He screamed at you on August 12th?
[13]    A: Yes. August 12th, 15th, August 16th,
[14] August 17, all of the days that I was physically
[15] there he was hostile towards me.
[16]    Q: Was anyone present during any of the
[17] times that he screamed at you or yelled at you?
[18]    A: I believe on one occasion, and
[19] I cannot testify, but Lindy was in the area, but
[20] I can't testify to that.
[21]    Q: Did Mr. DeWitt yell or scream at you
[22] during the September 12, 1994 meeting?
[23]    A: I don't think so. I don't know.
[24] But he was, he was very sarcastic and
[25] very, I can't even describe the behavior.

Page 469

*Giladi*

[1]
[2]    Q: Were there any people at the August
[3] 12th, 1994 meeting that would have witnessed
[4] Mr. DeWitt?
[5]    A: The answers he gave were sarcastic
[6] answers.
[7]    Q: Other people were there that witnessed
[8] the answer?
[9]    A: Mr. Zucker was there, Altman was there
[10] and Mr. Cohen was there, but I think I was more
[11] sensitive to everything there, maybe I saw more
[12] than anybody else.
[13]    Q: You are talking about the September
[14] 1994 meeting?
[15]    A: Yes.
[16]    Q: What about during the August 1994
[17] meeting?
[18]    A: August 12th?
[19]    Q: Yes.
[20]    A: August 12, he was very hostile towards
[21] me.
[22]    Q: And there were other people there that
[23] would have witnessed him being hostile?
[24]    A: Everybody on the tape.
[25]    Q: Do you think anyone else noticed him

Page 470

*Giladi*

[1]
[2] being hostile?
[3]    A: I think listening to the tape and you
[4] can tell.
[5]    Q: In paragraph 25 of this complaint you
[6] state in part that by reason of the premise set
[7] forth in the complaint the plaintiff Roni Giladi
[8] was severely and seriously, physically and
[9] psychologically injured and as a result suffered
[10] pain, humiliation, lasting embarrassment,
[11] anxiety, mental anguish and will continue to
[12] suffer in the future pain and injury.
[13]    Mr. Giladi, can you please tell me
[14] how AICOM's actions have severely and seriously
[15] physically injured you?
[16]    A: By not providing me with work
[17] without accommodation, they aggravated my medical
[18] condition to the point that my doctor had to put
[19] me back on medical leave.
[20]    Q: The severe and serious physical
[21] injuries that you feel, AICOM was responsible
[22] for?
[23]    A: Yes.
[24]    Q: Are they –
[25]    A: Yes.

Page 471

*Giladi*

[1]
[2] Q: That's not even a question.
[3] A: Go ahead. Sorry.
[4] Q: Strike it. It was a really bad
[5] question.
[6] Can you tell me whether the severe and
[7] serious physical injuries that you incurred or
[8] feel like you incurred as a result of AICOM's
[9] actions, are permanent?
[10] A: When you say – when you say this
[11] kind of question, I would like to have more
[12] clarification and specify to what period of time
[13] you are talking about.
[14] Q: Permanent. Do you understand what
[15] permanent means?
[16] A: Permanent, yes, I know. But this is
[17] why I am requesting of you to give me specific
[18] what kind, from what period to what period you
[19] are talking about, that I can respond to your
[20] questions.
[21] Q: All right. The complaint appears to
[22] cover the period August 12th of 1994 through the
[23] present; is that correct?
[24] A: I believe so.
[25] Q: All right. And you appear to claim

Page 472

*Giladi*

[1]
[2] in paragraph 25 that AICOM's actions during the
[3] period August 12th, 1994 to the present have
[4] severely and seriously physically injured you; is
[5] that correct?
[6] A: Put it this way, my work created my
[7] medical condition.
[8] Q: Mr. Giladi, I am just asking you to
[9] answer that question and stick with me.
[10] MS. SADE: Would you read back the
[11] last question.
[12] MR. DINHOFER: Listen to the question
[13] and take your time.
[14] (Record read.)
[15] A: In my opinion, the actions did.
[16] Q: Can you tell me how you have been
[17] severely and seriously physically injured because
[18] of AICOM's actions?
[19] A: If I was receiving physical
[20] accommodations the way I requested, I was not
[21] having a need to go to see my doctor and I could
[22] start, I could start to work and slowly, slowly
[23] build myself back in the work force.
[24] But what they did they just made me
[25] stand for eight hours per day with the demand

