RONI GILADI
June 23, 1998

RONI GILADI   v.
ALBERT EINSTEIN COLLEGE OF MEDICINE

Page 491

*Giladi*

[1]
[2] A: Yes, I understand. I am thinking.

[3] MR. DINHOFER: Repeat the question so

[4] that he can hear it back. Listen carefully

[5] to the question.

[6]    (Record read.)

[7] A: I don't recall exactly what the union

[8] did and what ground they filed. The only things

[9] I remember when I spoke with Mr. Cohen about the

[10] arbitration, the main issue there was that I

[11] return to work and I have the right for another

[12] year of medical leave, and if I would like to

[13] exercise it.

[14]    And I said, yes. And this is the

[15] reason that I went to arbitration. This is the

[16] only thing that I can respond, but I don't know

[17] the details.

[18] Q: Is it your position in this suit that

[19] AICOM's failure to grant you the year leave of

[20] absence –

[21]    Strike that. Is it your position in

[22] this lawsuit?

[23] A: In this lawsuit.

[24] Q: That AECOM failed to reasonably

[25] accommodate you by not granting you another year

Page 492

*Giladi*

[1]
[2] of leave of absence?

[3] A: No. This lawsuit is strictly to

[4] the fact that my boss deliberately refused to

[5] accommodate my medical disabilities, refused to

[6] provide me with a chair, refused to provide me

[7] with a lower table, refused to give me part-time

[8] work. And based on my boss' statement, he was

[9] challenging my doctor's notes.

[10] Q: Did you testify on your own behalf in

[11] the arbitration in March of 1996?

[12] A: I believe so, yes.

[13] Q: Did anyone else testify on your

[14] behalf?

[15] A: Yes. Lande.

[16] Q: Who testified on behalf of the school?

[17] A: Altman and Ms. Zuckman.

[18] Q: What did Jerry Lande testify about, at

[19] the arbitration?

[20] A: That I was giving jobs that, they

[21] were not accommodating my medical disability,

[22] not –

[23]    Sorry.

[24] He said that I was given jobs that

[25] do not fit with my professional status, and I

Page 493

*Giladi*

[1]
[2] suppose to be giving training for at least a

[3] month before I was given all this kind of work.

[4]    And although I have a background

[5] in photography, my skills as a technical

[6] photographer, and not medical photography where

[7] medical photography is totally different than

[8] regular photography, and therefore I am supposed

[9] to get some training period.

[10]    He testified that my boss, when he

[11] spoke with my boss about that, my boss refused to

[12] give him the time to teach me how to do medical

[13] photography.

[14] Q: You testified that Lande testified

[15] that you were supposed to be given a, at least a

[16] month of training before you were given

[17] photography work?

[18] A: Yes.

[19] Q: Is that correct?

[20] A: Yes.

[21] Q: What's your understanding of why you

[22] were supposed to be given a month of training?

[23] A: Because I am a video person, and if

[24] they would like me to do photography work, I

[25] cannot just, they cannot just put me in the

Page 494

*Giladi*

[1]
[2] darkroom for four or eight hours doing work that

[3] really is not something that I was doing on a

[4] daily basis.

[5]    I was not doing it for the last 13

[6] years, and I did it here and there for, here and

[7] there as a helping in the department.

[8]    And I was given light work, meaning

[9] doesn't need a lot of very complicated work for

[10] the darkroom.

[11]    They are giving me work that is

[12] complicated, difficult, you need a lot of

[13] knowledge, you need to be a photographer for

[14] that, where I am not specialized in photography,.

[15]    I specialize in video. And what you

[16] are saying, if you want to put me in photography,

[17] you should give him the training.

[18] Q: As far as you knew, were you entitled

[19] to at least a month of training pursuant to any

[20] kind of agreement?

[21] A: There is no agreement that I am a

[22] photographer to start with.

[23] Q: That's not what I am asking you,

[24] Mr. Giladi. I am asking you whether you are

[25] aware of any agreement that would have entitled

Page 495

*Giladi*

[1]
[2] you to at least a month of training before doing
[3] photography work?
[4]    A: What went on behind the scenes, I
[5] don't know.
[6]    Q: What do you mean by behind the scenes?
[7]    A: You asked me a question, if I know I
[8] am entitled. Before you ask me questions, if I
[9] can do the job, should I, can I bump somebody.
[10]    So the point is, if you want me to do
[11] some work, first if you think the person can do
[12] it, first you give him some time to get used to
[13] it, if the person was not doing it for many
[14] years.
[15]    Q: I am asking you a different question,
[16] Mr. Giladi.
[17]    I am asking you what the basis, what
[18] your understanding of the basis for this
[19] entitlement to at least a month of training
[20] before doing photography work is?
[21]    A: I don't know what –
[22] I know what Mr. Lande said, and why he
[23] said it; I don't know.
[24]    Q: You don't know what the basis for
[25] his knowledge of why the fact that you are

Page 496

*Giladi*

[1]
[2] supposed to get a month of training before doing
[3] photography is?
[4]    A: I don't know.
[5]    Q: All right. You testified that the
[6] darkroom work that you were asked to do in August
[7] of 1994 was complicated?
[8]    A: Yes.
[9]    Q: It was difficult. What about it was
[10] complicated and difficult?
[11]    A: You have to do a lot of work that is
[12] not routine, taking a negative and enlargement
[13] and just print it, a lot of them is composite
[14] works, a lot of work that is not part of my daily
[15] routine.
[16]    I am a video specialist, and I was
[17] managing all of the video production work for
[18] Albert Einstein for 13 years. And suddenly you
[19] put me in the darkroom and even any person, even
[20] though he went to school and studied something,
[21] when you go to a place of work, the place of work
[22] teaches you or gives you some training to be
[23] exposed to the type of work that the institution
[24] is doing. I was never, I never got this kind of
[25] training.

Page 497

*Giladi*

[1]
[2]    Q: What is composite work, Mr. Giladi?
[3]    A: Composite work is taking too many
[4] pictures and combining them together and making
[5] some difference, negative, and this is combined,
[6] putting them together.
[7]    Q: Have you ever done it prior to August
[8] of 1994?
[9]    A: No.
[10]    Q: Didn't you work in the darkroom prior
[11] to August of 1994?
[12]    A: I said before, I worked here and
[13] there, when the department needed help.
[14]    I said I worked there too before I
[15] went on medical leave, and I worked ten years or
[16] 13 years before that. For the period of the 13
[17] years I did not even touch darkroom work.
[18]    Q: In connection with the March 1996
[19] arbitration, did you take the position that AICOM
[20] failed to accommodate your disabilities in
[21] violation of the Collective Bargaining Agreement?
[22]    A: I did not.
[23]    Q: Are you aware of whether your union
[24] took that position?
[25]    A: I don't know.

Page 498

*Giladi*

[1]
[2]    Q: During that arbitration did you take
[3] the position that AICOM had failed to accommodate
[4] you by failing to modify your duties in the AV
[5] Department, Graphics Arts Department?
[6]    A: Audio visual. I do not recall the
[7] full detail of what the union's position was.
[8]    I know that I spoke to Mr. Cohen
[9] before November, and that is the extent, that is
[10] what I remember.
[11]    Q: You had a meeting with Hillel Cohen
[12] prior to the arbitration?
[13]    A: Not prior to the arbitration but prior
[14] to the grievances of November 11th, 19th, 20th,
[15] something like that. I don't recall.
[16]    Q: Was anyone else present at that
[17] meeting?
[18]    A: Which one?
[19]    Q: The one that you had with Paul Cohen
[20] prior to the grievance in November of 1994?
[21]    A: No. Only he and me.
[22]    Q: How long did the meeting take?
[23]    A: Five or ten minutes.
[24]    Q: What did you discuss at that meeting.
[25]    A: I spoke with him that, he –

Page 499

*Giladi*

[1]
[2]   MR. DINHOFER: Is that privileged?
[3]   MS. SADE: No.
[4]   MR. DINHOFER: I wonder. Would that
[5] be privileged as to what –
[6]   MS. SADE: If you are going to direct
[7] him not to answer based on privilege, we can
[8] have another reason to call him back.
[9]   MR. DINHOFER: This is the person
[10] conducting his arbitration hearing, and who
[11] will be his duly appointed attorney.
[12]   MS. SADE: He had an attorney at the
[13] arbitration hearing.
[14]   MR. DINHOFER: Per se, I don't know if
[15] this is privileged.
[16]   MS. SADE: Well –
[17]   MR. DINHOFER: I will reserve the
[18] objection on the basis of privilege, but I
[19] will let him answer over the objection.
[20]   But we will save that for the time of
[21] trial in connection with this context.
[22]   MS. SADE: In connection with the
[23] conversation that you had, that he had with
[24] Paul Cohen with respect to that.
[25]   MR. DINHOFER: Yes.

Page 500

*Giladi*

[1]
[2]   Q: What did you say to Hillel Cohen?
[3]   A: I don't recall at the moment. I don't
[4] recall the conversation.
[5]   Q: Did the issue of your request for an
[6] extended leave of absence come up during that
[7] conversation?
[8]   A: I believe, it could be.
[9]   Q: Did the issue of whether AICOM could
[10] accommodate you in your photography job come up
[11] in your conversation?
[12]   A: It may have. I can't recall at the
[13] moment the full conversation.
[14]   Q: Do you remember anything about the
[15] conversation?
[16]   A: I went to his office to file the
[17] grievance, the grievance paper, and we discussed
[18] five minutes and he wrote what he had to write
[19] and put it through.
[20]   Q: Did you write the actual grievance
[21] paper out?
[22]   A: No. He wrote it.
[23]   Q: He wrote it. Were you notified of the
[24] outcome of the arbitration?
[25]   A: Yes.

Page 501

*Giladi*

[1]
[2]   Q: What was the outcome?
[3]   A: Denied to give me another year of
[4] leave. A denial to give me another year.
[5]   Q: Were you notified of the outcome in
[6] writing?
[7]   A: I believe so.
[8]   Q: Did you review the award that was
[9] rendered in connection with the arbitration?
[10]   A: I don't think so. I don't recall.
[11]   Q: Do you know who lives at 14 Glen Drive
[12] in Livingston?
[13]   A: I found out on Sunday.
[14]   Q: Who lives there?
[15]   A: I believe what my son told me on
[16] Sunday, my son and his mother.
[17]   Q: So, it is your testimony that that is
[18] where your X wife lives with your children?
[19]   A: It is what I found out on Sunday.
[20]   Q: I take it you spoke to your son on
[21] Sunday?
[22]   A: I saw him on Sunday.
[23]   Q: Where did you see him?
[24]   A: In Millburn.
[25]   Q: Where in Millburn?