Page 473

*Giladi*

[1]
[2] that all of the work has to be done at the end of
[3] the day, with some intimidation that if the job
[4] is not going to be done by the end of the day, I
[5] will pay the price for that.
[6] So, and I just had to stand for all
[7] these hours and do all of the work, which
[8] resulted in aggravation of my medical condition,
[9] which forced me to go back to the doctors; and
[10] the doctor find out that my medical condition
[11] would be exacerbated – is that the word – and
[12] to the point that he had to put me back on
[13] medical leave.
[14] Q: And the medical condition to which you
[15] were referring is what?
[16] A: My back.
[17] Q: Do you feel that AICOM's activities
[18] during the period that we are discussing injured
[19] any other part of your body besides your back?
[20] A: I cannot respond to that. I was more
[21] concerned about my back at that time.
[22] I was seeing a doctor for my back.
[23] That's all. This was already the more
[24] obvious thing that was being effected at the
[25] time.

Page 474

*Giladi*

[1]
[2] Q: When you allege that AICOM's actions
[3] caused you severe and serious physical injury,
[4] were you talking about just your back or were you
[5] talking about other parts of your body?
[6] I am trying to identify what the basis
[7] of your injury is?
[8] A: I said, I am describing the major
[9] problem that this kind of work created with
[10] respect to my back, which is I cannot testify to
[11] anything else because I was more concerned about
[12] my back at the time.
[13] Q: Is it your position that, there
[14] was any other kind of injury that AICOM caused
[15] besides the injury to your back?
[16] A: They did not cause me head injury, no.
[17] Q: Did AICOM's alleged activities during
[18] this period aggravate the injuries in your wrist
[19] at all?
[20] A: I had swelling of my wrist.
[21] Q: Is it your position that AICOM's
[22] activities during this period caused injury to
[23] your wrist?
[24] A: I had – I don't know the word injury,
[25] I know it is a changing of condition.

RONI GILADI                                                    RONI GILADI    v.
June 23, 1998                           ALBERT EINSTEIN COLLEGE OF MEDICINE

---

Page 475

*Giladi*

[2]    You have some pain because if you do
[3] something in motion for eight hours without
[4] stopping, it is an aggravated condition.
[5]    I am talking about that the aggravated
[6] condition was, it became to be, I started to have
[7] some more problems because of the condition that
[8] they put me in.
[9]    Q: So, I guess the question is then, did
[10] you have any additional problems with respect to
[11] your wrist because of the conditions under which
[12] you were working during August 12th through
[13] August 24, 1994?
[14]    A: I had swelling and numbness.
[15]    Q: Was the swelling and numbness incident
[16] to any kind of permanent injury that AECOM caused
[17] you on your wrist during that period?
[18]    A: I cannot respond to that directly.
[19] I need to talk. I cannot respond to
[20] that with yes or no.
[21]    Q: I am trying to understand what you
[22] meant in this paragraph?
[23]    A: I said I meant that my boss did not
[24] cause or give me accommodation, which aggravated
[25] my condition to the point that my doctor had to

---

Page 476

*Giladi*

[2] put me back on medical leave. I don't understand
[3] why you don't understand that.
[4]    Q: Maybe I am just not as bright as you,
[5] Mr. Giladi?
[6]    A: You are bright.
[7]    Q: I am trying to find out what you mean
[8] by severe and serious physical injury.
[9]    A: Severe to the point that I couldn't
[10] continue work. When you cannot work it is a
[11] severe condition, I believe so.
[12]    Q: I am talking about an injury, about an
[13] actual injury. And you testified that severe and
[14] serious physical injury, you meant your back
[15] injury. I am trying to find out whether you are
[16] claiming that my client caused you any other
[17] injury as a result of that period?
[18]    A: Maybe the fact that I find myself
[19] sitting on a walkway that I couldn't walk,
[20] whichever the situation was, which I testified at
[21] the time was caused because of the condition that
[22] I was, the situation was so aggravated that it
[23] caused me to sit; I don't know.
[24]    Q: And that relates to your back injury;
[25] correct?