Page 502

*Giladi*

[1]
[2]   MR. DINHOFER: For the record note
[3] that Sunday was Fathers' Day.
[4]   Q: I know. I was –
[5]   MS. SADE: Off the record.
[6]   (Discussion off the record.)
[7]   A: I picked him up from his grandparent's
[8] house.
[9]   Q: Now, you previously testified that
[10] documentation from Dr. Herness, Dr. Goldstein and
[11] Dr. Cohen was submitted to Workers' Comp on your
[12] behalf; is that correct?
[13]   A: I believe so.
[14]   Q: All right. Did any other doctors
[15] submit any other reports or documentation to the
[16] Workers' Comp board on your behalf?
[17]   A: Dr. Paul P-E-S-C-U.
[18]   Q: Pescu.
[19]   MR. DINHOFER: Aside from the
[20] examining doctors on behalf of Workers'
[21] Comp.
[22]   MS. SADE: He is here to testify about
[23] that.
[24]   MR. DINHOFER: Those kind of treating
[25] doctors.

*Giladi*

[1]
[2]  **Q:** Let me get through my questions.
[3]  As far as you know, did any
[4]  other doctors submit medical reports or
[5]  documentation to Workers Comp in connection with
[6]  your condition, and that would include
[7]  independent medical examiners?
[8]  **A:** I was seen by the insurance doctors.
[9]  **Q:** Do you recall the names of any of the
[10]  doctors that you saw?
[11]  **A:** Not presently.
[12]  **Q:** Were you seen by a doctor named Dr.
[13]  J.A. Rosenblum?
[14]  **A:** I believe so.
[15]  **Q:** Jay is the name. Were you seen by a
[16]  doctor named Fulco?
[17]  **A:** I believe so.
[18]  **Q:** F-U-L-C-O. How many times were you
[19]  seen by Dr. Fulco?
[20]  **A:** I don't know.
[21]  **Q:** Were you seen by a doctor named Norman
[22]  Petigrow?
[23]  **A:** I believe so.
[24]  **Q:** How many times were you seen by Dr.
[25]  Petigrow?

*Giladi*

[1]
[2]  **A:** I don't recall.
[3]  **Q:** Were you seen by a K-U-L-I-C-K, Roy
[4]  Kulick?
[5]  **A:** I think so, yes.
[6]  **Q:** Do you recall when you were seen by
[7]  Dr. Kulick?
[8]  **A:** Not really.
[9]  **Q:** Were you seen by a doctor named Arthur
[10]  E. Helft –
[11]  **A:** I believe so.
[12]  **Q:** In connection with what injury?
[13]  **A:** I don't know. He is the insurance –
[14]  I think, all of these names you
[15]  mentioned now, this is doctors that I was
[16]  referred to by the insurance.
[17]  **Q:** By what insurance?
[18]  **MR. DINHOFER:** The State Insurance
[19]  Fund.
[20]  **A:** By the State Insurance Fund, and I
[21]  assume it was with regard to my case with them.
[22]  **Q:** You testified, when we last spoke,
[23]  that Dr. Herness –
[24]      Strike that.
[25]  You testified that, you gave your

*Giladi*

[1]
[2]  attorney a medical certificate from Dr. Herness?
[3]  **A:** That is correct.
[4]  **Q:** I will hand you what's going to be
[5]  marked as Exhibit 13.
[6]      (Defendant's Exhibit 13, medical
[7]  certification dated April 10, 1994, marked
[8]  for identification as of this date.)
[9]  **Q:** Were you examined at any point by
[10]  any –
[11]      (Recess.)
[12]  **Q:** Were you examined at any point by any
[13]  Workers Comp doctors other than the IMEs that you
[14]  identified earlier?
[15]  **A:** I believe so.
[16]  **Q:** Do you remember their names?
[17]  **A:** No.
[18]  **Q:** Were you examined by someone named
[19]  Benisse Lester?
[20]  **A:** I believe so.
[21]  **Q:** In connection with what injury?
[22]  **A:** I believe that this was with my hands,
[23]  related to my hands.
[24]  **Q:** Do you remember when you were examined
[25]  by him –

*Giladi*

[1]
[2]  **A:** No.
[3]  **Q:** – or her? B-E-N-I-S-S-E.
[4]  Do you recall when you were last
[5]  examined?
[6]  **A:** I said, no.
[7]  **Q:** Just to clarify, you previously
[8]  testified that Dr. Goldstein submitted C-4s,
[9]  documentation on your behalf to the Workers' Comp
[10]  board', is that correct?
[11]  **A:** I believe so.
[12]  **Q:** Was that in connection with just your
[13]  hand and elbow problems?
[14]  **A:** Dr. Goldstein?
[15]  **Q:** Yes.
[16]  **A:** I don't know exactly what is in the
[17]  reports.
[18]  **Q:** What was he treating you for?
[19]  **A:** I think both.
[20]  **Q:** Both what?
[21]  **A:** Back and the hands.
[22]  **Q:** Was Dr. Goldstein treating you for
[23]  your back at the same time that Dr. Cohen was
[24]  treating you for your back?
[25]  **A:** I did not see Dr. Goldstein for a long

---

**Page 507**

[1]                         *Giladi*
[2] period of time. When I was seeing Dr. – when I
[3] was seeing – I don't know.
[4]    **Q:** Did you start seeing Dr. Goldstein for
[5] your back after October of 1996, when Dr. Cohen
[6] stopped treating your back?
[7]    **A:** No. I believe I started with
[8] Dr. Goldstein before Dr. Cohen. I started with
[9] Dr. Goldstein in August of 1993, and then I was
[10] seen by Dr. Cohen and I went, after that I went
[11] back to Dr. Goldstein after, I was –
[12]    I was seeing Dr. Goldstein.
[13]    – to Dr. Goldstein after I stopped
[14] being seen by Dr. Cohen.
[15]    **Q:** Who was treating you for your wrists
[16] and elbows during October of 1993 to October of
[17] 1996 when you were being treated by Dr. Cohen for
[18] your back? Did you understand the question?
[19]    **A:** No.
[20]    **Q:** Let me rephrase the question.
[21] Withdrawn.
[22] Who was treating you for your wrist
[23] and hands and elbow condition during the period
[24] October of 1993 to October of 1996?
[25]    **A:** October of 1993 to October of 1996?

---

**Page 508**

[1]                         *Giladi*
[2]    **Q:** Yes.
[3]    **A:** I think for a period of time I
[4] was being seen by Dr. Harness in Israel and
[5] Dr. Russo, more specifically, Dr. Russo, really.
[6]    **Q:** Were you being treated by any doctors
[7] in America in connection with your wrists and
[8] elbow and hand problems?
[9]    **A:** I really don't recall.
[10]    **Q:** Excuse me.
[11]    **A:** I don't recall.
[12]    **Q:** Do you recall being treated by someone
[13] named Dr. James T. Goodrich?
[14]    **A:** This was until I think November of
[15] 1993.
[16]    **Q:** How many visits did you make to
[17] Dr. Goodrich?
[18]    **A:** I don't recall.
[19]    **Q:** Was he treating you for your wrist,
[20] hand and elbow condition?
[21]    **A:** He was treating me for my elbow
[22] condition, if I am not mistaken.
[23]    **Q:** Other than Dr. Goodrich, who else was
[24] treating you in America for your carpal tunnel
[25] and ulnar nerve condition?

---

**Page 509**

[1]                         *Giladi*
[2]    **A:** I don't believe anybody else besides
[3] him.
[4]    **Q:** When you went to the employee health
[5] services during the period that you worked for
[6] AICOM –
[7]    **MR. DINHOFER:** What period?
[8]    **Q:** Any of the periods.
[9]    **MR. DINHOFER:** From start to finish.
[10]    **Q:** When you worked for AICOM, was it
[11] their practice to give you documentation of the
[12] visit?
[13]    **A:** Not always.
[14]    **Q:** Did they ever give you documentation
[15] of the visit?
[16]    **A:** For the last, as I recall for the last
[17] few visits I got some documentation for the
[18] visit.
[19]    **Q:** Do you know who Dr. Ralph Bernstein
[20] is?
[21]    **A:** Who?
[22]    **Q:** Dr. Ralph Bernstein.
[23]    **A:** No.
[24]    **Q:** Have you ever heard the name Ralph
[25] Bernstein?

---

**Page 510**

[1]                         *Giladi*
[2]    **A:** Give me an address.
[3]    **Q:** I can't give you any other information
[4] but the name.
[5]    **A:** The name is not familiar to me.
[6]    **Q:** All right. I will hand you what has
[7] been marked as Defendant's Exhibit 13, and I
[8] don't have copies. I will give you a copy and
[9] you are welcome to look at the original.
[10]    **MR. DINHOFER:** I believe this is
[11] something that I have seen before.
[12]    **Q:** Can you tell me whether that is the
[13] document that you obtained from Dr. Herness and
[14] provided to your attorney in the Workers' Comp
[15] action?
[16]    **MR. DINHOFER:** By the attorney you
[17] mean the Brecker firm, but not me.
[18]    **MS. SADE:** That's why I said in the
[19] Workers' Comp.
[20]    **A:** I believe so.
[21]    **Q:** As far as you know is that the
[22] document that the Workers' Comp judge had in
[23] front of her in connection with your Workers'
[24] Comp period?
[25]    **A:** I believe so, but I did not see it.

---

*Giladi*

[2] But, I believe so.

[3] **Q:** When was the last time that you went

[4] to a Workers' Comp board for a hearing?

[5] **A:** When you went there.

[6] **Q:** Was that the last one?

[7] **A:** Yes.

[8] **Q:** When is the next one?

[9] **A:** I don't know.

[10] **Q:** Have you received any notice with

[11] respect to that?

[12] **A:** No.

[13] **Q:** Has an award been made with respect to

[14] your back, has a permanent award been made in

[15] connection with your back claim?

[16] **A:** I don't know. No.

[17] **MS. SADE:** Off the record.

[18] (Discussion off the record.)

[19] **Q:** Back on the record.

[20] You testified in the last two

[21] depositions that you have not done any work since

[22] August of 1994; is that correct?

[23] **A:** That is correct.

[24] **Q:** All right. I just want to clarify

[25] when I say work, I mean any type of work. Do you

*Giladi*

[2] understand that?

[3] **A:** I did not work for anybody.

[4] **Q:** You have not been paid for any

[5] services that you provided to anyone?

[6] **A:** No.

[7] **Q:** How long can you work on your lap top

[8] now without, before you start feeling pain?

[9] **A:** I don't know.

[10] **Q:** Can you do it for ten minutes?

[11] **A:** I said I don't know. I work,

[12] sometimes I have pain and I continue so I don't

[13] know.

[14] **Q:** You testified that you attended Ramapo

[15] part-time on record, what exactly does that mean?

[16] **A:** My records show that I am a part-time

[17] student.

[18] **Q:** Did you in fact attend part-time?

[19] **A:** Yes.

[20] **Q:** You also testified that you tried

[21] taking notes at Ramapo, but ended up depending on

[22] a tape recorder?

[23] **A:** Yes.

[24] **Q:** Why was that?