---

Page 477

*Giladi*

[2]    A: I believe so.
[3]    Q: Okay. I am just trying to figure out
[4] whether you are claiming that my client caused
[5] you any other aggravation of your injuries
[6] besides that with respect to your back?
[7]    A: As I said, I know that I had to
[8] be put back on medical leave after the
[9] observation of my medical condition, as a
[10] result to my boss refusing to give me medical,
[11] visible accommodations.
[12]    Q: Did the medical leave relate to your
[13] back injury; correct?
[14]    A: Because of the doctor that I was
[15] seeing at the time.
[16]    Q: Is it your position that if you were
[17] seeing a wrist doctor, that they would have put
[18] you on medical leave with respect to your wrist?
[19]    A: I can't speak with respect to just
[20] anything. You are asking for stipulation.
[21]    Q: I don't want –
[22]    A: You are asking me to speculate.
[23]    Q: I don't want you to speculated.
[24]    A: I can't give an answers to that.
[25]    Q: I am giving you a simple question.

---

Page 478

*Giladi*

[2]    A: A simple answer.
[3]    Q: Are you claiming that AICOM caused you
[4] any additional injury to your wrist as a result
[5] of your, as a result of their activity during
[6] this period?
[7]    A: I am claiming that their not giving,
[8] refusing to give me reasonable accommodations
[9] aggravated my condition.
[10]    Q: By your condition, what condition are
[11] you referring to?
[12]    A: I am referring to my swelling in my
[13] hands. I had numbness in high hand, back pain,
[14] radiating to my leg, radiating to my legs. What
[15] do you want more than that?
[16]    Q: That was a good answer.
[17]    MR. DINHOFER: Off the record.
[18]    (Recess).
[19]    Q: In the complaint in paragraph 25,
[20] Mr. Giladi, you also state that you have been
[21] severely and seriously psychologically injured as
[22] a result of AICOM's alleged actions, as set forth
[23] in the complaint. Can you tell me what you mean
[24] by that?
[25]    A: Just not having a job is a

---

*Giladi*

[2] psychological stress on you.
[3] Q: So, are you saying that you have been
[4] severely and psychologically injured because you
[5] are unemployed?
[6] A: By being mental harassment by my boss
[7] by him screaming and yelling at me, degrading me,
[8] putting me down for the few days that I was
[9] there, without any reasonable, without any
[10] reasonable justification.
[11] All of that, you are building up
[12] something that makes you feel that you are worth
[13] nothing. And you take every person and make them
[14] feel like they are nothing, it causes some
[15] psychological effect on you.
[16] Q: Do you have current psychological
[17] severe or serious psychological effects as a
[18] result of what happened to you at AICOM?
[19] A: I am not surprised to say that I have
[20] – I am not proud to say that I have no job.
[21] I do not talk with a lot of my friends
[22] because I do not want to disclose all of this
[23] kind of embarrassment that I feel. So, it is
[24] causing me a lot of psychological embarrassment,
[25] I have embarrassment. I feel like I am not –

*Giladi*

[2] Not having a job is a very severe
[3] problem and a lot of people go, everybody –
[4] It could affect everybody, and even a
[5] stronger person.
[6] Q: So, just to be clear, the severe and
[7] serious psychological injury that you have
[8] incurred as a result of my client's actions –
[9] A: Yes.
[10] Q: Are –
[11] MR. DINHOFER: Let her answer.
[12] THE WITNESS: She stopped.
[13] Q: – are stress related to being
[14] unemployed, embarrassment as related,
[15] embarrassment related to being unemployed; is
[16] there anything else?
[17] A: Yes.
[18] MR. DINHOFER: He said being abused.
[19] A: Being abused by my supervisor on a few
[20] days and making you feel like you are worth
[21] nothing.
[22] MR. DINHOFER: You said this already.
[23] You don't have to do it again.
[24] Q: Have you sought any psychological
[25] treatment in connection with the severe and

*Giladi*

[2] serious psychological injuries that you incurred
[3] in 1994?
[4] A: No.
[5] Q: Why have you not sought treatment for
[6] this severe and serious psychological condition?
[7] A: What condition?
[8] Q: Strike that.
[9] Why have you not sought treatment
[10] in connection with this severe and serious
[11] psychological injury that you incurred in 1994?
[12] A: There is nothing that a psychologist
[13] can do for me. They will tell me to go look for
[14] a job. So I did what I have to do.
[15] Q: What is that?
[16] A: Going back to school and build myself
[17] and improve myself, prove to myself that I am not
[18] worthless, I am a person and I am a person that
[19] can do things in life. But in order to do things
[20] in life, I need a new profession and that is what
[21] I am doing.
[22] Q: How do you know that you need a new
[23] profession if you did not try to get a job in
[24] your old profession since being terminated from
[25] AECOM?