[25] **A:** Because the professor talked too fast

*Giladi*

[2] and I could not write fast with respect to my

[3] hand.

[4] **Q:** How long were the classes that you

[5] attended at Ramapo?

[6] **A:** 25 minutes; 90 minutes.

[7] **Q:** They ranged from 45 to 90 minutes; is

[8] that your testimony?

[9] **A:** Yes.

[10] **Q:** How many people attended the classes?

[11] **A:** It depends on what course you took.

[12] **Q:** Were they examiners or lecture

[13] classes?

[14] **A:** Lecture. A lot of them were lectures.

[15] **Q:** Where were the lectures held?

[16] **A:** In a classroom.

[17] **Q:** A classroom or an auditorium?

[18] **A:** A classroom.

[19] **Q:** Were you able to sit through a 45

[20] minute class while you attended Ramapo?

[21] **A:** It depends on the day, it depends on

[22] the chair, it depends on a lot of reasons.

[23] **Q:** Typically, were you able to?

[24] **A:** Sometimes I did and sometimes I did

[25] not.

*Giladi*

[2] **Q:** Was it possible for you to stand up

[3] and walk around during classes?

[4] **A:** I could do whatever I felt. I could

[5] do it if I felt.

[6] **Q:** So, did the physical limitations that

[7] are associated with your back impede your ability

[8] to sit through the classes at all?

[9] **A:** I don't understand the question.

[10] **Q:** Did you have any problems sitting

[11] through the classes because of your back problem?

[12] **A:** For a long period of time if, and if

[13] the chair is not comfortable, yes. If I had a

[14] comfortable chair I could sit longer.

[15] **Q:** What about with respect to the 90

[16] minute classes, were you able to sit through

[17] those classes?

[18] **A:** We have breaks in the middle, so.

[19] **Q:** So because of the breaks you were able

[20] to sit through them?

[21] **A:** As I said, this is talking about two

[22] years period, but I can't recall exactly what I

[23] did.

[24] **Q:** I am just asking you generally.

[25] **A:** Sometimes I was able and sometimes I

*Giladi*

[1]
[2] was not.

[3]    Q: Is the same true of the classes that

[4] you took at Bergen Community College?

[5]    A: Correct.

[6]    Q: Even in the fall of 1994, immediately

[7] after you attempted to return to work, were you

[8] still able to sit through classes at that point?

[9]    A: I don't recall what I did then.

[10]    Q: You testified that while you were

[11] employed by AICOM you were asked to design closed

[12] circuit television systems?

[13]    A: Correct.

[14]    Q: Who asked you to do that?

[15]    A: Dr. Levine.

[16]    Q: Was that more than once?

[17]    A: More than once.

[18]    Q: During the 1980s or '90s?

[19]    A: In response to your question, when I

[20] arrived at Einstein it was not, there was no real

[21] department. I designed the full video

[22] department, section of the department.

[23]    Q: I think the testimony that you gave

[24] was actually you helped design closed circuit

[25] television systems, and I am asking about

*Giladi*

[1]
[2] something separate now.

[3]    A: This is part of building a closed

[4] circuit TV in the institution to the studio which

[5] I designed also.

[6]    Q: I don't think I understand what you

[7] mean by a closed circuit TV in the institution to

[8] the studio, can you please explain that?

[9]    A: We had all of the equipment in the

[10] studio and I designed the system that it will be

[11] a possibility when I am, to record on one

[12] location and you can view in a different

[13] location.

[14]    Q: Okay.

[15]    A: It is closed circuit TV.

[16]    Q: Where did you install the closed

[17] circuit TV outside of the studio?

[18]    A: We had a few outputs through the

[19] institution.

[20]    Q: Were they still in existence when you

[21] were terminated in August of 1994?

[22]    A: Yes. I think it was used only a few

[23] weeks ago.

[24]    Q: You testified that while you were

[25] attending Bergen Community College, you car

*Giladi*

[1]
[2] pooled with other students; during what years did

[3] you car pool?

[4]    A: I believe 1984 and partial of 1985.

[5]    Q: How often did you car pool?

[6]    A: I don't recall.

[7]    THE WITNESS: 1994.

[8]    MR. DINHOFER: 1994 and not 1984.

[9]    Q: Was it more than once a week?

[10]    A: I think I was going to school only

[11] once or twice a week.

[12]    Q: Did you car pool only once or twice a

[13] week?

[14]    A: I don't recall.

[15]    Q: How many people were in the car pool?

[16]    A: Another person.

[17]    Q: Two of you?

[18]    A: Yes.

[19]    Q: What was the name of the other

[20] individual in the car pool?

[21]    A: Someone from the class, but I don't

[22] recall the name.

[23]    Q: Where did the individual live?

[24]    A: I don't know.

[25]    Q: Didn't you have to pick him or her up

*Giladi*

[1]
[2] and drop him or her off in connection with the

[3] car pool?

[4]    A: No. I did not have the car. I did

[5] not have a car at the time.

[6]    Q: This individual was picking you up and

[7] dropping you off?

[8]    A: Yes.

[9]    Q: It was not really a car pool, it was

[10] like a ride.

[11]    A: A ride.

[12]    MR. DINHOFER: Whatever. It is the

[13] same.

[14]    MS. SADE: Off the record.

[15]    (Discussion off the record.)

[16]    Q: You testified previously that in

[17] conversations with Dr. Goldstein you did not

[18] discuss anything with him regarding your ability

[19] to work; is that still your recollection?

[20]    A: From what period of time are you

[21] talking about?

[22]    Q: During the period that he treated your

[23] I guess any of your physical conditions after

[24] August of 1994.

[25]    A: As I said before, to the best of my

[1] Giladi

[2] recollection I saw him only in 1996, after I
[3] stopped seeing Dr. Cohen.
[4] **Q:** You said 1996.
[5] **A:** 1996. With regard to the period of me
[6] returning to work to Einstein, I was not seeing
[7] him at that time.
[8] **Q:** Since 1996 can you tell me whether you
[9] have discussed anything regarding your ability to
[10] work with Dr. Goldstein?
[11] **A:** I did not discuss it with him.
[12] **Q:** I really should ask since
[13] Dr. Goldstein started treating you, did you
[14] discuss anything relating to your ability to work
[15] with him?
[16] **A:** I don't know. I don't recall.
[17] **Q:** All right. Are you aware of
[18] Dr. Goldstein's, whether Dr. Goldstein made any
[19] C-4 submissions on your behalf to Workers' Comp?
[20] **A:** I believe so.
[21] **Q:** Do you know whether Dr. Goldstein
[22] indicated on those C-4s that you were totally
[23] disabled from work?
[24] **A:** I did not hear the full question.
[25] **Q:** Do you know whether Dr. Goldstein

[1] Giladi

[2] indicated on the C-4s that he submitted to
[3] Workers' Comp that you were totally disabled from
[4] your job?
[5] **A:** I believe so. It may on some
[6] occasion. I said may on some occasion.
[7] **Q:** You testified that prior to August
[8] 12th, 1993, this is both previously and today,
[9] you were being harassed for a long time.
[10] **A:** All right.
[11] **Q:** You identified Dr. Levine as the
[12] person who was harassing you.
[13] **A:** The primary, yes.
[14] **Q:** Who else harassed you?
[15] **A:** The one of –
[16] He was the one, but he usually, yes,
[17] he was the one that was harassing me.
[18] **Q:** When did Dr. Levine become your – he
[19] was not your supervisor was he?
[20] **A:** He was my director.
[21] **Q:** When did Dr. Levine become the
[22] director of the Audio Visual Department?
[23] **A:** I don't recall exactly the year, but
[24] some time probably in 1984.
[25] **Q:** When did Dr. Levine start harassing

[1] Giladi

[2] you subsequent to becoming the director of the
[3] department?
[4] **A:** The second part of 1980s.
[5] **Q:** The late '80s.
[6] **A:** The second part of the '80s, but I
[7] cannot give you exact dates.
[8] **Q:** How did Dr. Levine in your opinion
[9] harass you?
[10] **A:** Taking away from me all my rights,
[11] causing me to do my job with some restriction,
[12] taking all my freedom that I received up to the
[13] point when the harassment started, and writing
[14] false letters and creating some scenarios in
[15] order to get me fired, writing memos for the
[16] disciplinary memos which have no ground to it.
[17] Give me permission to do something and
[18] after I do it, he reverse the situation and tell
[19] me that I was not following his order.
[20] Asked me to use my car to pick up
[21] equipment, and I got stuck on the highway with a
[22] flat tire. I came back to the department and he
[23] was punishing me for being late, whereas I
[24] provided him with the receipt, the letter, with
[25] the receipt from the towing company for that.

[1] Giladi

[2] It was something that I was not
[3] exposed to before.
[4] Before I could go and do my work, come
[5] back and everything was appreciated and accepted
[6] and everybody understood that I am the person
[7] that does the video work. And I have to get the
[8] full freedom and access to do my job to the best
[9] of my knowledge. And this was from the beginning
[10] of my work there, and things just one day turned
[11] to the worst and began to be very unpleasant to
[12] do my job.
[13] **Q:** Why do you think that Dr. Levine was
[14] harassing you in this manner as you described it?
[15] **A:** Because one time I was working in
[16] the studio and he came behind me, and I was
[17] surprised.
[18] He came behind me and he rubbed me in
[19] my hips and I jumped, and I looked at him with a
[20] very nasty look. And I told him not to do it
[21] ever again.
[22] After that I was locking my door in
[23] the studio, and he demanded that my studio door
[24] would be open, and I said absolutely not, I am
[25] locking my door. And this started to build some

RONI GILADI
June 23, 1998

RONI GILADI     v.
ALBERT EINSTEIN COLLEGE OF MEDICINE

---

Page 523

*Giladi*

[2] problem.

[3] **Q:** Did you tell anyone at AICOM about the
[4] alleged incident with Dr. Levine coming up behind
[5] you and grabbing you?

[6] **A:** I believe that in my response to
[7] Dr. Levine's letter of March of 1990, I denied
[8] all of the allegations in a letter, and in one of
[9] the paragraphs I indicated that it is my belief
[10] that all this action of Dr. Levine is for
[11] harassing purposes because I refused to comply
[12] with his sexual approach.

[13] **Q:** Would you provide the letter to your
[14] response?

[15] Who did you provide –

[16] Your response to his March 1990 letter
[17] was to provide Ms. Zuckman with a written
[18] response?

[19] **A:** Yes.

[20] **Q:** Was it in letter form?

[21] **A:** Yes. It was a few pages.

[22] **Q:** Who was it addressed to?

[23] **A:** Ms. Zuckman.

[24] **Q:** Do you have a copy of it still?

[25] **A:** I need to look for it.

---

Page 524

*Giladi*

[2] **Q:** Do you think you have a copy of it?

[3] **A:** I said I would have to look for it.

[4] **Q:** If you identify a copy of it, would
[5] you provide it to your attorney in connection
[6] with this suit?