*Giladi*

[2] A: If my job that that I worked for
[3] for 13 years refused to accept me and all my
[4] medical conditions and disabilities created by
[5] the work that I was doing, and my carpal tunnel
[6] syndrome is part of my job, where I was trying to
[7] do repeated motion for years, and my back injury
[8] is a result of my boss refusing to give me
[9] accommodation, by refusing to provide me with
[10] help; so the company I work for for ten years
[11] saying you are not good for us, why somebody else
[12] would take me to work for them for the same kind
[13] of work?
[14] Q: How do you know if you did not try to
[15] apply?
[16] A: Because my boss told me that nobody
[17] would hire you and he knows better than anybody.
[18] Q: Why does he know better than anybody?
[19] A: Because they are the work force and
[20] they are hiring people administratively, and they
[21] know who they are going to hire.
[22] If they are not going to hire somebody
[23] like that, why would somebody else hire you?
[24] Q: Based on Mr. DeWitt's statement that
[25] no one would hire you, you decided not to seek

Page 483

*Giladi*

[1]
[2] employment within your field after being
[3] terminated by AICOM?
[4]    **A:** I tried to return to work. I tried to
[5] keep, not to kill a year of looking for a job and
[6] find out that I have no jobs. And I decided to
[7] start with school, taking into consideration my
[8] age, and the work market. And I decided to get a
[9] degree in a profession as soon as possible.
[10] That's why I went back to school.
[11]    **Q:** I am a little confused.
[12]    **A:** I know.
[13]    **Q:** Thank you. Did you go back to school
[14] because –
[15]    Strike that. Did you decide not to
[16] look for a job and instead went back to school
[17] because you wanted a new career?
[18]    **A:** No. Because I was being told that
[19] nobody would hire me.
[20]    So if nobody would hire me, so why
[21] would I take a year or two years looking for a
[22] job and being denied constantly, where I am
[23] already feeling that from my boss by his
[24] humiliation and embarrassment, humiliation and
[25] degrading me constantly that I am worth nothing

Page 485

*Giladi*

[1]
[2]    **A:** I went back to school because I needed
[3] a new profession to be able to do what my boss
[4] convinced me that nobody would hire me with my
[5] medical disability, especially when I have a
[6] litigation.
[7]    **Q:** Based on what your boss said to you,
[8] you decided not to apply for any more jobs?
[9]    **MR. DINHOFER:** That's what he just
[10] said. You don't have to repeat it.
[11]    **MS. SADE:** I want an answer to that.
[12]    **MR. DINHOFER:** He said exactly those
[13] words, and you repeated exactly what he
[14] said. Come on, that is ridiculous.
[15]    **Q:** Mr. Giladi, paragraph 25 states that
[16] you have incurred economic loss and special
[17] damages and will incur such losses in the future,
[18] what do you mean by that?
[19]    **A:** In my position at Einstein I had five
[20] weeks and two days vacation time per year. I had
[21] ten personal days, I had ten sick times, I had
[22] pension. I had a salary, it was a good salary.
[23]    At the present condition no jobs will,
[24] first if anybody will hire me, then I have, they
[25] are not going to give me the same benefits and

Page 484

*Giladi*

[1]
[2] and I cannot do any work, and nobody will hire
[3] me? I just felt that it is time for me to look
[4] for maybe a new field that I needed to have my
[5] head and my brain to use, would be better for me
[6] to take this kind of field that maybe will
[7] provide me with better opportunities in the work
[8] force.
[9]    **Q:** So, once again, it sounds like you
[10] decided not to apply for a job in your field
[11] based on Mr. DeWitt saying that no one is going
[12] to hire you; is that correct?
[13]    **A:** This and that, and I think I would
[14] discuss already for the first – the position,
[15] and the second –
[16]    We discussed this issue a few times
[17] and I don't understand why you are repeating the
[18] same thing over and over.
[19]    **Q:** You have not answered my question.
[20]    **A:** Yes, I did answer the question on the
[21] first day of the deposition.
[22]    **Q:** What was the answer to the question,
[23] yes or no?
[24]    **A:** I think I told you that.
[25]    **Q:** What was the answer, yes or no?