[7] **A:** Yes, I will.

[8] **Q:** Thank you.

[9] **MR. DINHOFER:** The reverse request
[10] should be made, is why doesn't Ms. Zuckman
[11] have it and why isn't a copy being supplied
[12] to us?

[13] **MS. SADE:** You have what's in the
[14] file.

[15] **MR. DINHOFER:** Of course.

[16] **Q:** What was the substance of this
[17] document that you provided to Ms. Zuckman in
[18] March of 1990?

[19] **A:** I indicated in the letter.

[20] I will go back a little bit. In June
[21] of 1990, I believe so, I was being asked to, as
[22] usual to prepare for the graduation.

[23] And I made arrangements to pick up
[24] the equipment and I did it on my own free time.

[25] I was not being paid for that, and

---

Page 525

*Giladi*

[2] after work I went to pick up the equipment.

[3] I brought the equipment to the
[4] institution and a few days after the graduation,
[5] a few days later I was receiving the letter,
[6] disciplinary letter, with Dr. Levine telling me
[7] that I am disobeying the ruling of the school
[8] because they never received the bill for the
[9] equipment to be picked up.

[10] And he asked me to come for, to talk,
[11] he wanted my supervisor, my union delegate to be
[12] there during this.

[13] After this meeting that I had with
[14] Dr. Levine I realized that I had to respond to
[15] Mr. Levine's letter of March of 1990. And in my
[16] letter I indicated that first I showed how all of
[17] the allegations were false and how I clearly
[18] complied with the rules and regulations of the
[19] college and I did all my work.

[20] All of the allegations were false and
[21] had no basis.

[22] And I also indicated that basis for
[23] this disciplinary action was that, did Dr. Levine
[24] have in mind to bring somebody from outside to do
[25] the job of the graduation, the videotaping of the

---

Page 526

*Giladi*

[2] graduation.

[3] And the only way he could have people
[4] come to the department is view the work that I
[5] did to get some ideas, is only by kicking me out
[6] from the department for a week.

[7] What he did, he just built a false
[8] scenario and he told me that I am suspended for a
[9] week, and in the same week he brought people to
[10] the department to review the tape.

[11] Accidently, I found out and I filed an
[12] arbitration, grievance in this regard which my
[13] attorney told me that this grievance is not in
[14] the file, in his file, when I spoke with him
[15] about this. Which I don't understand why it is
[16] not in the file. This is what exactly –

[17] Now the letter is not there, but this
[18] is very, and also, this is the basic –

[19] I was denying and I was showing why
[20] this disciplinary letter was even being created
[21] for.

[22] **Q:** So, you stated in the letter to
[23] Ms. Zuckman that the basis for the March 1990
[24] disciplinary letter was false, is that
[25] essentially what you said?

---

**Min-U-Script®**

Page 527

*Giladi*

[1]
[2]   A: Correct.
[3]   Q: Did you say anything about Dr. Levine
[4] making an advance to you in that letter?
[5]   A: I said it is my belief, I said in a
[6] paragraph, it is my belief that Mr. Levine's
[7] action is only for harassment, and because I
[8] refused to comply with his sexual approach.
[9]   Q: Did Ms. Zuckman ever get back to you
[10] in connection with your allegation of sexual
[11] harassment?
[12]   A: No.
[13]   Q: Did you ever discuss the fact that
[14] Dr. Levine had sexually harassed you, with your
[15] union?
[16]   A: No. I don't recall if I discussed it
[17] or not.
[18]   Q: Did you ever file a sexual harassment
[19] complaint against Mr. Levine with the office?
[20]   A: No.
[21]   Q: Why?
[22]   A: Why?
[23]   Q: Yes. Why.
[24]   A: I felt uncomfortable, and I did not
[25] want to cause turmoil, and I have two kids.

Page 528

*Giladi*

[1]
[2]   At the time I was having only one
[3] child, I believe.
[4]   I have children to take care of, I
[5] have a family to take care of and everything that
[6] it will do will cause me to quit my job.
[7]   And I tried to eliminate any contact
[8] with him by closing the door and trying to do my
[9] work. And also I did not, I don't think that,
[10] no, the reason why –
[11]   And even if I wrote the letter, nobody
[12] even said anything.
[13]   Q: Is it your belief that the basis for
[14] all of Dr. Levine's harassment of you was simply
[15] that you rejected his sexual advance?
[16]   A: How could you describe a person who
[17] is being described by everybody as a devoted
[18] employee, somebody that is acknowledged by
[19] everybody in the institution, the top employee of
[20] the department, that not only has became the
[21] worst employee with this kind of letter, that I
[22] am not responsible, not that, not that.
[23]   And I know that I am the same person,
[24] I know that I was doing my work.
[25]   I know that I was getting a lot of

Page 529

*Giladi*

[1]
[2] letters of accommodation, and from everybody in
[3] the institution.
[4]   And Dr. Levine, before this act,
[5] was complying with my requests for everything,
[6] telling me –
[7]   Suddenly he is not giving me, going
[8] for training, he is not providing me, refused to
[9] give me to go to conferences.
[10]   He refused to buy me new equipment
[11] to keep up with the new technology, he refused to
[12] fix my equipment.
[13]   He is creating fake prices when he is
[14] given a price by people, three times or five
[15] times as high as anybody in the institution will
[16] charge you, only to break the video to cause me
[17] to lose my job.
[18]   Q: Why would he do that?
[19]   A: Ask him when you talk to him.
[20]   Q: Why do you think that he was doing
[21] that?
[22]   A: Because I think the fact is, it is
[23] after the fact. It was after I rejected him.
[24]   Q: You think it was related to his sexual
[25] advance?

Page 530

*Giladi*

[1]
[2]   A: I believe so.
[3]   MS. SADE: Would you mark these as
[4] exhibits.
[5]   (Defendant's Exhibits 14 to 31,
[6] letters and memorandums, marked for
[7] identification as of this date.)
[8]   MR. DINHOFER: We are starting with
[9] Exhibit 14.
[10]   Q: We have marked as Exhibit 14 a
[11] document, Bates D00900, it is a memo dated July
[12] 6, 1989 to Roni Giladi from Mr. David Sagorski,
[13] administrator of the Audio Visual Department,
[14] subject is written warning.
[15]   We have marked as Exhibit 15, a
[16] two-page document, Bates numbered Defendant's 896
[17] and Defendant's 897, dated August 11, 1989, from
[18] Dr. Martin Levine to Roni Giladi.
[19]   And we have marked as Exhibit 16, a
[20] two-page document Bates D1366 and D11367, dated
[21] March 28, 1990 to Roni Giladi from Dr. Martin
[22] Levine. Subject violation of work rules and
[23] regulations.
[24]   We have marked as Exhibit 17, a
[25] one-page document Bates D-893 dated April 26th,

Page 531

[1]                 *Giladi*
[2] 1990 to Roni Giladi, from Dr. Martin Levine
[3] subject suspension.
[4]     We have marked as Exhibit 18, a five
[5] page document Bates D1406 through D1410, dated
[6] June 19, 1990, to Roni Giladi from Richard
[7] DeWitt, subject meeting.
[8]     We have marked as Exhibit 19, a
[9] two-page document, Bates D1191 to D1192, dated
[10] February 11, 1992, to Louise Zuckman from Richard
[11] DeWitt subject Roni Giladi.
[12]     We have marked as Exhibit 20, a
[13] two-page document Bates D890 to D891, dated May
[14] 21, 1992, to Roni Giladi from Richard DeWitt
[15] subject written warning regarding work rules and
[16] regulations.
[17]     We have marked as Defendant's Exhibit
[18] 21, all the way at the back, it appears to be a
[19] postcard to Roni Giladi from the State Insurance
[20] Fund signed by Mr. Giladi on March 22, 1996.
[21]     We have marked as Exhibit 22, a notice
[22] of retainer and appearance, to be filed with the
[23] Workers' Comp board the date is I believe
[24] 9/23/93.
[25]     We have marked as Exhibit 23, a three

Page 532

[1]                 *Giladi*
[2] page document Bates D00920, '920 and '921, and
[3] that is a cover letter dated November 10, 1981
[4] from Roni Giladi to the Personnel Department at
[5] Albert Einstein College of Medicine enclosing
[6] what appears to be a resume.
[7]     We have marked as Defendant's Exhibit
[8] 24, a one page document Bates D922, what appears
[9] to be an application for employment to Yeshiva
[10] University.
[11]     We have marked as Exhibit 25, a
[12] two-page document Bates D768 to D769, what
[13] appears to be a September 9, 1994 letter from
[14] Roni Giladi to Ms. Louise Zuckman, enclosing a
[15] handwritten note dated September 1, 1994 written
[16] by A.J. Cohen.
[17]     We are marking as Exhibit 26, a
[18] two-page document Bates D728 to D729, what
[19] appears to be a September 23rd, 1994 letter from
[20] Louise Zuckman to Mr. Roni Giladi, enclosing a
[21] handwritten note dated August 15, 1994 signed by
[22] J. Cohen MD.
[23]     We are marking as Exhibit 27, a
[24] two-page document Bates D731 and D732, what
[25] appears to be a memorandum dated December 9,

Page 533

[1]                 *Giladi*
[2] 1994, from Louise Zuckman to Hillel Cohen,
[3] regarding a second step grievance regarding the
[4] denial of leave of absence to Roni Giladi.
[5]     We are marking as Exhibit 28, a three
[6] page document Bates D155 through D157, what
[7] appears to be a December 22, 1994 letter from
[8] Roni Giladi to Louise Zuckman.
[9]     And we are marking as Exhibit 29,
[10] a one-page document with no Bates number,
[11] identified as the Employer's Report of Injury.
[12]     And marking as Exhibit 30, Plaintiff's
[13] Bates number 56, what appears to be a form. It
[14] looks like the top and bottom have been cut off.
[15] It appears to be an Employer's Report of Injury
[16] with the bottom and top cut off.
[17]     **MR. DINHOFER:** The same form, it is
[18] cut off.
[19]     **MS. SADE:** Marking as Exhibit 31, a
[20] Workers' Comp board form C3, dated 9/28/93.
[21]     And that is it.
[22]     **MS. SADE:** Off the record.
[23]     (Discussion off the record.)
[24]     **Q:** Mr. Giladi, I will hand you what has
[25] been marked as Exhibits 14 through 20.

Page 534

[1]                 *Giladi*
[2]     And actually, strike that.
[3] I will hand you what has been marked
[4] as Exhibit 14. Defendant's Exhibit 14. Can you
[5] tell me when you have had a chance to review
[6] that?
[7]     **A:** All right. Okay.
[8]     **Q:** Mr. Giladi, have you ever seen Exhibit
[9] 14 before?
[10]     **A:** I believe so.
[11]     **Q:** Who is Mr. David Sagorski?
[12]     **A:** My supervisor at the time.
[13]     **Q:** Was Dr. Levine an employee of AICOM at
[14] this point?
[15]     **A:** He was a direct supervisor, yes. He
[16] was a director for Audio Visual.
[17]     **Q:** Can you tell me after reading this
[18] document whether you believe that the contents
[19] are accurate?
[20]     **A:** No.
[21]     **Q:** What is not accurate about this
[22] document?
[23]     **A:** As I mentioned before, I was given
[24] full access to make the arrangements because,
[25] full access to make the arrangements to pick up

Page 535

*Giladi*

[2] the equipment.