Page 486

*Giladi*

[1]
[2] the same salary.
[3]    And second, my pension was being
[4] affected by me losing my job, and there are a lot
[5] of economic issues that got involved with this
[6] that related to when somebody is being fired.
[7]    **Q:** Mr. Giladi, if AICOM offered you a
[8] clerical job tomorrow, would you accept it?
[9]    **A:** If they would offer me a job that
[10] would fit my medical disability? Yes.
[11]    **Q:** Didn't you say in paragraph 7 of this
[12] complaint that –
[13]    **A:** I said, yes. Why go back to –
[14]    **Q:** All right. If AICOM offered you a
[15] receptionist or telephone job tomorrow would you
[16] accept it?
[17]    **A:** With respect to my medical
[18] disabilities? Yes.
[19]    **Q:** Is a telephone job consistent with
[20] your medical disabilities?
[21]    **A:** Working as an operator to work there,
[22] the way I know them there, there are three people
[23] changing positions constantly, they are not
[24] sitting for 24 hours straight, eight hours
[25] straight at Einstein.

Page 487

### Giladi

[1]
[2] **Q:** Where in Einstein, what department?
[3] **A:** On the first floor. They have the
[4] operating room there.
[5] **Q:** As far as you know, was there a
[6] vacancy in the telephone operating room in August
[7] of 1994?
[8] **A:** I don't know if there was a vacancy.
[9] I know that they have a, I know that I
[10] have a bumping right.
[11] **Q:** As far as you know, were there any
[12] vacancies for clerical positions in August of
[13] 1994?
[14] **A:** I don't know, but I have a bumping
[15] right.
[16] **Q:** What do you mean by a bumping right,
[17] Mr. Giladi?
[18] **A:** I can bump anybody in the institution
[19] that works less years than me.
[20] **Q:** Is that true even where you are not
[21] qualified for the position?
[22] **A:** Qualified in which way?
[23] **Q:** If you don't have the education or the
[24] experience necessary for the position.
[25] **A:** If you don't try, you don't know.

Page 488

### Giladi

[1]
[2] **Q:** As you understand it, do you have a
[3] right to bump people out of positions for which
[4] you don't have the requisite education or
[5] experience?
[6] **A:** I don't think that I have bumping
[7] right – I don't know the full law, the full
[8] contract.
[9] **Q:** Is that pursuant to the Collective
[10] Bargaining Agreement?
[11] **A:** Correct.
[12] **Q:** Did you participate in an arbitration
[13] in March of 1996?
[14] **A:** That is correct.
[15] **Q:** Were you represented in that
[16] arbitration?
[17] **A:** Yes. The union.
[18] **Q:** Were you represented by counsel or by
[19] the union?
[20] **A:** The union had an attorney there.
[21] **Q:** Do you know what was the name of the
[22] union attorney representing you?
[23] **A:** I believe Rick M-I-N-T-E-R,
[24] Rachel Minter.
[25] **Q:** Did you pay any legal fees in

Page 489

### Giladi

[1]
[2] connection with that representation?
[3] **A:** No.
[4] **Q:** Who was present at the arbitration?
[5] **A:** Louie Zuckman. Louise Zuckman.
[6] Mr. – I don't remember his name, the
[7] lawyer from Einstein.
[8] **Q:** Anyone else besides your lawyer, you,
[9] Louise and the lawyer from Einstein?
[10] **A:** Altman was there. And Lennie, Jerry
[11] Lande.
[12] **Q:** Anybody else?
[13] **A:** I don't recall.
[14] **Q:** What took place during the
[15] arbitration, what happened?
[16] **A:** I am sorry. Steve was there also.
[17] **Q:** Steve who?
[18] **A:** Steve the union, the representative.
[19] **Q:** Frankel?
[20] **A:** Frankel.
[21] **Q:** Steve Frankel. What took place at the
[22] arbitration?
[23] **A:** To my best memory, the union was
[24] trying to, was asking for an extension of medical
[25] leave.

Page 490

### Giladi

[1]
[2] **Q:** The relief the union was seeking was
[3] the extension of your medical leave of absence?
[4] **A:** Yes. For another year.
[5] **Q:** Was the union seeking any other kind
[6] of relief as far as you know?
[7] **A:** Not that I remember.
[8] **Q:** Did the issue of whether AICOM would
[9] or could reasonably accommodate you arise during
[10] that arbitration?
[11] **A:** This was not, I don't –
[12] This issue was not, the issue was only
[13] with regard to if, with regard to if I have a
[14] right to another year of medical leave. Somehow
[15] they made talk about how things not related to
[16] the main issue.
[17] **Q:** The main issue was only with respect
[18] to whether you were entitled to another leave of
[19] absence?
[20] **A:** Yes.
[21] **Q:** Were you seeking another leave of
[22] absence as an accommodation to your physical
[23] disabilities from AICOM?
[24] **A:** I said that.
[25] **Q:** Do you understand the question?