[3]     This is the issue I discussed before

[4] when I said that I got stuck on my return to work

[5] with the equipment, and I provided Dr. Levine

[6] with a receipt from the company who fixed my

[7] tire, and he just disregarded and wrote this

[8] letter to me.

[9]     **Q:** Had you been told prior to July 6,

[10] 1998 –

[11]     Actually, had you been told prior to

[12] February of 1998 that if you were going to be

[13] late for any reason that you should call them and

[14] let you know?

[15]     **A:** No. First I was not being told, and

[16] second on this day I told Dr. Levine that I am

[17] going to pick up the equipment, and I will be in

[18] the department. I will be, only I can be –

[19]     We never discussed time, we never

[20] discussed anything.

[21]     And I never discussed any time when I

[22] am going to be arriving. So all this letter is,

[23] is false.

[24]     **Q:** Didn't you have a start time and an

[25] end time for your business day?

Page 536

*Giladi*

[2]     **A:** Not until my harassment by him

[3] started.

[4]     **Q:** Didn't a position description that

[5] described your job initially say that you had a

[6] 9 to 5 job?

[7]     **A:** No. If you look at all of the

[8] records, you will find one of the records clearly

[9] indicating that I have flexible time, flexible

[10] way to do my work.

[11]     And sometimes I can come after hours

[12] or sometimes hourly, I never had real time.

[13]     Sometimes I had to come at 10 and stay

[14] until 6 or 7. Sometimes I used to come at 7 in

[15] the evening and stay all night to do the job.

[16]     It was not 9 to 5. That I was working

[17] 9 to 5 is only because my job required it, but if

[18] I needed to work odd hours I could work odd

[19] hours.

[20]     **Q:** Who advised you that you were

[21] entitled to have flexible time and not a set work

[22] schedule?

[23]     **A:** During my interviewing in December of

[24] 1981.

[25]     **Q:** Is it set forth anywhere in your

Page 537

*Giladi*

[2] position description?

[3]     **A:** It is set forth in one of the letters

[4] that you have, one of the papers you should have

[5] someplace.

[6]     **Q:** What paper? I have lots of papers.

[7]     **A:** On my job description there is no

[8] strict hours 9 to 5.

[9]     **Q:** Are you sure?

[10]     **A:** Show me that I am wrong.

[11]     **Q:** No. That was a question, you have to

[12] answer.

[13]     **A:** This is my recollection, yes.

[14]     **Q:** Okay. Is there anything else wrong,

[15] is there anything else that is not accurate about

[16] this letter, the July 6, 1998 written warning?

[17]     **A:** Other things.

[18]     **MR. DINHOFER:** Other than the facts.

[19]     **MS. SADE:** Are you testifying here?

[20]     **MR. DINHOFER:** He testified as to the

[21] facts.

[22]     **MS. SADE:** He testified to part of

[23] these facts.

[24]     **A:** The first paragraph the last three

[25] lines was incorrect. The second paragraph –

Page 538

*Giladi*

[2]     I did not say anything –

[3] The second paragraph, the second

[4] paragraph I was not instructed to make phone

[5] calls because I was not, the time when I am going

[6] to be arriving was not, there was no prior

[7] decision when I am going to be arriving to the

[8] department.

[9]     **Q:** Other than that, is the second

[10] paragraph accurate?

[11]     **A:** The paragraph?

[12]     **Q:** Yes.

[13]     **A:** That I arrived at 12:30, I don't

[14] recall. I may have, I would have to look at my

[15] time sheets for that.

[16]     I did not have access to a telephone.

[17] Yes, I was on a highway, I was on a

[18] highway. There is no phone in the area, and when

[19] you ask why I didn't call, I said to him first, I

[20] was, I never was required to give you a call; why

[21] is now different?

[22]     And second, even if I had a right,

[23] even if you asked me to give you a call, I

[24] couldn't, because I am on a highway with no phone

[25] around; so how would you like me to give you a

Page 539

*Giladi*

[1] call?

[3] **Q:** Is there anything else not accurate [4] about this?

[5] **A:** I will look at it slowly.

[6] He is talking here that I failed to [7] call the office to inform them about a delay.

[8] It was not, it was never as I said [9] before, there was no exact time.

[10] So I don't know what delay he is [11] talking about, because they are not expecting me [12] to be there by certain times.

[13] He just docked two hours from my time [14] for, this is correct. But this money I think I [15] got back later after I was fighting to prove that [16] all these letters, this letter was wrong.

[17] And I think that I was being, all [18] these hours were being given to me, that I proved [19] that the Dr. Levine letter was incorrect and for [20] the purpose of harassment.

[21] **Q:** This is not a letter from Mr. Levine [22] is it?

[23] **A:** This is a Gurski, it is the same [24] thing. Gurski said to many people in the [25] department, to Mr. Giladi, to do what you have

Page 540

*Giladi*

[2] to do.

[3] It is unfair and it is not proper.

[4] Mr. Giladi works very hard, he is [5] trying to keep the Video Department running, and [6] it is not fair. It is not fair to do what has [7] been done to him.

[8] **Q:** Who did he make that statement to?

[9] **A:** To people in the department. I don't [10] recall at the moment.

[11] **Q:** How do you?

[12] **A:** Because other people came to me and [13] told me that.

[14] **Q:** How many people?

[15] **A:** Two people.

[16] **Q:** Male or female?

[17] **A:** Male and female.

[18] **Q:** One male and one female; do you recall [19] who the male was?

[20] **A:** No. I don't recall.

[21] **Q:** The female?

[22] **A:** I don't recall. I will think about [23] it.

[24] **Q:** Is there anything accurate –

[25] **A:** I am reading.

Page 541

*Giladi*

[2] **Q:** – on the second paragraph?

[3] **A:** The third paragraph.

[4] I am going step by step.

[5] You have to remember, this is 1989, [6] this is a long time ago.

[7] The third paragraph I was, he said [8] that you remind me again. It was the first time [9] that he was talking about this issue. To the [10] best of my recollection, I can't answer.

[11] The rest is intimidation. If I were [12] to do something again, I would be, have some [13] disciplinary action.

[14] **Q:** In intimidation or a warnings?

[15] **A:** Intimidation to intimidate me.

[16] Whether he was doing it in the context [17] of a warning or whatever, what he is trying to do [18] with this letter, he is trying tow tie my hand [19] from me not to be able to do my job the way I [20] should be able to.

[21] **Q:** In order to do your job you need to [22] arrive whenever you want and leave when you want?

[23] **A:** I need to pick up the equipment [24] necessary with the time needed and arrive when [25] the time required, sometimes it will take to go

Page 542

*Giladi*

[2] through the traffic 20 minutes or three hours, [3] sometimes you have stuff.

[4] All right. I will stop there.

[5] **Q:** I will hand you what has been marked [6] as Defendant's Exhibit 15.

[7] Can you let me know when you have had [8] a chance to read that, Mr. Giladi.

[9] **A:** All right.

[10] **MS. SADE:** Off the record.

[11] (Discussion off the record.)

[12] **Q:** Have you ever seen this document, [13] Mr. Giladi?

[14] **A:** I believe so. I am not sure.

[15] **Q:** Exhibit 15. When you received this [16] document –

[17] **A:** I believe so.

[18] **Q:** Do you recall whether you received [19] this document in 1989, August of 1989?

[20] **A:** I don't know.

[21] **Q:** Was it your practice to read documents [22] that you received from Dr. Levine back in August [23] of 1989?

[24] **A:** My practice, again we are talking [25] about almost ten years ago. I don't recall what

*Giladi*

[1]
[2] happened then.
[3]   **Q:** When you received documents, when you
[4] received a document from your –
[5]   **A:** I read it.
[6]   **Q:** All right. You don't recall whether
[7] you specifically read this one?
[8]   **A:** This is an area a little bit I
[9] remember the scenario, but I don't remember the
[10] letter.
[11]   **Q:** All right. I am handing you what has
[12] been marked as Exhibit 16. Let me know when you
[13] have finished reading that.
[14]   **A:** All right.
[15]   **MS. SADE:** Off the record.
[16]   (Discussion off the record.)
[17]   **MS. SADE:** Pursuant to the Federal
[18] Rules of Civil Procedure, you have a right
[19] within 30 days of the transcript being
[20] complete to obtain a copy of it and make any
[21] corrections that you want.
[22]   But unless you specifically make that
[23] request then under the Federal Rules it
[24] doesn't need to be signed.
[25]   **MR. DINHOFER:** Are you providing me

*Giladi*

[1]
[2] with a copy to execute?
[3]   **MS. SADE:** No. Under the Federal
[4] Rules he is entitled to get a copy to read
[5] and make changes, but we are not entitled to
[6] provide you with anything.
[7]   **MR. DINHOFER:** I understand. Then I
[8] won't be providing you with copies of our
[9] depositions.
[10]   **MS. SADE:** Along the lines of this
[11] deposition, you previously indicated that
[12] you were going to provide us with medical
[13] releases, releases to obtain records for the
[14] New Jersey Institute of Technology and
[15] Ramapo, and there is one other.
[16]   **MR. DINHOFER:** Put it in a litter to
[17] me.
[18]   **MS. SADE:** I did. You said that you
[19] would bring them.
[20]   **MR. DINHOFER:** Edison College.
[21]   **MS. SADE:** We are entitled to the
[22] documents that were submitted. You also
[23] submitted financial aid material and we
[24] don't have that.
[25]   **MR. DINHOFER:** If they have it.

*Giladi*

[1]
[2]   **MS. SADE:** I checked. They do. Can
[3] you provide me with those?
[4]   **MR. DINHOFER:** Absolutely. To
[5] reaffirm it, I think your letter only said
[6] for Ramapo.
[7]   **MS. SADE:** It identified them all. We
[8] will clarify the letter. I would like to
[9] get those letters.
[10]   **MR. DINHOFER:** Please fax me a copy of
[11] your earlier letter.
[12]   **MS. SADE:** We also find out that we
[13] need to get one for Employee Health Services
[14] for our client, we never got one to actually
[15] get his records there.
[16]   **MR. DINHOFER:** You gave me the
[17] records.
[18]   **MS. SADE:** The HS.
[19]   **MR. DINHOFER:** I assume that was the
[20] medical records that you provided to me.
[21]   **MS. SADE:** The only EHS notes that
[22] were included were those in the personnel
[23] files. They were not the records, actual
[24] records from EHS. We don't have control of
[25] them. We need a Einstein Medical release to

*Giladi*

[1]
[2] get them. They are maintained separately.
[3]   **MR. DINHOFER:** I noticed under the
[4] notice of discovery that you had given them
[5] to me. If they are not, we will take care
[6] of that problem.
[7]   **MS. SADE:** Health records are always
[8] kept separate from personnel files, and we
[9] do need an authorization, even us to get
[10] access to that.
[11]   **MR. DINHOFER:** For the record.
[12]   **MS. SADE:** For the record and
[13] otherwise we have not seen those records
[14] yet. If you could provide me with a
[15] release, I would appreciate that.
[16]   **MR. DINHOFER:** Okay.
[17]   **Q:** Are you finished looking at that yet?
[18]   **MR. DINHOFER:** We are on 16.
[19]   **Q:** Have you seen this document?
[20]   **A:** Yes.
[21]   **Q:** Have you seen this document prior to
[22] today?
[23]   **A:** Yes.
[24]   **Q:** All right. Is this the March 1990
[25] letter from Dr. Levine that you testified about

Page 547

*Giladi*

[1]
[2] previously?
[3]   A: Correct.
[4]   Q: Okay. That's it. I will hand you
[5] what has been marked as Defendant's Exhibit 17,
[6] Mr. Giladi. Can you please let me know when you
[7] have finished reviewing that.
[8]   A: Yes.
[9]   Q: Mr. Giladi, have you seen this
[10] document prior to today?
[11]   A: I believe so.
[12]   Q: Did you receive it back in April of
[13] 1990?
[14]   A: I believe so.
[15]   Q: When you received it did you read it?
[16]   A: I believe so.
[17]   Q: Did you understand it?
[18]   A: If I understood it at the time? I
[19] believe so.
[20]   Q: All right. I will hand you what has
[21] been marked as Defendant's Exhibit 18. Can you
[22] please let me know when you have finished
[23] reviewing that document. (Pause)?
[24]   Are you finished reviewing Exhibit 18?
[25]   A: Yes.

Page 548

*Giladi*

[1]
[2]   Q: Mr. Giladi, have you seen Exhibit 18
[3] prior to today?
[4]   A: We had a, we have a grievance over
[5] this letter.
[6]   Q: This was the subject of a grievance?
[7]   A: Yes.
[8]   Q: When you say grievance, are
[9] you talking about the meeting referenced in
[10] document 1406, which states, this is to inform
[11] you that upon Dr. Levy's return a meeting will be
[12] scheduled and you may want to have a delegate
[13] present?
[14]   A: Yes.
[15]   Q: You were referring to that meeting or
[16] you consider that meeting the arbitration, I mean
[17] the grievance?
[18]   A: Yes.
[19]   Q: All right. Did you look at all of the
[20] pages of Exhibit 18?
[21]   A: No.
[22]   (Pause).
[23] The document number 1409, it is the
[24] first time that I am seeing it. But the rest is
[25] something familiar to me.

Page 549

*Giladi*

[1]
[2]   Q: What do you remember about that
[3] meeting described in document 1460, in 1405?
[4]   A: Which one?
[5]   Q: The subject of this document, what do
[6] you recall about the meeting which you described
[7] as a grievance relating to the equipment rental
[8] from VRI?
[9]   A: As I said before, I was told to
[10] arrange for video equipment for the graduation
[11] and I did all of the arrangements for the
[12] equipment, and the graduation.
[13]   And after hours I went to pick up the
[14] equipment, which was being discussed with my
[15] supervisor and Dr. Levine, and this is a practice
[16] that I was doing for years.
[17]   And I was totally shocked when I
[18] received the letter, because they were trying to
[19] nail me for not being charged for the delivery.
[20]   So I understand what are the problems
[21] to start with. If you are not being charged for
[22] the delivery, so what is the problem; what is the
[23] problem there?
[24]   Q: Who was present at the meeting which
[25] took place?

Page 550

*Giladi*

[1]
[2]   A: Hillel Cohen, Dr. Levine and I believe
[3] Rick DeWitt.
[4]   Q: How long was the meeting?
[5]   A: Around 15 minutes, I believe. During
[6] this meeting Dr. Levine admitted that he had no
[7] problem with my work. And he was very happy with
[8] the quality of the work that I did, and he just
[9] apologized for the misunderstanding.
[10]   Q: You characterized this meeting as
[11] a grievance in your testimony earlier today.
[12] What's the basis for your calling it that?
[13]   A: I said a grievance, but it was a
[14] meeting that I had to have the union there, that
[15] was involved in this part of an agreement and
[16] something.
[17]   Q: You did not mean that you asked to
[18] file a second step grievance on your behalf; did
[19] you?
[20]   A: On this one? On this one, not on this
[21] one. On the other letter that he showed me
[22] before, I did.
[23]   Q: Are you referring to the March 28,
[24] 1990 letter?
[25]   MR. DINHOFER: Exhibit 16.

Page 551

*Giladi*

[2] THE WITNESS: No. I am talking about
[3] the suspension letter when I was –
[4]   **Q:** Exhibit 17?
[5]   **A:** Yes. I filed a grievance after me
[6] finding out that Dr. Levine suspended me for the
[7] purpose of having people coming to view my
[8] videotapes of the graduation videotapes.
[9]   **Q:** Was it a written grievance?
[10]   **A:** Yes. It was.
[11]   **Q:** Who did you file it with?
[12]   **A:** With the Personnel Department, Hillel
[13] Cohen filed the paper gave it to Zuckman, I
[14] believe.
[15]   **Q:** Are you aware of whether Hillel Cohen
[16] generally retains files relating to the grievance
[17] that he submits on behalf of 1199 members?
[18]   **A:** I have no knowledge about his
[19] practice.
[20]   **Q:** You have no knowledge. All right.
[21] Have you ever asked Hillel Cohen
[22] whether he has such files?
[23]   **A:** If I have no knowledge.
[24]   **Q:** Then the answer must be no, and you
[25] need to say it?

Page 552

*Giladi*

[2]   **A:** I don't recall that I asked him.
[3]   **Q:** All right. I will hand you what
[4] has been marked as Defendant's Exhibit 19,
[5] Mr. Giladi. Can you please tell me when you are
[6] finished reviewing it?
[7]   **A:** All right. Okay.
[8]   **Q:** Have you had a chance to finish
[9] reviewing that?
[10]   **A:** Yes.
[11]   **Q:** Have you ever seen this document
[12] before?
[13]   **A:** I believe so.
[14]   **Q:** When did you see it?
[15]   **A:** I believe in, I don't recall, maybe
[16] March. Not from this date.
[17]   **Q:** March of 1992?
[18]   **A:** Yes.
[19]   **Q:** How did it come about that you saw
[20] this document?
[21]   **A:** It was many years ago. I am denying
[22] all of the allegations in this letter.
[23]   **Q:** I am handing you what has been marked
[24] as Defendant's Exhibit 20; can you tell me –
[25]   I will hand you what has been marked

Page 553

*Giladi*

[2] as Defendant's Exhibit 20. Would you let me know
[3] when you have finished reviewing that document?
[4]   **A:** Yes.
[5]   **Q:** Do you recall seeing this document
[6] prior to today, Mr. Giladi?
[7]   **A:** Yes. The grievance filed on this.
[8]   **Q:** Excuse me.
[9]   **A:** And there was a grievance filed on
[10] this, with regard to this letter.
[11]   **Q:** Are you testifying that you filed a
[12] grievance after you received this letter?
[13]   **A:** That is correct.
[14]   **Q:** How did you file the grievance?
[15]   **A:** I spoke with Hillel Cohen, and we
[16] filed a grievance that this letter. This letter
[17] is for the purposes of harassment.
[18]   **Q:** Do you know whether a first step
[19] grievance took place?
[20]   **A:** I don't recall.
[21]   **Q:** Do you know whether a second step
[22] grievance took place?
[23]   **A:** The only thing I recall is that
[24] Einstein said that they would withdraw this
[25] letter from my file.

Page 554

*Giladi*

[2]   **Q:** Are you aware of who at Einstein said
[3] that they would drop this letter from your file?
[4]   **A:** Louise Zuckman.
[5]   **Q:** When did she say that?
[6]   **A:** Around this period of time.
[7]   **Q:** As a result of her representation you
[8] decided not to pursue the grievance?
[9]   **A:** I said I know that the outcome of all
[10] of this issue was that this letter was supposed
[11] to be withdrawn from my file, that is the only
[12] thing that I can recall.
[13]   **Q:** You don't know whether a hearing
[14] actually took place?
[15]   **A:** I said, I don't recall.
[16]   **Q:** I will handing you what has been
[17] marked as Defendant's Exhibit 23. Would you tell
[18] me when you have had a chance to review that. Do
[19] you recognize this document?
[20]   **A:** I signed it.
[21]   **Q:** Do you recognize the document?
[22]   **A:** Yes.
[23]   **Q:** Is this your signature?
[24]   **A:** I believe so.
[25]   **Q:** Is this the cover letter and resume

---

Page 555

*Giladi*

[1]
[2] that you first sent to Albert Einstein College of
[3] Medicine in November of 1991?
[4]    A: I did not send it. My X wife sent it.
[5]    Q: Did you sign it?
[6]    A: I only signed it.
[7]    Q: I am handing you Exhibit 24. Would
[8] you tell me after you have had a chance to review
[9] that?
[10]    MR. DINHOFER: I can't read it.
[11]    Q: To the extent that you can read it.
[12]    A: Yes. I read it as much as I could.
[13]    Q: Is this your handwriting, Mr. Giladi?
[14]    A: It used to be.
[15]    Q: Did you fill this document out,
[16] Mr. Giladi?
[17]    A: Yes. I did.
[18]    Q: That's fine. I am handing you what
[19] has been marked as Defendant's Exhibit 25. Can
[20] you please tell me when you have had a chance to
[21] review that document?
[22]    A: All right.
[23]    Q: Is that your signature?
[24]    A: Yes.
[25]    Q: Do you recognize this document?

---

Page 556

*Giladi*

[1]
[2]    A: Yes.
[3]    Q: Did you send this document to
[4] Ms. Zuckman?
[5]    A: Yes. But I never got a response.
[6]    Q: What was the purpose of you sending
[7] her this document?
[8]    A: She wrote me a letter, and I don't
[9] remember the letter. She sent me a letter and
[10] this is my response to her letter.
[11]    Q: Would you take a look at the enclosure
[12] to the letter.
[13]    A: Yes.
[14]    Q: What's the date on the enclosure?
[15]    A: September 1st.
[16]    Q: What's the date on the letter?
[17]    A: September 9th.
[18]    Q: Do you recall why you waited eight
[19] days to forward this medical documentation to
[20] Ms. Zuckman?
[21]    A: First I did not wait eight days for
[22] this medical documentation, because after seeing
[23] the doctor I walked in, I walked, I believe I
[24] walked in to the department with my supervisor.
[25]    And I believe I showed this document

---

Page 557

*Giladi*

[1]
[2] to my supervisor.
[3]    Q: Which supervisor?
[4]    A: Rick DeWitt.
[5]    Q: What did he say when you showed him
[6] the documentation?
[7]    A: I don't recall. I went from
[8] Dr. Cohen's office, and I went to him and I told
[9] him that the doctor told me to stay in bed, and
[10] he said to me, okay, go home.
[11]    And I got the letter dated September
[12] 2nd, and I am sure he spoke with, I am not sure
[13] but I assume that he spoke with Zuckman about
[14] this letter.
[15]    I assume that Rick spoke with her
[16] about the September 1st letter, and as a result
[17] she wrote the September 2nd letter.
[18]    Q: Mr. Giladi, did you give Mr. DeWitt a
[19] copy of the enclosure to this letter –
[20]    A: I believe so.
[21]    Q: – when you spoke with him?
[22]    A: I believe so. At this time I don't
[23] recall.
[24]    Q: All right. Did you receive any
[25] additional correspondence from Ms. Zuckman after

---

Page 558

*Giladi*

[1]
[2] sending her the September 9th letter?
[3]    A: I believe so. I cannot recall.
[4]    Q: I am handing you what has been marked
[5] as Exhibit 26. Can you take your time to review
[6] that and let me know when you have had a chance
[7] to look it over?
[8]    A: I read it.
[9]    Q: Do you recall receiving this document
[10] from Ms. Zuckman in 1994?
[11]    A: I believe so.
[12]    Q: What did you do in response to
[13] receiving the document?
[14]    A: I think we filed a grievance.
[15]    Q: I am handing you what has been marked
[16] as Defendant's Exhibit 27. Let me know when you
[17] have had a chance to review it.
[18]    A: All right. Yes.
[19]    Q: Have you ever seen this document
[20] before, Mr. Giladi?
[21]    A: Yes.
[22]    Q: When did you first receive this
[23] document?
[24]    A: I don't recall.
[25]    Q: Was it in –

---

*Giladi*

[1]
[2] **A:** After December 9th.
[3] **Q:** Was it December of 1994?
[4] **A:** I don't know when.
[5] **Q:** Did you read the document?
[6] **A:** Yes.
[7] **Q:** When you received it back in 1994?
[8] **A:** Yes.
[9] **Q:** Did you understand the document?
[10] **A:** Yes.
[11] **Q:** What did you do in response to
[12] receiving this document?
[13] **A:** First I think I called Ms. Zuckman
[14] with regard to the money that they owed me, the
[15] money that the college owed me, which I never
[16] received up to this moment.
[17] And second, I think I may have
[18] responded in writing, but I am not sure. And I
[19] think after this, we also had some arbitration,
[20] we filed for arbitration.
[21] **Q:** I will hand you what has been marked
[22] as Defendant's Exhibit 28. Please let me know
[23] when you have had a chance to review that.
[24] **A:** I read it.
[25] **Q:** Is that your signature, Mr. Giladi?

*Giladi*

[1]
[2] **MR. DINHOFER:** On the second page.
[3] **Q:** 1156. Page 1156.
[4] **A:** Yes.
[5] **Q:** Can you tell me whether this is
[6] the document that you wrote in response to
[7] Ms. Zuckman's memorandum to Hillel Cohen dated
[8] December 9, 1994?
[9] **A:** This is in regard to the December 9th
[10] letter, I believe so. Yes.
[11] **Q:** I will hand you what has been marked
[12] as Defendant's Exhibit 29.
[13] **A:** Yes.
[14] **Q:** Have you ever seen this document,
[15] Mr. Giladi?
[16] **A:** I filled it.
[17] **Q:** You filled it out?
[18] **A:** Yes.
[19] **Q:** That is your handwriting?
[20] **A:** Partial.
[21] **Q:** Where's your handwriting, where on
[22] this document have you written?
[23] **A:** The section that says accident.
[24] And I believe the first section the
[25] dates, employment, Social Security, name, and

*Giladi*

[1]
[2] address. Injured person and insurance carrier.
[3] **Q:** When did you fill this out?
[4] **A:** I believe the next day after the
[5] injury.
[6] **Q:** For what purpose?
[7] **A:** For what purpose? I was having pain
[8] and I had to go, I had to go to the health
[9] service.
[10] **Q:** Did the health service give you this
[11] form to fill out?
[12] **A:** I am not sure at this –
[13] The health service or my supervisor.
[14] **Q:** Who did you give the form to when you
[15] were finished completing it?
[16] **A:** To the receptionist at the health
[17] service.
[18] **Q:** Did you see it again at any point
[19] after giving it to her?
[20] **A:** I don't recall.
[21] **Q:** I will hand you what has been marked
[22] as Defendant's Exhibit 30.
[23] Would you hold on to the other
[24] exhibit.
[25] Can you tell me what Defendant's

*Giladi*

[1]
[2] Exhibit 30 is, Mr. Giladi?
[3] **A:** It is the same exhibit like 29, but a
[4] little bit enlarged.
[5] **Q:** All right.
[6] **MS. SADE:** I guess this should be
[7] really directed to Mr. Dinhofer.
[8] Do you have a non-enlarged version of
[9] Plaintiff 056?
[10] **MR. DINHOFER:** I did not enlarge it.
[11] I produced what I had. This came from the
[12] Comp file or something, I don't know, I
[13] don't know what section of the documents I
[14] provided you with.
[15] **MS. SADE:** It is different from this
[16] document.
[17] **MR. DINHOFER:** I did not enlarge
[18] anything that I gave you.
[19] **MS. SADE:** Your copy is cut off, too.
[20] **MR. DINHOFER:** Yes.
[21] **MS. SADE:** It is different from this.
[22] It looks like an earlier version.
[23] I notice that line 17 is not the same
[24] nor is 15. It is a version that predates
[25] the final one that was submitted to Workers'

---

Page 563

*Giladi*

[1]
[2] Comp, and it is different. Look up here, it
[3] has a squiggly on it.
[4]     MR. DINHOFER: The employers report?
[5] It doesn't have the dates.
[6]     MS. SADE: We ended up with this.
[7]     MR. DINHOFER: Maybe it is the State
[8] Insurance Fund or the Workers' Comp. I gave
[9] you what I had. I don't blow things up.
[10]     Q: I will hand you what has been marked
[11] as Defendant's Exhibit 30. I will hand you
[12] Exhibit 31.
[13]     A: All right.
[14]     Q: Have you ever been seen this document
[15] before, Mr. Giladi?
[16]     A: I saw the document, but I did not
[17] write it.
[18]     Q: Down in the signature line, which has
[19] been obscured, courtesy of the State Insurance
[20] Fund, there is a little teeny piece of a
[21] signature.
[22]     A: I can't read it.
[23]     Q: I will have to get another copy from
[24] Workers' Comp then. Do you have any idea who
[25] filled out Exhibit 31?

---

Page 564

*Giladi*

[1]
[2]     A: One of the attorneys at Workers' Comp.
[3]     Q: Did you provide that attorney with
[4] information with which to fill out Exhibit 31?
[5] She asked me, she or he asked me the
[6] condition, about my condition.
[7]     Q: Did you tell your Workers' Comp
[8] attorney that the nature of your illness/injury
[9] related to both arms and hands, carpal tunnel
[10] syndrome?
[11]     A: Carpal tunnel syndrome, I told her
[12] related to my job.
[13]     Q: That was not the question.
[14] I am reading what's on the form.
[15] Did you tell her that you, the nature
[16] of your injury/illness was both arms and hands
[17] carpal tunnel syndrome?
[18]     A: I don't remember the full content of
[19] the conversation, it was in 1993. And I know
[20] that we sat and talked about many things and she
[21] came with these forms.
[22]     Q: Did you read the forms?
[23]     A: I don't think I read them.
[24]     Q: Is it your understanding that she
[25] filled the forms out based on the information

---

Page 565

*Giladi*

[1]
[2] that you gave her?
[3]     A: I believe so.
[4]     Q: Do you typically read forms before you
[5] sign them?
[6]     A: It depends on who gives it to me.
[7]     Q: You understand for example, did you
[8] understand when you signed it that this form was
[9] going to be submitted to the Workers' Comp board?
[10]     A: I don't know if I signed it, because I
[11] can't see the signature.
[12]     Q: I wasn't assuming that you signed it.
[13]     A: You said when you signed this form.
[14]     Q: I apologize.
[15] When you signed forms that your
[16] Workers' Comp attorney gave you, did you
[17] understand that those forms were going to be
[18] submitted to the Workers' Comp board?
[19]     A: I assume that whatever I am giving
[20] them will go to some place else.
[21]     Q: Do you recall telling your Workers'
[22] Comp attorney that you had to stop work because
[23] of your hand and arm carpal tunnel syndrome on
[24] August 9, 1993?
[25]     A: I don't recall the entire conversation

---

Page 566

*Giladi*

[1]
[2] of what I said.
[3]     Q: Does this look like the form that she
[4] provided to you after you had that conversation?
[5]     A: I don't recall.
[6]     Q: I will hand you what has been marked
[7] as Defendant's Exhibit 21. Have you ever seen
[8] this exhibit before? Have you ever seen this
[9] document before? Have you seen this document
[10] before?
[11]     A: I said I wrote it.
[12]     Q: The answer is, yes?
[13]     A: I said, yes.
[14]     Q: Is that your signature?
[15]     A: I believe so.
[16]     Q: How frequently did you receive
[17] documents like this from the State Insurance
[18] Fund?
[19]     A: I don't recall.
[20]     Q: More than once?
[21]     A: It can be.
[22]     Q: Do you recall filling out more than
[23] one of these documents?
[24]     A: It is a possibility, but I can't
[25] testify to that.

---

Page 567

**Giladi**

[1]
[2]  Q: According to this form, did you
[3] identify Dr. Joel S. Cohen as your doctor as of
[4] March 22, 1996?
[5]  A: I believe that I was, I put him as my
[6] doctor, yes.
[7]  Q: Why didn't you identify any other
[8] doctors in connection with this form?
[9]  A: Why?
[10]  Q: Aha.
[11]  A: I don't know what I was thinking at
[12] the moment when I filed this paper.
[13]  Q: Were you under treatment with any
[14] other doctors in March of 1996?
[15]  A: I don't recall.
[16]  Q: You don't recall whether you were
[17] being treated in March of 1996 by any other
[18] doctors?
[19]  A: I said it is a possibility. I don't
[20] recall.
[21]  Q: Who was treating you for carpal tunnel
[22] syndrome in March of 1996?
[23]  A: I don't have a specific doctor that
[24] was dealing with my carpal tunnel syndrome as I
[25] said before.

Page 568

**Giladi**

[1]
[2]  Q: Were you being treated for your carpal
[3] tunnel syndrome in March of 1996?
[4]  A: I don't recall.
[5]  Q: I will hand you what has been marked
[6] as Defendant's Exhibit 22. Would you tell me
[7] when you have had a chance to look at that
[8] document, Mr. Giladi.
[9]  A: Yes. I have looked.
[10]  Q: You have looked.
[11]  A: Yes.
[12]  Q: Can you tell me what this is?
[13]  A: It is another form that my lawyer
[14] asked me to sign.
[15]  Q: Have you ever seen it before?
[16]  A: If I signed it, I saw it.
[17]  Q: Is that your signature?
[18]  A: Yes.
[19]  Q: Do you know who filled out the date on
[20] this document, 9/28/93?
[21]  A: It is the same attorney that I talked
[22] about.
[23]  Q: The female attorney that works for the
[24] Workers' Comp firm that you hired?
[25]  A: Excuse me. I did not hear.

Page 569

**Giladi**

[1]
[2]  Q: The same attorney that works for the
[3] Workers' Comp firm that you hired?
[4]  A: Yes.
[5]  Q: Is she the same attorney who you
[6] provided information to to fill out this form,
[7] which is Exhibit 31?
[8]  A: I said, I just said it could be a he
[9] or she, but I believe it is a she. I did not
[10] guarantee that it was a she.
[11]  Q: But it was your Workers' Comp attorney
[12] that filled out both Forms 22 and 31, Exhibits 22
[13] and 31?
[14]  A: Yes.
[15]  Q: We will go back to one exhibit and
[16] then we are done.
[17]  I am going to give you what has been
[18] marked as Defendant's Exhibit 28. Have you had a
[19] chance to review this document?
[20]  You had a chance to review this
[21] document earlier; is that correct?
[22]  A: I read it.
[23]  Q: The last line of the first page reads:
[24] It should also be noted that the August 5th
[25] letter and your proposed agreement relative to

Page 570

**Giladi**

[1]
[2] this matter doesn't contain this statement on a
[3] regular basis.
[4]  What did you mean by your proposed
[5] agreement?
[6]  A: As I testified to that, they provided
[7] me with this – some letter on August 12th, which
[8] they asked me to sign it.
[9]  Q: What letter did they provide you on
[10] August 12th?
[11]  A: I said something, but I don't recall
[12] exactly what it is. I don't have it in front of
[13] me. I did not, I did not –
[14]  I did not see it for a long period of
[15] time, so I couldn't go into it at the moment.
[16]  Q: Who provided you with the letter that
[17] they wanted you to sign?
[18]  A: Ms. Zuckman.
[19]  Q: Do you remember what was in the
[20] letter?
[21]  A: A lot of things in the letter, I can't
[22] remember at the moment.
[23]  Q: Does that mean that you saw
[24] Ms. Zuckman on August 12th of 1994?
[25]  A: She was running away from me.

Page 571

*Giladi*

[2] She refused to have any contact with
[3] me on the phone, or in any ways. And she did
[4] everything through my supervisor.
[5]     This is why they kept me there until
[6] five o'clock, and one day they kept me there
[7] until five. I was never paid for this time even
[8] though Victor.
[9]     Victor Davidovic clearly indicated
[10] that they are going to pay me for this hours even
[11] though, and I considered returning to work as of
[12] August 12th, and I was not being paid for these
[13] hours.
[14]     The only thing I recall from this is
[15] only that I had a piece of paper and I don't know
[16] the content of it at the moment.
[17]     Q: Just to clarify the pieces of paper
[18] that you were given by your supervisor that came
[19] from Ms. Zuckman, is what you are talking about
[20] when you say your proposed agreement in Exhibit
[21] 28?
[22]     A: Yes.
[23]     Q: Do you remember anything about it?
[24] What did it have to do with?
[25]     A: I remember that, saying that they are

Page 572

*Giladi*

[2] going to give me until Wednesday to provide them
[3] with the connotation, medical documentation.
[4]     That they are going to provide me with
[5] the letter to my physician, which would indicate
[6] exactly what their request from him, what they
[7] will request from him. I think also, I don't
[8] recall –
[9]     When I arrived on August 15th things
[10] were totally different.
[11]     Q: Okay. With respect to that agreement
[12] did you retain a copy of it, this proposed
[13] agreement; was it in writing?
[14]     A: It was in writing, yes.
[15]     Q: Did you retain a copy of it?
[16]     A: In 1994, I assume I had something in
[17] my hand but as I said, I don't recall.
[18]     Q: So they gave you a copy of it or they
[19] showed it to you; do you know which?
[20]     A: I assumed that they showed it to me or
[21] gave it to me to sign it. I never signed it,
[22] that's what I know.
[23]     Q: Did you discuss the agreement with
[24] anyone from your union or anyone else?
[25]     A: No, because the college never complied

Page 573

*Giladi*

[2] with the letter.
[3]     Q: Complied with what letter?
[4]     A: They told me until August 17, August
[5] 17, which was Wednesday, that they are giving me
[6] the time to go to see the doctor. When I arrived
[7] on Monday morning, August 15th, they told me that
[8] I have to see the doctor today.
[9]     And we are not giving you any extra
[10] time. And I said, I assumed that I came through
[11] there to pick up a letter. They said we are not
[12] giving you anything, we will not give a letter.
[13] You have to see the doctor today. What happened
[14] to the 17th?
[15]     Q: I thought you said that they did not
[16] sign –
[17]     A: This is the part of the letter, all
[18] this is part of it. This is one or two pages.
[19]     Q: And in the one or two-page document
[20] AICOM was representing to you that you had until
[21] the 17th to get medical documentation?
[22]     A: That is correct.
[23]     Q: But did you sign that letter?
[24]     A: No.
[25]     Q: So, what's the basis for your saying

Page 574

*Giladi*

[2] that you expected until the 17th?
[3]     A: They told me that the next, on Monday
[4] when I come back, to think about it and on Monday
[5] when I come back, that I will sit with the union
[6] and everybody, because the union has to sign,
[7] too.
[8]     Q: Okay.
[9]     A: And they changed the full story.
[10]     Q: By Monday there was no longer a
[11] proposed agreement, they said just go get medical
[12] documentation; is that what your testimony is?
[13]     A: That is correct.
[14]     Q: On page 1156 for a second, the
[15] first sentence of the second paragraph reads,
[16] furthermore in reviewing my notes relating to the
[17] August 12th, 1994 conference regarding my request
[18] for accommodation in my workplace for work within
[19] my physical limitations –
[20]     And the sentence goes on.
[21]     Mr. Giladi, what notes do you have
[22] relating to the August 12th, 1994 conference?
[23]     A: What I have?
[24]     Q: What notes.
[25]     A: The only notes I have is the

*Giladi*

[1] videotape.

[3]    **Q:** Why did you write notes in here
[4] instead of something else?

[5]    **A:** Because after listening to the tape
[6] I wrote this statement, I wrote one of the
[7] statements as I indicated here and for me these
[8] are notes, from the notes.

[9]    **Q:** Do you still have those notes?

[10]    **A:** I don't think so. I had the tape.

[11]    **Q:** The original of the tape has this
[12] statement, this statement identified on page 1156
[13] on it?

[14]    **A:** From the beginning of today, meaning
[15] Friday August 12th, 1994, and it doesn't make any
[16] difference, even if she, meaning Ms. Zuckman says
[17] he can work from Monday.

[18]    **Q:** Your testimony is, that is on the
[19] tape?

[20]    **A:** Yes. That he said clearly that
[21] Mr. Davidovic stated in the course of the
[22] conference that what she said exactly that the
[23] college will pay, that the college will pay,
[24] would pay me from the beginning of today, meaning
[25] Friday August 12th, 1994, and it doesn't make a

*Giladi*

[2] difference what Ms. Zuckman said.
[3]    And yes, you can hear this on the
[4] tape. Again, I never got paid for these days.

[5]    **Q:** Mr. Giladi, is there anything that
[6] you would like to clarify with respect to your
[7] testimony that you have given in the last three
[8] days of testifying?

[9]    **A:** To clarify –

[10]    **Q:** This is your opportunity to do so.

[11]    **MR. DINHOFER:** Wait a minute.
[12]    Let me clarify that for my client.
[13] That is not entirely true.
[14] You are entitled to get a copy of the
[15] transcript, which I have made a request for,
[16] okay. You will have an opportunity to
[17] review it and make clarifications based on
[18] your review of the transcript.

[19]    Not having had an opportunity, not
[20] having the, not having had the opportunity
[21] to review the transcripts of the proceedings
[22] but based on your present recollection of
[23] what you have testified to over the last
[24] three sessions spread out over the last
[25] three weeks, is there anything that you

*Giladi*

[2] would like to clarify?

[3]    **THE WITNESS:** At the present time I
[4] would like to review the record first before
[5] I mention anything.

[6]    **MS. SADE:** Pursuant to the Federal
[7] Rules, Rule 30, your attorney will explain
[8] this to you. You will have to identify the
[9] basis for making any changes.

[10]    Is that it for the day?

[11]    **MR. DINHOFER:** That is it for the day.

[12]    **MS. SADE:** Thank you. I have no
[13] further questions at this time.

[14]    (Time noted: 2:50 p.m.)

[17]    **RONI GILADI**

[19]    Subscribed and sworn to before me
[20] this day of 199__.

[3]  ----------------INDEX----------------
[4] **WITNESS      EXAMINATION BY      PAGE**
[5] R. GILADI      MS. SADE      418

[7]  ---------- INFORMATION REQUESTS ------------
[8] DIRECTIONS:
[9] RULINGS:
[10] TO BE FURNISHED:
[11] REQUESTS: 524, 544

[13]  ---------------- EXHIBITS -----------------
[14] DEFENDANT'S                FOR ID.
[15] Defendant's Exhibit 11, EEOC documents,
[16] Bates D-00864 to 867.......................... 419
[17] Defendant's Exhibit 12, complaint............ 442
[18] Defendant's Exhibit 13, medical
[19] certification dated April 10, 1994........... 505
[20] Defendant's Exhibits 14 to 31, letters and
[21] memorandums.................................. 530

Page 579

[1]
[2]
[3]              CERTIFICATE
[4]
[5]      STATE OF NEW YORK            )
[6]                                   ) ss.
[7]      COUNTY OF NEW YORK           )
[8]
[9]         I, ROBERT X. SHAW, CSR, a Notary
[10] Public within and for the State of New York,
[11]         do hereby certify:
[12]         That RONI GILADI, the witness
[13]   whose deposition is hereinbefore set forth,
[14]         was duly sworn by me and that such
[15] deposition is a true record of the testimony
[16]         given by such witness.
[17]         I further certify that I am not
[18]   related to any of the parties to this action
[19]    by blood or marriage; and that I am in no
[20]   way interested in the outcome of this
[21]         matter.
[22]         IN WITNESS WHEREOF, I have hereunto
[23]   set my hand this 7th day of June, 1998.
[24]
[25]         ROBERT X. SHAW, CSR